## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHUN-KO CHANG, individually and on behalf of all others similarly situated,

        Plaintiff,

        v.

SHEN YUN PERFORMING ARTS, INC., FEI TIAN COLLEGE, FEI TIAN ACADEMY OF THE ARTS, DRAGON SPRINGS BUDDHIST INC., INTERNATIONAL BANK OF CHICAGO, SHUJIA GONG a/k/a TIANLIANG ZHANG, HONGZHI LI, and RUI LI,

        Defendants.

Case No. 24-8980 (PMH) (JCM)

FIRST AMENDED
CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 7

PARTIES ................................................................................................................. 8

    Plaintiff ........................................................................................................... 8

    Shen Yun Defendants .................................................................................... 8

    International Bank of Chicago ..................................................................... 10

FACTUAL ALLEGATIONS ................................................................................. 10

    Shen Yun Background ................................................................................. 10

    Shen Yun's Core Motive is Commercial .................................................... 14

    The Shen Yun Defendants' Use of Forced Labor....................................... 17

        The Shen Yun Defendants' System of Coercion and Control ................... 23

        The International Bank of Chicago Facilitated and Benefitted from the Shen Yun Defendants' Venture ......................................................................................... 37

        Defendants Violated New York Labor Law and Failed to Pay Performers Minimum Wage and Overtime Payments.................................................................... 50

        Plaintiff Chang's Forced Labor as a Dancer for Shen Yun ....................... 52

        The Shen Yun Defendants' Retaliation Against Plaintiff.......................... 59

DANCER CLASS ALLEGATIONS....................................................................... 61

PERFORMER CLASS ALLEGATIONS ............................................................... 63

COUNT ONE.......................................................................................................... 65

COUNT TWO......................................................................................................... 67

COUNT THREE ..................................................................................................... 69

COUNT FOUR ....................................................................................................... 69

COUNT FIVE ......................................................................................................... 70

COUNT SIX ........................................................................................................... 71

COUNT SEVEN ................................................................................................................. 72

COUNT EIGHT ................................................................................................................. 73

COUNT NINE ................................................................................................................... 73

COUNT TEN ..................................................................................................................... 74

COUNT ELEVEN ............................................................................................................. 74

PRAYER FOR RELIEF .................................................................................................... 75

DEMAND FOR A JURY TRIAL ..................................................................................... 76

Chun-ko Chang ("Plaintiff"), on behalf of herself and all others similarly situated, based on Plaintiff's knowledge as to herself and her own acts, and upon information and belief as to all other matters, seeks damages and injunctive relief against Shen Yun Performing Arts, Inc. ("Shen Yun"), Fei Tian College, Fei Tian Academy of the Arts, Dragon Springs Buddhist Inc. ("Dragon Springs"), Hongzhi Li, Rui Li, Shujia Gong a/k/a Tianliang Zhang ("Zhang") (the "Shen Yun Defendants"), and the International Bank of Chicago (together with the Shen Yun Defendants, "Defendants"), as follows:

## INTRODUCTION

1.      Shen Yun touts itself as a nonprofit dance company devoted to highlighting traditional Chinese culture and morality and to exposing the cruelty of the Chinese Communist Party ("CCP"). But the truth is Shen Yun is part of an enterprise that has generated hundreds of millions of dollars via forced child labor of vulnerable minors, for the financial benefit of Hongzhi Li, his wife Rui Li, and the rest of the Defendants.

2.      Hongzhi Li works with and through the other Shen Yun Defendants to target children as young as twelve years old, whom they recruit to work as dancers for Shen Yun and to live at the Dragon Springs compound in New York (the "Dancers"). Many Dancers are recruited from abroad, and all Dancers are children of adherents of a movement called Falun Gong, which has been banned by the Chinese Communist Party (CCP) and whose members have been targeted for persecution by the CCP.

3.      Hongzhi Li founded and leads Falun Gong. Falun Gong is a practice that combines teachings for self-improvement and meditation exercises. Hongzhi Li is the source of these teachings. Shen Yun's child workers call him Master Li, and Rui Li is called the "Master's Wife."

Hongzhi Li has repeatedly asserted—both publicly and to adherents—that Falun Gong is not a religion.

4.      The families who send their children to live at Dragon Springs are led to believe that Hongzhi Li will protect their children and provide them with an education and opportunities for advancement. However, once uprooted from their families, the Shen Yun Defendants instead subject Dancers to a system of coercion and control that extends to nearly every aspect of the Dancers' lives, cuts them off from much of the outside world, threatens them with grave harm if they do not comply with the harsh conditions or try to leave, and forces the Dancers to labor long hours for the Shen Yun Defendants' monetary gain.

5.      A tragic irony is that, while Falun Gong practitioners have been systematically persecuted by the CCP for a quarter century, the Lis themselves have adopted some of the CCP's most abusive practices, including subjecting offenders to large-scale, public humiliation reminiscent of the Cultural Revolution's mass criticism sessions, which were used to break the spirit of those the CCP viewed as enemies. The Lis use this tactic on Shen Yun Dancers, starting from when they are vulnerable minors, to ensure the Dancers' compliance in a forced labor scheme that lines the Lis' pockets.

6.      Hongzhi Li has established himself as the ultimate authority within the Shen Yun and Dragon Springs community. Hongzhi Li and the other Shen Yun Defendants teach the child Dancers that defying Hongzhi Li's authority will result in a loss of his protection, ostracization from the community, destruction of their reputation, and expose them to physical and moral peril. Ensconced in the world of Shen Yun at an impressionable age, Dancers reasonably believe that they cannot refuse Hongzhi Li's directives that they dance for Shen Yun without facing grave harm.

7.     From the start of their time at the Dragon Springs compound, the Dancers'
schedules are tightly controlled by the Shen Yun Defendants. The Dancers are allegedly recruited
to attend the Fei Tian Academy of the Arts or Fei Tian College (the "Fei Tan Schools"), but in
reality, the Fei Tian Schools operate as a cover for the forced labor scheme. Fei Tian Academy
houses students in grades six through twelve, after which students typically matriculate into the
Fei Tan College. However, any purported education provided by the Fei Tan Schools is
perfunctory at best, and grossly deficient at worst, with little to no academic requirements for
advancement; instead, Dancers are required to spend long hours training and practicing for Shen
Yun performances.

8.     While ostensibly at Dragon Springs as students, Dancers are quickly directed
toward fulfilling the Defendants' goal of perpetuating their forced labor scheme: performing
uncompensated or undercompensated labor as Dancers in Shen Yun performances. Within mere
months of their arrival at the Fei Tan Schools, Dancers are incorporated into the Shen Yun tours.
They tour from December through May and travel across the country and abroad to perform for
large audiences. Dancers typically have no days off, and they regularly work over 16-hour days.
On tour, Dancers' schedules regularly involve engaging in pre-show rehearsal, setting up the show,
performing in at least one or more shows a day, breaking down and packing up the set, and
traveling to the next location.

9.     Dancers are not properly compensated for these long hours in a lawful manner. In
their first year on tour, Dancers are not paid at all. Starting in their second year on tour, Dancers
are paid only five hundred dollars ($500.00) a month. Even after they graduate from Fei Tan
College and are considered "professional" dancers, Defendants only pay Dancers one thousand
dollars ($1,000) a month. All performers for Shen Yun—including dancers, musicians, emcees,

and set designers ("Performers")—are largely paid according to the same inadequate schedule. These amounts do not vary based on the number of hours Performers worked, they fall well below the minimum wage guidelines, and they never include overtime pay (notwithstanding the work regularly extending to more than 40 hours per week and often more than 80 hours per week). These blatant violations of New York State law are currently being investigated by the New York Department of Labor.

10.    The Shen Yun Defendants profit handsomely from this arrangement. With their scheme ensuring a ready supply of forced child labor, the Shen Yun Defendants keep overhead low, sidestep requirements to pay Performers minimum wages, overtime, payroll taxes, or benefits, and thereby maximize their revenues from their coercive exploitation of children. Indeed, Shen Yun has pocketed hundreds of millions of dollars as revenue from its performances and, among its other assets, reportedly holds over $249 million in cash. The mastermind of the forced labor scheme, Hongzhi Li, and his wife, Rui Li, effectively control Shen Yun's considerable assets, and are rumored to personally benefit from that control by living a life of privilege via arrangements that obscure their beneficial ownership, all the while espousing to Dancers the importance of sacrificing their material desires and well-being in order to make Shen Yun possible.

11.    Dancers labor for little to no compensation because they reasonably believe that disobeying Hongzhi Li's directives to perform for Shen Yun will result in grave harm to themselves and their families. The Shen Yun Defendants have established protocols and practices whereby these directives govern nearly every aspect of Dancers' lives and foreclose any opportunities for outside influence or support, consequently making a challenge to the authority of Shen Yun seem insurmountable.

12.     The Shen Yun Defendants aggressively police the Dancers' physical movement and intellectual freedom in order to prevent the Dancers from leaving. For example, Dancers are not permitted to leave the Dragon Springs compound without the Shen Yun Defendants' permission. The enforcement of this rule begins when the Shen Yun Defendants confiscate Dancers' passports and immigration documentation after arriving, and it continues when armed guards stationed at the gates keep Dancers inside the compound. The Shen Yun Defendants further isolate Dancers from persons outside the forced labor scheme by restricting their access to the internet and smart phones, limiting communication with the Dancers' own families, and forbidding contact with any individuals that reject the authority of Hongzhi Li. Dancers are also prohibited from consuming unapproved media, while most of the approved media made available to them is produced by affiliates of Hongzhi Li.

13.     Even the Dancers' bodies and personal lives are subject to control by the Shen Yun Defendants. The Shen Yun Defendants dictate the Dancers' eating habits and weight, regularly deprive Dancers of necessary medical care, and instruct them that injury or illness is a result of imperfect adherence to Hongzhi Li's teachings. The Shen Yun Defendants also control Dancers' family and romantic relationships by requiring that Rui Li not only approve any romantic or marital relationships, but that she also sanction whether a married couple may become pregnant.

14.     The Shen Yun Defendants regularly demonstrate to Dancers the perils of disobeying any of these rules. Dancers who are perceived to fall short of Hongzhi Li's directives and expectations are subjected to mass criticism sessions wherein they are berated on stage in front of the entire community, publicly humiliated, and made to apologize for their alleged shortcomings. Violations that lead to mass criticism can include acts as miniscule as looking at comic books.

Dancers accordingly fear stepping out of line with respect to any of the numerous rules that govern life under the auspices of Shen Yun.

15.     Still, the Shen Yun Defendants save the harshest treatment for those who have left the community. Individuals that leave Shen Yun are ostracized by the broader community, the community members are instructed to publicly shame them, and their reputation is destroyed. What is more, the Shen Yun Defendants tell Dancers that grave harm has befallen these individuals because of their rejection of Hongzhi Li, including violent death, suicide, deadly illness, moral depravity, or becoming a tool of the CCP.

16.     Dancers are also warned that they will face monetary harm if they leave Shen Yun. Although all Dancers who enroll at the Fei Tan Academy and Fei Tain College are given "scholarships" and room and board, the Shen Yun Defendants do not issue the scholarships as an act of generosity. Rather, the scholarships serve as another means for trapping Dancers in the forced labor system, as many former performers were advised that quitting Shen Yun would contractually require them repay the cost of tuition (an amount up to $50,000 per year).

17.     The Shen Yun Defendants' practices, individually and taken together, are intended to and do in fact cause Plaintiff and Dancers to believe that they would face serious harm if they did not perform labor as Shen Yun Dancers.

18.     The International Bank of Chicago ("Bank") is the Shen Yun Defendants' financial institution. Founded by close personal friends of the Lis, the Bank serves as the bank to the Shen Yun Defendants and the Performers, turning a blind eye to the obvious coercion and control of children taking place at the Fei Tian Schools. All Defendants knew or should have known about the Shen Yun Defendants' offenses and misconduct, and the International Bank of Chicago, along

with all participants, is jointly and severally liable for the physical, emotional, psychological, and economic harm caused to Plaintiff and Dancers.

19.    Plaintiff alleges violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") against Defendants on behalf of a proposed class of individuals who were dancers for Shen Yun Defendants and lived at the compound at Dragon Springs ("Dancers"). Plaintiff also alleges violations of the New York Labor Law on behalf of a proposed class of individuals who worked for Shen Yun as non-exempt performers, including dancers, musicians, emcees, and set designers, in New York in the previous six years ("Performers").

20.    Plaintiff was forced to work as a Shen Yun dancer from age 13 until age 24. She brings this case to protect other similarly situated individuals, for damages that she and others similarly situated individuals suffered as a result of Defendants' scheme to fore them to labor under threat of serious harm and without pay, and to enjoin Defendants from continuing their unlawful practices, including the systemic practice of coercing children into forced labor for Defendants' commercial benefit.

21.    Plaintiff's investigation is ongoing. Discovery will yield more information about Defendants' violations of law.

## JURISDICTION AND VENUE

22.    Jurisdiction is proper under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely 18 U.S.C. § 1581 *et seq.*, and because 18 U.S.C. § 1595(a) provides that such actions may be brought "in an appropriate district court of the United States[.]"

23.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### Plaintiff

24.    Plaintiff Chun-ko Chang is a former dancer who worked for Shen Yun throughout the United States, including in the state of New York, and she is an adult resident of Taiwan.

### Shen Yun Defendants

25.    Defendant Shen Yun Performing Arts, Inc. ("Shen Yun") is a nonprofit organization established in New York State. Shen Yun operates as a dance and music company.

26.    Defendant Fei Tian Academy of the Arts ("Fei Tian Academy") is a nonprofit secondary school, serving grades six through twelve, based in New York State. Fei Tian Academy's headquarters are located at 140 Galley Hill Road, Cuddeback, New York, 12729.

27.    Defendant Fei Tian College ("Fei Tan College") is a nonprofit college based in New York State that offers baccalaureate and Hongzhi Li's programs in Music and Classical Chinese Dance. Fei Tian College's headquarters are located at 140 Galley Hill Road, Cuddeback, New York, 12729.

28.    Defendant Dragon Springs Buddhist, Inc. ("Dragon Springs") is a nonprofit organization established in New York State. Dragon Springs' headquarters are located at 140 Galley Hill Road, Cuddeback, New York, 12729.

29.    Defendant Hongzhi Li is the founder and leader of Falun Gong or Falun Dafa ("Falun Gong") and he founded and created Defendants Shen Yun Foundation, Shen Yun, Fei Tian College, and Fei Tian Academy of the Arts, as well as the Dragon Springs compound.

30.    Defendant Rui Li is married to Defendant Hongzhi Li and helps Defendant Hongzhi Li manage Defendants Shen Yun Foundation, Shen Yun, Fei Tian College, and Fei Tian Academy of the Arts, as well as the Dragon Springs compound.

31.     Defendant Shujia Gong a/k/a Tianliang Zhang ("Zhang") is an agent and employee of Shen Yun, Fei Tian Academy, and Feitian College. Among other things, Zhang is a pseudo-intellectual who taught history to students. Zhang is also a public relations spokesperson for the Shen Yun Defendants' efforts, including (as discussed in further detail below) their public efforts to justify the misconduct alleged herein, as well as their efforts to publicly retaliate against and intimidate those who speak out, including Plaintiff. Zhang is also the founder of a nonprofit called the Tianliang Alliance, Inc., located at 99 Galley Hill Road, Cuddebackville, New York, 12729, to which he claims to devote 40 hours per week, and which claims as its mission: "Support Art, Education and mass communication projects that can elevate society." In fiscal years 2021 and 2022, Tianliang Alliance claims to have not had any paid employees, but did have over $1 million in revenues, most (if not all) of which was from Shen Yun or Falun Gong related activities.

32.     Shen Yun, Fei Tian Academy, Fei Tian College, Dragon Springs (the "Shen Yun Entity Defendants") serve as alter egos for the individual defendants Hongzhi Li and Rui Li.

33.     None of the Shen Yun Entity Defendants adhere to corporate formalities: Hongzhi Li and Rui Li manage the day-to-day operations of each of those entities, transitioning from tasks for Shen Yun to tasks for Fei Tian Academy to tasks for Fei Tian College to tasks for Dragon Springs.

34.     The individuals who purportedly run the respective entities all report to Hongzhi Li. Li, in turn, supervises all of those individuals who follow his directives.

35.     All the Shen Yun Entity Defendants work towards the same goal: generating revenue from Shen Yun performances. Each entity plays a clear role in that goal: Fei Tian Academy lures minors to become Dancers; Fei Tian College lures those minors into staying into

their early adulthood, providing even more of their labor to performing for Shen Yun; and Dragon Springs houses all these entities, the individual Defendants, and the Performers under one roof.

## International Bank of Chicago

36.     Defendant International Bank of Chicago is a bank organized under the laws of the State of Illinois. It has its principal place of business in Chicago, Illinois. It has a branch located at 2 West Main Street, Port Jervis, New York, 12771, from which it services the Shen Yun Defendants. The Bank's president and CEO is Y. Frank Wang. The Bank is a unit of IBC Bancorp Inc.

## FACTUAL ALLEGATIONS

### Shen Yun Background

37.     Shen Yun is a massively successful dance company that stages hundreds of dance performances across the world each year. Shen Yun is registered as a non-profit, but the company rakes in hundreds of millions of dollars that inure to the benefit of the Shen Yun Defendants.

38.     Shen Yun was founded in 2006 by Hongzhi Li in the Hudson Valley region of New York. Shen Yun operates out of Dragon Springs in Cuddeback, NY, where its offices and rehearsal spaces are based.

39.     Shen Yun's stated mission is to "revive traditional Chinese culture" and achieve "a revival of the beauty and goodness of China before communism" by showcasing the beauty and technical excellence of traditional Chinese dance.[1] These performances also highlight the threats Shen Yun perceives to traditional Chinese culture: the influence of the Chinese Communist Party as well as its persecution of those who practice Falun Gong.[2]

---

[1] Shen Yun Performing Arts, *Shen Yun Factsheet*, https://pl.shenyun.org/shen-yun-factsheet (last visited Nov. 23, 2024).

[2] Shen Yun Performing Arts, *Challenges We Face*, https://www.shenyun.org/challenges-we-face (last visited Nov. 23, 2024).

40.     Shen Yun is clear that their shows are not only meant to entertain; they also serve a political agenda. It describes itself as "[a] performing arts company up against the world's biggest dictatorship."[3] Shen Yun explains that "[b]y performing 'China before communism,' as our tagline says, Shen Yun also allows people to envision a China without communism."[4]

41.     Shen Yun is organized into eight companies that are staffed by Dancers and Performers. Each company includes approximately 80 dancers, orchestra musicians, singers, emcees, and production crews.[5]

42.     Large-scale group dance is at the center of Shen Yun productions. Each company performs what Shen Yun describes as classical Chinese dances done by "elite performers." The technique is highly specialized. Shen Yun explains that "[o]nly Shen Yun performs classical Chinese dance in its purest form, preserving its traditional aesthetic the way it was originally passed down."[6]



43.     The Shen Yun choreography incorporates "leaps, flips, spins and other difficult tumbling techniques, forming an extensive and independent dance system."[7] These movements are extremely difficult.

---

[3] *Id.*

[4] *Id.*

[5] Shen Yun Performing Arts, *FAQ*, https://www.shenyun.org/faq (last visited Nov. 23, 2024).

[6] Shen Yun Performing Arts, *9 Characteristics That Make Shen Yun Unique*, https://www.shenyun.org/classical-chinese-dance-music-costumes-singers-and-more (last visited November 22, 2024).

44.     Learning and performing the most advanced technical moves used in Shen Yun choreography requires extensive, specialized training and high levels of discipline.



45.     Shen Yun targets children and young adults to perform these techniques. As Shen Yun puts it:

---

[8] Shen Yun Performing Arts, *Classical Chinese Dance*, https://www.shenyun.org/classical-chinese-dance (last visited Nov. 23, 2024).

Shen Yun's primary art form, classical Chinese dance, is a young person's game. Its standards – for form, flexibility, tumbling and flipping, and other special techniques – are more precise and difficult skill-wise than what is required in many other dance forms, and make classical Chinese dance highly akin to gymnastics or other elite sports in terms of the level of athleticism required. And much like gymnastics (where, for example, the average age of female Olympic gold medalists is 18), the golden years for classical Chinese dancers are their mid-teens into early 20s. [9]

46.    Shen Yun markets aggressively to audiences world-wide by using mailers, billboards, online ads, and commercials. Local organizations associated with Shen Yun spend tens of millions of dollars on advertising in the United States alone every year.

47.    Shen Yun's reach and popularity is enormous and has expanded in recent years. Shen Yun's companies regularly perform in approximately 200 cities across five continents. Shen Yun reported that its 2024 season was its biggest tour ever and broke records by featuring 810 performances across 209 cities in 22 countries.

48.    Shen Yun is a vast enterprise that is extremely lucrative, selling millions of tickets during its season each year. These tickets range in cost from approximately $80 to $300, with the average cost of a ticket at approximately $220.

49.    The Shen Yun companies pack this incredible volume of performances into only 4.5 to 5 months per year, typically organizing tours from Christmas to early May. Many Dancers dance in over 100 shows in a season and often perform multiple shows per day. For example, in the upcoming tour scheduled to take place in March and April 2025, one company will perform eighteen (18) shows over the course of fifteen (15) days at New York City's David H. Koch Theater at Lincoln Center.

---

[9] Shen Yun Performing Arts, *New York Times Coverage of Shen Yun Riddled with Inaccuracies and Exudes Bias*, https://www.shenyunperformingarts.org/news/view/article/e/fiplEp2lQYA/new-york-times-coverage-riddled-with-inaccuracies-bias.html (last visited Nov. 23, 2024).

50.    Shen Yun expends strikingly little on overhead to conduct its tours. Shen Yun performs by invitation only and is hosted and "presented" by local organizations who wish to bring Shen Yun to their communities. The local organizations pay to rent the performance venue, promote the show, and sell tickets. After the expenses of the local organizations are covered through ticket sales, all proceeds go to Shen Yun.

51.    As a result, the primary cost associated with putting on these productions is the labor of the Dancers and Performers. However, instead of appropriately and lawfully compensating the employees, Shen Yun has established a complex forced and child labor scheme to avoid these costs and ensure that Defendants pocket all the proceeds on the backs of the Dancers and Performers who work crushing schedules to make those performances happen.

**Shen Yun's Core Motive is Commercial**

52.    Despite its non-profit designation, Shen Yun's core motive is commercial. Shen Yun generated revenues of $51.5 million in 2023 alone, with holdings valued above $265 million dollars (most of which is in cash).

53.    Hongzhi Li and the other Shen Yun Defendants generate extraordinary profits from the Shen Yun performances. Hongzhi Li and his wife Rui Li effectively control those assets, have a bodyguard, and are rumored to live a life of privilege.

54.    The Shen Yun Defendants are highly motivated to ensure the Shen Yun performances continue to rake in millions of dollars, and they have orchestrated the forced labor scheme to ensure the steady supply of cheap or uncompensated labor that makes the performances possible.

55.    Notably, while Hongzhi Li is the founder and leader of the Falun Gong movement and Shen Yun describes its approach as guided by the principles of the Falun Gong spiritual

practice, neither Shen Yun's activity nor the acts undertaken by the Shen Yun Defendants in furtherance of the forced labor scheme are religious in character.

56.     Falun Gong describes itself as a practice grounded in self-improvement through the study of teachings, and gentle exercises and meditation.

57.     The Falun Gong movement is not a religion. Hongzhi Li himself has made this point clear, and he has directed his followers to clearly relay this message. For example, in an interview, Hongzhi Li said – in response to a question about whether Falun Gong was a religion – that "[w]e do not get involved in faiths," and that instead Falun Gong "is a practice that can remove illnesses, keep people fit and make one live longer," likening it to "a morning exercise."[10]

58.     Shen Yun likewise describes Falun Gong as "a practice that combines teachings for self-improvement and meditation exercises."[11] Shen Yun notes that the Falun Gong exercises are "part of our daily schedule, and every day has time slots allotted to group meditation and study sessions."[12] Shen Yun conceptualizes this as a philosophical or moral, but not religious practice, that helps Performers center themselves. Shen Yun explains that, "[i]n ancient China, artists would practice meditation and seek inner stillness and a connection with the universe . . . Shen Yun's artists follow this noble tradition."[13]

59.     Indeed, Falun Gong originated during China's secular "Qigong boom" of the 1980s and 1990s, a social phenomenon that saw an explosive rise in the popularity of Qigong, a tai chi-like practice that claimed to promote health and inner well-being through specific movements and breathing techniques. Falun Gong is a prominent sub movement of Qigong first taught publicly in

---

[10] *See* "The Way We Live Now: 8-8-99: Questions for Li Hongzhi; Eye of the Storm," *The New York Times Magazine* (Aug. 8, 1999).

[11] Shen Yun Performing Arts, *FAQ*, https://www.shenyun.org/faq (last visited Nov. 23, 2024).

[12] Shen Yun Performing Arts, *Life at Shen Yun*, https://www.shenyun.org/life-at-shen-yun (last visited Nov. 23, 2024).

[13] Shen Yun Performing Arts, *FAQ*, https://www.shenyun.org/faq (last visited Nov. 23, 2024).

1992 and it incorporates a moral, not a religious philosophy. These teachings "are centered on three main principles – truth, compassion, and forbearance."[14]

60.     Falun Gong has also positioned itself as a political movement in that it is staunchly anti-communist and is an outspoken critic of the Chinese Communist Party. As a result, during the rise of Falun Gong in the 1990s, the Chinese government targeted the group for persecution and banned sales of Falun Gong publications.

61.     Facing escalating anti-Falun Gong sentiment and activity by the Chinese government, Hongzhi Li fled to the United States in 1998 and settled in the state of New York. In 1999, more than ten thousand followers of Falun Gong staged a silent protest in front of the central government compound in Beijing. Many protesters were beaten and imprisoned, and the government subsequently issued an arrest warrant for Hongzhi Li.

62.     Followers of Falun Gong allege that they continue to be persecuted by the Chinese Communist Party, both in China and abroad. Shen Yun has explained that it cannot itself perform in China, as if its Dancers "went to a park in China today and started doing . . . mediation exercises, they would be arrested and possibly tortured and killed."[15] Shen Yun also reports that the CCP persecutes family members of its Performers.

63.     Shen Yun describes its performances as aligned with this political position. "Shen Yun's mission is to revive traditional Chinese culture, the same heritage of five millennia that the Chinese Communist Party (CCP) has spent a century destroying." The performances also tell of the dangers of the Chinese Communist Party and the suppression of the Falun Gong community.

---

[14] *Id.*

[15] *Id.*

64.     Shen Yun contends that, as a result, the CCP "has never stopped trying to sabotage us."[16] This has included "pressuring theaters and elected officials to try cancel our performances, threatening media partners to stop running our ads, sending spies to try to steal our technology secrets, and tampering with our tour buses."[17]

65.     The tragic irony, however, is that the Shen Yun Defendants now rely on the exploitation and abuse of the members of the same vulnerable group, their own Dancers, the children of adherents of Falun Gong, to put on these performances. Worse still, in so doing, they use many of the same tactics as the CCP to frighten and control those subject to their authority.

**The Shen Yun Defendants' Use of Forced Labor**

66.     As part of their commercial performing arts enterprise, the Shen Yun Defendants have established a sophisticated operation that is designed to identify and recruit vulnerable people to work as Dancers, ensnare them in a system that dominates every aspect of their lives, and force them to work grueling hours through multiple methods of control and coercion. The Shen Yun Defendants have created these structures and practices of coercion and control to power the enterprise that is Shen Yun and recoup significant profit off the Performers' unpaid or underpaid labor.

67.     Hongzhi Li and his wife, Rui Li, preside over Dragon Springs, a guarded compound from which Hongzhi Li directs the activities of Defendants Shen Yun, the Fei Tian Academy, and Fei Tian College.

---

[16] Shen Yun Performing Arts, *Overcoming Adversity, from Humble Beginnings to Today* (last visited March 5, 2025) https://www.shenyun.org/news/view/article/e/B9MSZ-imlNM/overcoming-adversity-from-humble-beginnings-to-today.html.

[17] *Id.*

68.    The Shen Yun Defendants are based in and operate from the Dragon Springs compound. The Dragon Springs compound includes all of Shen Yun's administrative and rehearsal facilities and two performing arts boarding schools: Defendants Fei Tian College and Fei Tian Academy for the Arts.

69.    Hongzhi Li works with and through the other Shen Yun Defendants to target children as young as twelve years old, whom they recruit to work as Dancers for Shen Yun and live at the Dragon Springs compound.

70.    The Shen Yun Defendants acknowledge that they recruit children because they view "the golden years for classical Chinese dancers [to be a Dancer's] mid-teens into early 20s." However, the Shen Yun Defendants' focus on children also has a darker purpose: children are more easily coerced. This is particularly true where, as here, children are uprooted from their home and family environments and become exclusively reliant on the Shen Yun Defendants to meet their basic needs.

71.    The Shen Yun Defendants also specifically recruit the children of Falun Gong practitioners, thereby preying on individuals particularly vulnerable to their influence. For the practitioners believe they are subject to persecution by the CCP, and they view Hongzhi Li as an ultimate authority. Many families who send their children are also based abroad and have no contacts in the United States other than the Shen Yun Defendants and little to no ability to interact with the outside world without the strict supervision of the Defendants.

72.    The Shen Yun Defendants tell the families that they will enroll the Dancers in the Fei Tan Schools. The families who send their children to live at Dragon Springs believe that Hongzhi Li will protect their children, ensure their children's and their families' well-being, and provide their children with an education and opportunities for advancement.

73.     But, once uprooted from their families, the Shen Yun Defendants subject Dancers to a system of coercion and control that extends to nearly every aspect of the Dancers' lives, and forces the Dancers to labor long, brutal hours for little to no pay.

74.     Hongzhi Li directs the activities of the Fei Tian Schools.

75.     The Dancers are allegedly recruited to attend the Fei Tian Academy of the Arts or Fei Tian College, but, in fact, these sham schools operate as a cover for the forced labor scheme. For, under the cover of their purported educational purpose, the Fei Tian schools ensure an ongoing supply of forced child labor to Shen Yun without attracting scrutiny.

76.     All Dancers since at least 2008 arrived as students at the Fei Tan Schools and were under the age of 18.

77.     Fei Tian Academy of the Arts, established in March 2007, purports to be a secondary boarding school that accepts students from grades 6 to 12. During the 2024-2025 academic year, Fei Tian Academy had approximately 169 students.

78.     Fei Tian College, established in June 2011, purports to offer baccalaureate and master' degrees. Both schools operate primarily as feeders for Shen Yun. During the 2023-2024 academic year, Fei Tian College had approximately 139 students.

79.     Any promise of traditional schooling is perfunctory, if not grossly deficient. The Fei Tian schools conduct minimal formal education and ignore academic standards. In place of an academic curriculum, students are subject to rigorous schedules where they must spend as many as sixteen (16) hours a day or more engaged in dance training and study of Falun Gong.

80.     All or nearly all students are trained by the Fei Tian schools to act as Shen Yun Performers and perform with Shen Yun during the annual performance season. Pulling from the

students of Fei Tian Academy, Dancers are recruited to dance for Shen Yun as young as 11 and range in age up to 28 years old.

81.     There are little to no academic requirements for advancement. Instead, the schools are designed and operate to ensure that students remain ensnared in the forced labor scheme as the transition from grade to grade and from secondary school to college. Indeed, Plaintiff's own ascension from secondary school at Fei Tian Academy to college at Fei Tian College was arranged almost entirely without her involvement, after Plaintiff was told that her academic work was poor but that the Shen Yun Defendants' personnel would make it appear stronger than it actually was.

82.     All Dancers at the Fei Tian schools receive a "scholarship" to attend. Shen Yun estimates that that the "full scholarship, which includes room and board, . . . amounts to about $50,000/year."[18] While masked as generosity, the scholarship program in fact has a sinister purpose. For the Shen Yun Defendants threaten Dancers that if they leave Shen Yun, they will be required to pay back the "scholarship," which can amount to hundreds of thousands of dollars. This is a daunting sum for anyone, but its coercive means is compounded by the fact that most Dancers come from modest backgrounds and are not properly compensated by Shen Yun for their work.

83.     While purportedly at Dragon Springs as students, Dancers are quickly transitioned to fulfilling the goal of the forced labor scheme: performing uncompensated or undercompensated labor as Dancers in Shen Yun performances, all in violation of the law, as alleged more specifically below.

---

[18] Shen Yun Performing Arts, *New York Times Coverage of Shen Yun Riddled with Inaccuracies and Exudes Bias*, https://www.shenyunperformingarts.org/news/view/article/e/fiplEp2lQYA/new-york-times-coverage-riddled-with-inaccuracies-bias.html (last accessed November 22, 2024).

84.     Dancers are incorporated into the Shen Yun tours within mere months of their arrival at the schools. For example, Plaintiff arrived in New York in September 2009 at age 13, and by December 2009, she was dancing at Radio City Music Hall in a Shen Yun performance.

85.     All Dancers start at Shen Yun when they are children and still students at the Fei Tan Schools.

**The Bleak Reality of Life in Shen Yun at Dragon Springs**

86.     The Dancers' days overwhelmingly revolve around preparing for and performing in Shen Yun performances.

87.     From May to December, Dancers live at Dragon Springs and prepare for the upcoming Shen Yun season. This includes participating in rehearsals six (6) days a week, from Tuesday to Sunday.

88.     The Dancers are typically required to engage in hours of unpaid rehearsals each day. The remainder of Dancers' schedules are minutely controlled by the Shen Yun Defendants, with directives regarding meditation and other tasks for the community.

89.     Dancers then are forced to perform in the Shen Yun tours from December until May or June.

90.     Dancers generally work from 9 or 10 a.m. until as late as 11:30 p.m. on days when they perform. A typical Dancer schedule will often include the following tasks:

       a.     Dancers rehearse for hours at the venue or at their hotel prior to the show.

       b.     Dancers assist in constructing or preparing the set.

       c.     Shen Yun performances last approximately 2.5 hours, including intermission. Often, Dancers have two shows a day.

       d.     Dancers then work to break down and pack up the set.

e.      Dancers often end their day by traveling to the next performance location.

91.      During the tour, the eight Shen Yun companies typically move from city to city by bus.

92.      The Shen Yun Defendants provide Dancers with no breaks on the tours; rather, the only time Dancers rest is on the bus.

93.      Dancers spend long hours on the bus. The pace of travel is relentless, as the same tour company is regularly scheduled to visit many cities in a tight time frame.

94.      To maintain this pace, the Shen Yun Defendants often will not permit the buses to stop so that Dancers can use the bathroom. What is more, the Shen Yun Defendants control of Dancers is so pervasive and extreme that, although there is a bathroom on the bus, the Shen Yun Defendants prohibit Dancers from using the bathroom. As the bus rarely stops, Dancers have urinated in bottles or defecated on themselves.

95.      Dancers do not partake in any substantive academic studies while on tour. They are given tablets during their travel time – with no curriculum, instructors, or books to guide them. For example, while on the tour bus, Plaintiff was given a tablet, and was told she could watch the sitcom series "Leave It to Beaver" to learn English.

96.      The tablets that Dancers are given while on tour do not have access to the internet, so Dancers cannot communicate with their families or otherwise access the outside world.

97.      Overall, the Dancers' schedules are overwhelmingly dictated by Defendants. This is true whether Dancers are on tour or rehearsing at Dragon Springs. The constant is the extensive work that the Shen Yun Defendants force Dancers to perform, whether on stage in front of an audience or in rehearsal at Dragon Springs.

98.    The Dancers adhere to this grueling schedule as a direct result of the Shen Yun Defendants' system of coercion and control that causes the dancers to reasonably believe that they will face serious harm if they refuse to labor.

**The Shen Yun Defendants' System of Coercion and Control**

99.    Hongzhi Li is the ultimate authority within the Shen Yun and Dragon Springs community. Hongzhi Li and the other Shen Yun Defendants teach the child Dancers that defying Hongzhi Li's authority will result in a loss of his protection, ostracization from the community, destruction of their reputation, and open them up to physical and moral peril.

100.    Hongzhi Li and his affiliates repeatedly tell Dancers from a young age that individuals who reject Hongzhi Li's authority face physical harm, in the form of disease or violent death through incidents like suicide or car accidents, as well as moral condemnation.

101.    Understanding that they perform at Hongzhi Li's direction, Dancers approach each show with unwavering gravity. Dancers push themselves to their physical and mental limits, in part, because they fear the consequences of disobedience.

102.    Some troupe managers, under the Shen Yun Defendants' directives, seize on Dancers' errors after the show ends and shame those who make mistakes in front of their peers. The mistakes are often cast as a moral failing.

103.    Moreover, Dancers fear grave harm will befall them or their families if they cease performing for Shen Yun without Hongzhi Li's permission, as this amounts to a rejection of Hongzhi Li's authority and protection.

104.    Dancers—who have been targeted and recruited in part because of their and their families' adherence to Falun Gong—reasonably believe what Hongzhi Li tells them, as well as what others say about him, because of his position and authority. Because Dancers are recruited

while they are children, they are particularly impressionable to what Defendants tell them, and carry these fears and beliefs into adulthood.

105.    Dancers reasonably fear what may come to them and their family if they disobey Hongzhi Li's commands.

106.    The Shen Yun Defendants have established many interlocking methods of control, whereby they limit Dancers' agency and ensure Dancers will follow the Shen Yun Defendants Instructions. As detailed below, these methods of control include:

a.    Restricting Dancers' physical movement, including by prohibiting them from leaving the compound without permission and confiscating their passports and immigration paperwork.

b.    Restricting Dancers' contact with the outside world, including limiting contact with Dancers' own families and restricting consumption of unapproved media that originates outside the Falun Gong movement;

c.    Exerting control over every aspect of Dancers' lives, including what they eat, how much they weigh, who they date, whether they may marry or have children, and whether they receive medical care.

d.    Requiring that any person who steps out of line with the Shen Yun Defendants' directives be subject to social ostracism and disparagement, including large-scale public humiliation sessions;

e.    Inculcating the belief that Dancers will face serious harm, including physical harm, if they do not follow and obey Hongzhi Li.

107.    These limitations operate in many, interconnecting ways to ensnare the Dancers within the Shen Yun Defendants' control and ensure their continued labor. For instance, the Shen

Yun Defendants not only physically restrain Dancers from leaving and stopping their work for Shen Yun, they also restrict Dancers' contact with outsiders that could challenge the merits of Hongzhi Li's teachings and support the Dancers in leaving Shen Yun.

108.    Further, by exerting control over Dancers' most fundamental needs, such as food, medical care, and companionship, the Shen Yun Defendants usurp Dancers' basic bodily autonomy and make it unthinkable for most Dancers to reject their authority.

109.    Finally, the Shen Yun Defendants seek to limit Dancers' contacts and community to only those within Shen Yun and Dragon Springs, and the Shen Yun Defendants leverage this isolation to make threats of public approbation and ostracism from this community an extremely compelling deterrent to rejecting the Shen Yun Defendants' authority. For, to be rejected by Shen Yun would amount to a loss of the Dancers' primary community and would leave Dancers, many of them foreign children, without any support network.

110.    The Shen Yun Defendants methods of control over Dancers include, but are not limited to, the following:

<u>Control of Physical Movement</u>

111.    When Dancers first arrive at Dragon Springs, Hongzhi Li and his agents confiscate Dancers' passports and immigration documentation, and do not return them until Dancers are terminated from Shen Yun.

112.    The Shen Yun Defendants keep Dancers' passports and immigration documents even while they are living at Dragon Springs.

113.    For example, Plaintiff was forced to hand over her passport and immigration documentation to Defendants at the age of 13. She generally did not have custody of her documents

again until she left Shen Yun at age 24, except on the rare occasion when the Shen Yun Defendants let her visit her family once per year.

114.    When Plaintiff returned from visiting her family, the Shen Yun Defendants required that she turn over her passport and immigration documents to them as soon as she arrived.

115.    While at the compound, Dancers are not permitted to leave without Hongzhi Li or Rui Li's permission.

116.    Armed guards are stationed outside Dragon Springs, and they do not allow anyone to come in or go out without Hongzhi Li or Rui Li's permission.

117.    The Shen Yun Defendants routinely deny permission to Dancers who ask to leave the compound.

118.    Any Dancer who is permitted to leave the compound is accompanied and monitored by an agent of Hongzhi Li or Rui Li. Dancers cannot leave Dragon Springs alone, even after they turn eighteen (18).

<u>Control of Communication</u>

119.    The Shen Yun Defendants teach Dancers to mistrust the outside world and limit the Dancers' contact with even their own families. This is particularly insidious because many Dancers are brought to the United States as young children who do not speak English and have no other contacts apart from Defendants.

120.    The Shen Yun Defendants tell Dancers not to reveal the realities of life at Dragon Springs and with Shen Yun to their family members. Hongzhi Li instructed Plaintiff and Dancers to only say "happy things" to their parents.

121.    Hongzhi Li also tells the Dancers that they should not communicate with their families too often and that being too attached to their parents would be detrimental.

122.    After working to alienate Dancers from their families at a young age, the Shen Yun Defendants encourage Dancers to rely on Hongzhi Li and Rui Li as parental figures.

123.    The Shen Yun Defendants also do not permit Dancers to communicate with anyone outside of the Dragon Springs complex.

124.    By instilling a fear and mistrust of the world outside the compound and the dance troupes, the Shen Yun Defendants undermine any other support system for Dancers and make it difficult for Dancers to leave Dragon Springs and Shen Yun.

Control of Access to Information

125.    The Shen Yun Defendants tightly control Dancers' access to information.

126.    The Shen Yun Defendants do not allow Dancers to have a smartphone before they reach their early 20s.

127.    The Shen Yun Defendants also restrict Dancers' internet usage. In recent years, Dancers have been allowed to browse the internet for just 15 minutes a day, only from designated computers, and only to designated websites.

128.    The Shen Yun Defendants require that Dancers sign a "contract" promising to adhere to these restrictions:

<< 約 書 >>

做為一個修煉人，助師救人，修煉好自己，在校
期間，和當神韻演員中，我一定會做到不看與學
生學習無關的電腦與玩電子遊戲！不用手機上網，
違反自動離開學校與神韻。

**Contract**

**As a cultivator, [I am to] assist the Master to save
people, cultivate myself well. While at school and
being a Shen Yun performer, I absolutely will not
view those computer [materials] what have
nothing to do with studying as a student nor play
computer games! [I will] also not use cell phones
to access the internet. [If I] violate, [I will]
automatically depart the school and Shen Yun.**

129.    The Shen Yun Defendants restrict the media that Dancers are permitted to consume. They prohibit Dancers from looking at so-called "ordinary media," the term used for unapproved news outlets. The approved outlets are overwhelmingly media that is produced by affiliates of Hongzhi Li, such *as The Epoch Times* newspaper and New Tang Dynasty TV.

130.    The Shen Yun Defendants repeatedly tell Dancers that they know what they are doing while online and that the Dancers' use of social media is monitored.

131.    Dancers are allowed to use the internet in designated computer rooms that are continuously patrolled by a monitor such that there is no privacy.

132.    The Shen Yun Defendants control the music Dancers listen to, the movies they watch, and the books they read. They prohibit Dancers from reading any unauthorized materials, including novels, comic books, and magazines. Dancers that do not follow these requirements are publicly criticized and accused of rejecting the authority of Hongzhi Li.

Control Over Access to Medical Care

133.    In yet another measure of their control, the Shen Yun Defendants direct Dancers to forego modern medical care as a sign of their commitment to Hongzhi Li's teachings. Hongzhi Li tells Dancers that true healing only occurs by following his teaching, and thus medical care is not necessary. The Shen Yun Defendants tell Dancers that seeking medical care meant that something was wrong with their moral state, for their injuries or illnesses will "self-heal" if they sent forth righteous thoughts.

134.    Accordingly, when Dancers are injured due to their grueling rehearsal and performance schedule, they are forced to work through their injuries, including instances involving broken bones, sprains, and dislocated joints. Instead of allowing Dancers to seek medical attention, Hongzhi Li urges Dancers to purge the bad karma that causes illness. This often makes the injuries worse.

135.    For example, on one occasion, a Dancer fell and injured her knee so badly that it was swollen and dark purple. Plaintiff witnessed Hongzhi Li tell that Dancer to cure herself by sitting in full lotus position, a pose that involves sitting cross-legged with ankles on top of opposite thighs, and which is very difficult on a practitioner's knees. Plaintiff heard Hongzhi Li instruct the injured Dancer to stay in full lotus for over an hour. Although the other Dancer was crying in pain, Hongzhi Li instructed the other Dancers not to help her. The injured Dancer was never taken to see a doctor.

136.    On other occasions, Dancers were injured but did not feel they could seek medical care because doing so would signal that they were unworthy and had not properly followed Hongzhi Li's teachings. Consequently, some Dancers resorted to stitching themselves up with hotel sewing kits when they cut themselves and could not access medical care.

<u>Control Over Eating Habits</u>

137.    The Shen Yun Defendants also extend their control to directing Dancers' dietary habits and scrutinizing their bodyweight. They institute strict weight limits for Dancers and use surveillance and shaming to enforce these requirements.

138.    Dancers are required to attend weigh-ins every two to three days. Their weight is recorded on a sheet posted in a classroom, with the names of those deemed to be overweight scrawled in red.

139.    Despite being forced to participate in the daily grueling physical rehearsals and performances, some Dancers eat only once a day to keep their weight down. If Dancers gain weight, their instructors berate them in front of their peers.

140.    Dancers also are encouraged to inform on one another and report whether others are eating snacks.

141.    Many Dancers develop eating disorders due to the pressure, expectations, and emotional abuse around their weight.

142.    Dancers that cannot adhere to the weight requirements are reassigned to non-performance jobs, such as working in the warehouse to design patterns for Shen Yun costumes and may even be forced to leave the compound.

143.    Sometimes, Dancers are given food that has expired, such as expired ramen noodles, biscuits, and beef jerky. Hongzhi Li's agents told Dancers that it was disrespectful to refuse anything given to them by Hongzhi Li, including the expired food, and that they had to eat it. When Dancers experienced gastrointestinal distress in connection with eating the expired food, Hongzhi Li's agents informed Dancers that it was their own fault because of their moral failings.

144.    One time, the Shen Yun Defendants gave Plaintiff expired food which resulted in her having diarrhea. They told her that Hongzhi Li gave her the expired food to eat to cleanse herself from the inside out.

145.    By ordering Dancers to ignore their bodily needs, refusing them medical care, denying them food, or forcing to them eat expired food as a display of their respect, the Shen Yun Defendants exert control over the Dancers' most fundamental needs and well-being.

146.    Further, the Shen Yun Defendants' severe food restrictions ensure that Dancers, most of them vulnerable minors, are cognitively and emotionally distracted and therefore easier to manipulate and coerce into forced labor.

<u>Control Through Public Humiliation</u>

147.    The Shen Yun Defendants also exert control and compliance over Dancers through threat of public shaming and ostracization. They have established a practice wherein any individual who rejects the authority of Hongzhi Li, or is perceived to do so, is subject to group criticism and faces grave reputational harm.

148.    Hongzhi Li and his adherents conduct mass criticism sessions where they gather everyone residing at Dragon Springs, over 100 people, and publicly criticize individuals who the Shen Yun Defendants identify as having violated their directives.

149.    During a mass criticism session, the Shen Yun Defendants make the offender go on stage and Hongzhi Li and Rui Li take turns berating them. Then lower-level management will stand up and admonish the offender, often telling them that Hongzhi Li gave them a great opportunity, and that the offenders actions betrayed Hongzhi Li. The offender is then forced to apologize in front of the whole community. Many times, individuals apologize even if they had not done the purported offense, because they do not feel they have a choice. After the offender

apologizes, the community members are sent to separate classrooms where they discuss the offenders' flaws and berate the offender in smaller groups.

150.    The Shen Yun Defendants extend the mass criticisms even to individuals who otherwise profess adherence to Hongzhi Li's teachings but are perceived to break one of the many rules imposed on Dancers. For instance, on one occasion, a 13-year-old resident of Dragon Springs was subjected to a mass criticism session for reading anime.

151.    The most virulent mass criticisms, however, are conducted regarding those who have left Shen Yun. The Shen Yun Defendants target individuals who left Shun Yun for mass criticism and often tell the Dancers that various purported harms that befell these individuals were a result of their rejection of Hongzhi Li's authority. These harms include illness, death from illness, and violent death through suicide or accidents.

152.    The Shen Yun Defendants often exaggerate or fabricate these harms or misfortunes in an effort to make Dancers fear that they, too, would be subject to such harm if they ever left Shen Yun. The Shen Yun Defendants use the mass criticism practice to reinforce messages regarding the peril of abandoning Shen Yun.

153.    For example, Hongzhi Li told Dancers that an orchestra member who left Shen Yun had died. When Plaintiff left Shen Yun, she found out from others who had left Shen Yun that the orchestra member was actually alive and well, and Hongzhi Li told the Dancers he had died so that Dancers would be scared to leave themselves.

<u>Control Over Romantic and Family Relationships</u>

154.    The Shen Yun Defendants' control extends even to Dancers' "romantic" relationships (or lack thereof).

155.    The Shen Yun Defendants generally prohibit Dancers from speaking to any members of the opposite sex, and they forbid homosexuality.

156.    Defendant Rui Li, however, regularly directs the romantic relationships of Dancers for visa purposes by arranging relationships between foreign Dancers and U.S. citizens. Rui Li's goal in this matchmaking is that, once no longer on a student visa, the foreign Dancers could marry U.S. citizens and thereby stay in the United States and continue laboring for Defendants.

157.    Even once married, however, Rui Li's permission is required for the couple to become pregnant – another measure of control to ensure that the pool of labor is plentiful. And Rui Li has withheld this permission. Pregnant dancers eventually cannot perform, which hurts the Shen Yun Defendants' bottom line.

158.    On one occasion, Rui Li set up an American female dancer with a French male dancer and they married. However, when that couple became pregnant without Rui Li's permission, they were subject to a mass criticism session.

<u>Control Over Finances</u>

159.    The Shen Yun Defendants also exercise financial control over the Dancers.

160.    Since approximately 2011, the Shen Yun Defendants have required that every new Dancer who joins Shen Yun open an account with the International Bank of Chicago. It is into this account that the Shen Yun Defendants pay their unlawfully low wages of somewhere between $0 and (at most) $12,000 per year per class member.

161.    The Shen Yun Defendants tightly restrict Dancers' control and access to those accounts.

        a.    Opening a bank account requires multiple forms of identification—a passport, ID, social security information, immigration documentation for foreign nationals like

most Dancers, etc. Yet the Shen Yun Defendants confiscate Dancers' passports and immigration documents.

b.      Minors generally cannot open bank accounts without a parent or guardian to serve as a shared account holder. Yet the Shen Yun Defendants isolate Dancers from their families (who are in far-flung places like Taiwan) and discourage and obstruct attempts at communication with them.

c.      Bank account holders generally receive bank statements, cards to access their accounts, tax forms that report interest earned on the accounts, and the like. Yet the Shen Yun Defendants do not permit Dancers' access to the internet, they prevent Dancers from leaving the Dragon Springs compound without one of the Defendants' chaperones, and Plaintiff never received any bank statements or tax forms.

162.    The Dancers thus largely depend on the Shen Yun Defendants to access their bank accounts. Indeed, Dancers are dependent on the Shen Yun Defendants to allow them to exit the compound and take them to the bank or an ATM, in order for them to access their resources.

**Dancers Reasonably Fear That They Will Face Grave Harm If They Cease to Labor**

163.    The Shen Yun Defendants explicitly and implicitly threaten the Dancers with grave harm if they were to cease dancing for Shen Yun without the Shen Yun Defendants' permission.

164.    The Shen Yun Defendants use the threat of public criticism and reputational harm to enforce their control over multiple aspects of Dancers' lives. Dancers reasonably fear being the subject of a mass criticism session, which in turn motivates them to follow the organization's rules so as not to be lambasted in public.

165.    The Shen Yun Defendants also tell Dancers that physical harm will befall any who tried to leave. The Shen Yun Defendants conduct mass criticism sessions for former Dancers and

tell the community that these people had committed suicide or died due to illness. Hongzhi Li stated that those people had died because they left Shen Yun or ceased adhering to Hongzhi Li's directives. The Shen Yun Defendants often fabricate or exaggerate the harms that purportedly befall those that leave, so as to keep Dancers afraid of rejecting Hongzhi Li's authority.

166.    This threat of physical harm is actively leveled against individuals who seek to leave. On one occasion, when Hongzhi Li discovered that Plaintiff's best friend wanted to leave Shen Yun, he tasked Plaintiff with helping to prevent that from happening, and he communicated that the best friend was likely to commit suicide otherwise.

167.    The Shen Yun Defendants often actively work to destroy the reputation of individuals that leave Shen Yun by spreading misinformation about them. For instance, after Plaintiff left Shen Yun and began speaking out about her time there, persons affiliated with the Shen Yun Defendants publicly asserted that she and her husband were doing so on behalf of the CCP.

168.    The extreme fabrications spread about defectors reinforce the Shen Yun Defendants' hold over Dancers. Dancers often suspect or fear that similar lies will be spread about them if they leave, smearing their reputation.

169.    Dancers also understand that individuals that leave Shen Yun not only face public criticism and reputational harm, but also are ostracized from those who remain. Dancers are not allowed to speak to or have any relations with individuals that leave Shen Yun. If a Performer contacts any individual who has left, the Performer is subject to a mass criticism session.

170.    As Dragon Springs and Shen Yun are most Dancers' only or primary community in the United States, leaving Shen Yun risks being shamed and ostracized from the only community they have known in their young lives.

171.    The Shen Yun Defendants also tell Dancers that they will have to repay the tuition for the scholarships they were given at the Fei Tian Schools. Shen Yun values these scholarships at $50,000 a year. Even one year of tuition at $50,000 is a daunting sum for anyone, and some students spend as many as ten years at the Fei Tian Schools, which would amount to tuition of half a million dollars.

172.    The coercive means of the scholarship repayment threat is compounded by the fact that most Dancers come from modest backgrounds. Further, because the Shen Yun Defendants do not pay Dancers a proper wage and the time commitment required of Dancers allows for no additional work, Dancers cannot independently earn enough to pay back the alleged tuition and room and board themselves.

173.    Dancers are typically only allowed to leave Shen Yun when they become too old to dance or are otherwise unable to keep dancing, at which point they are terminated.

174.    The Shen Yun Defendants typically aggressively oppose permitting any Dancers who wish to leave Shen Yun before this point.

175.    On one occasion, when a Dancer tried to leave the organization while on tour in Europe, Hongzhi Li personally flew to Europe and berated the Dancer into returning to Shen Yun.

176.    Hongzhi Li regularly tells Dancers that wish to leave that they will face grave harm if they abandon Shen Yun and his protection.

177.    Finally, while, by Hongzhi Li's own definition, Falun Gong is not a religion, Hongzhi Li teaches that practitioners who leave the fold will suffer extreme harm in different planes of existence. For example, he teaches that while non-practitioners are subject to re-incarnation, practitioners who leave the fold are not. In other words, practitioners who quit Falun

Gong will cease to exist in any dimension, a fate that is taught to be worse than death. This is another reason Dancers are afraid to leave Shen Yun.

178.    In the face of the control and coercion that the Shen Yun Defendants exert over every aspect of their lives, as well as the direct and indirect threats these Defendants make to Dancers who might leave Shen Yun, Dancers reasonably feel that they must work as Dancers for Shen Yun because to do otherwise would result in grave harm.

### The International Bank of Chicago Facilitated and Benefitted from the Shen Yun Defendants' Venture

179.    The Bank facilitated and benefited from the Shen Yun Defendants' commercial performing arts venture. The Bank ignored clear signs of forced labor in violation of its regulatory obligations in favor of associating with Shen Yun and the network of lucrative businesses associated with the Shen Yun Defendants.

180.    Shen Yun is big business. With approximately $266 million in (mostly cash) holdings, and tens of millions of dollars more generated each year, Shen Yun's profit margins are unusually high because it relies on trafficking and forced labor, including forced child labor.

181.    Shen Yun is also at the heart of a group of lucrative businesses with close ties to Hongzhi Li. The businesses include *The Epoch Times*, a media company and newspaper that generated $121 million in revenue in 2021, and Universal Communications, a global television network doing business as "New Tang Dynasty TV" that generated $48.9 million in revenue in 2022. Together, these businesses have generated hundreds of millions of dollars.

182.    Hongzhi Li has considerable influence and power over these businesses and their employees. He has referred to *The Epoch Times* and NTD as "our media." His power is so

extensive that employees fear speaking publicly about the businesses' inner workings because to do so is considered "tantamount to disobeying" Li.[19]

183.    This ecosystem of businesses—Shen Yun, *The Epoch Times*, and New Tang Dynasty TV—reinforce one another, especially financially. *The Epoch Times*, for example, has run more than 17,000 articles about Shen Yun since 2009, contributing to its ubiquitous advertising. In 2021, *The Epoch Times* made a $10.4 million grant to Shen Yun Performing Arts and a $2.5 million grant to Fei Tian College. In 2022, *The Epoch Times* made a $41.4 million grant to Universal Communications (New Tang Dynasty). Large amounts of money flows between these businesses.

184.    The same senior executives have controlled both *The Epoch Times* and Universal Communications. In 2021, for example, Zhong Tang (a/k/a "John Tang") was the CEO and Treasurer of Epoch Times Association Inc. (the organization that owns *The Epoch Times*) and also the president of Universal Communications Network Inc. (the organization operating New Tang Dynasty) Similarly, Weidong Guan (a/k/a "Bill Guan") was the CFO of both the Epoch Times Association Inc. and Universal Communications Network Inc.

185.    At the time all this money was moving between Shen Yun, *The Epoch Times*, and Universal Communications, Bill Guan (the CFO of both *The Epoch Times* and Universal Communications) was running what federal prosecutors have described as "a sprawling, transnational scheme to launder at least $67 million of illegally obtained funds" for the benefit of *The Epoch Times*.[20] Guan is currently under federal indictment in the Southern District of New

---

[19] *See* Kevin Roose, *How The Epoch Times Created a Giant Influence Machine*, THE NEW YORK TIMES (updated March 9, 2021), https://www.nytimes.com/2020/10/24/technology/epoch-times-influence-falun-gong.html ("Many employees and Falun Gong practitioners contacted by The [New York] Times said they were instructed not to divulge details of the outlet's inner workings. They said they had been told that speaking negatively about The Epoch Times would be tantamount to disobeying Mr. Li, who is known by his disciples as 'Master.'").

[20] *See* Indictment ¶ 1, *United States v. Weidong Guan* (a/k/a "Bill Guan"), Case No. 24-cr-322 (S.D.N.Y.).

York. Given the sums of money involved and transmitted, it is plausible that some of the laundered funds were transmitted to Shen Yun.

186.    In light of the lucrative nature of these businesses and the amount of cash transmitted between them, the International Bank of Chicago turned a blind eye to scores of red flags that should raise concerns for any bank in order to participate in the Shen Yun Defendants' performing arts venture. Indeed, the Bank repeatedly gave the Shen Yun Defendants special treatment in order to support the performing arts venture and ingratiate the Bank with the Shen Yun Defendants.

187.    The Bank is generally based in Chicago and is a small bank with only six branches. The Bank has opened only one bespoke branch outside of Illinois—to service the Shen Yun Defendants and their members.

188.    This branch is in Port Jervis, New York, at a location that is 8.5 miles (a 15-minute drive) from the Dragon Springs compound. The Bank's CEO, Y. Frank Wang, confirmed its motivation when the Bank opened the branch, stating that "the bank's target market includes religious refugees and Chinese performance artists in the region," the latter of which includes "members of Shen Yun Performing Arts, [the] traditional Chinese dance group based in Cuddlebackville." Maria Yu Tai, one of the Bank's founders, made the purchase offer for the property that became the Bank's Port Jervis branch.

189.    The Bank serves as a financial arm of the Shen Yun Defendants' performing arts venture. Shen Yun sets up and largely controls bank accounts for the minor Performers. Shen Yun does so in partnership with the Bank. By ensuring the Performers have Bank accounts, the Bank confers outside markers of legitimacy on the relationship between Shen Yun and the Performers, cloaking it in the trappings of standard working relationship. This imprimatur of legitimacy allows

Shen Yun to better conceal the forced labor that is at the heart of the performing arts venture. Further, by establishing the bank accounts through and with the Shen Yun Defendants, the Bank enables the Shen Yun Defendants to further control the Performers though control of and access to these accounts.

190.    The Bank demonstrated a striking level of closeness with the Shen Yun Defendants and access to the otherwise highly secretive and guarded Dragon Springs compound. In compliance with the Shen Yun Defendants' directives, the Bank—multiple times each year for more than a decade—has sent a team of its representatives into Dragon Springs to sign up the new Shen Yun recruits for accounts at the Bank.

191.    One of the Bank representatives responsible for setting up the minor accounts was Lina Wu, a customer service representative. She operated out of the Port Jervis branch. Wu frequently traveled to Dragon Springs, setting up accounts and conducting bank business for the minors inside the compound.

192.    While inside the compound, Wu also worked in the hairdressing and costume departments, performing additional work for the benefit and success of the Shen Yun Defendants' performing arts venture. This signaled the degree to which Wu and the Bank were committed to the success of the venture.

193.    As noted, the Shen Yun Defendants directed minors to set up accounts with the Bank. It was into those accounts that the Shen Yun Defendants made their meager payments to the Performers—ranging from $0 to $1,000 per month.

194.    The Bank's process for opening these accounts was as follows. A minor Performer was told by representatives of the Shen Yun Defendants that Wu or one of her colleagues was looking for them. This was a direction—the Shen Yun Defendants directed the minor to follow

Wu or the Bank colleague's instructions. The minor then met with Wu or one of the Bank's other representatives, typically in the cafeteria inside the Dragon Springs compound. The Bank then opened the account upon the minor's signing of a few forms.

195.     Minors generally cannot open bank accounts on their own. They need an adult custodian on the account. The Bank opened all the accounts with the same custodian: Siu Qing (a/k/a Judy Siu), the unpaid bookkeeper of the Shen Yun Defendants and a top aide to Hongzhi Li and Rui Li.

196.     When the minor Performers signed the forms to open their accounts, Sui was often not present. Rather, the Bank automatically named her as the joint account holder.

197.     Siu's involvement as a joint account holder was a means by which the Shen Yun Defendants exercised power and access over the Performers' Bank accounts. Siu was so intensely devoted to the Lis that she worked for nothing. She not only followed the Lis' directives unwaveringly, but the Lis also had access to her personal finances. When she developed kidney cancer, she refused to see a doctor—because Hongzhi Li espoused the view that mediation and reading his texts would keep the body healthy instead of medical care. By 2019, when her weight as a 66-year-old woman fell to seventy (70) pounds, her children finally persuaded her to seek medical care. But she could not afford it, because (as she revealed to her children) she had given all her money to the Shen Yun Defendants. Yet Siu's children also learned that someone inside Shen Yun had used Siu's credit card to go shopping at Saks Fifth Avenue, Hermes, Van Cleef & Arpels, Ferragamo, Tiffany & Company, and to buy custom billiard cues (Hongzhi Li is an "avid

pool player").[21] With Siu as the custodian on all the minors' accounts, the Shen Yun Defendants likewise could access and control the Performers' bank accounts that were also held in Sui's name.

198.    Once opened, the Bank managed the accounts in accordance with the restrictive conditions that the Shen Yun Defendants placed on the Performers. For example, the minor Performers' Bank accounts were structured with very low limits, so that they generally could not use their debit cards for more than $100 at a time—a limitation that worked to keep the minor Performers from using their meager earnings to leave Dragon Springs.

199.    What little access was provided to the accounts was done in adherence to the Shen Yun Defendants' control—sometimes, with behavior far outside normal banking practice. For example, the minor Performers were subject to the most severe restrictions on their movement during the COVID-19 pandemic. To ensure the Performers would not leave the compound during this time, the Bank's representatives brought duffle bags of cash into the Dragon Springs compound for the students to make "withdrawals" from their accounts.

200.    The Bank benefits from its participation in the Shen Yun Defendants' performing arts venture. In exchange for its provision of banking services and corresponding imprimatur of legitimacy to the Shen Yun Defendants' performing arts venture, the Bank received the following benefits:

    a.    First, it obtained an exclusive pipeline of accounts from the Performers, constituting hundreds of new bank accounts into which the Bank knew the Shen Yun Defendants would make deposits. For a bank of modest size, this is an important pipeline of new clients and deposits.

---

[21] *See* Michael Rothfield and Nicole Hong, *How Shen Yun Tapped Religious Fervor to Make $266 Million*, THE NEW YORK TIMES (Dec. 29, 2024), https://www.nytimes.com/2024/12/29/nyregion/shen-yun-money-falun-gong.html.

b. Second, it obtained a competitive edge with the lucrative network of businesses associated with the Shen Yun Defendants. Like *The Epoch Times* and Universal Communications, certain of the Bank's representatives have very close ties to Hongzhi Li and are eager to ingratiate themselves with him—because Hongzhi Li has substantial influence over a whole network of businesses, including various media outlets like *The Epoch Times* and New Tang Dynasty TV, and so the Bank's maintenance of its relationship with him ensures that the Bank can grow its business with the entire network. For example, one of the Bank's largest loans is a $22 million loan made to New Tang Dynasty TV.

c. Third, the Bank obtained banking business from the Shen Yun Defendants themselves. The International Bank of Chicago has a relatively modest amount of $1 billion in assets. The Shen Yun Defendants, by contrast, possess over a quarter of a billion dollars, mostly in cash. For a modestly sized bank, the Shen Yun Defendants are thus a major client. Obtaining— through deposits, fees, lending, or other banking business—even a fraction of the cash generated from the Shen Yun Defendants' business represents an outsized percentage of the Bank's overall holdings.

201.    The Bank knew or should have known that the Shen Yun Defendants' performing arts venture is engaged in forced labor and trafficking violations. At a minimum, the Bank facilitates the Shen Yun Defendants' venture by providing an imprimatur of legitimacy while turning a blind eye to the red flags of unlawful activity that any other legitimate bank would immediately catch.

202.    The Bank's representatives directly observed, during their visits to the compound to open new accounts, the Dancers, Performers, and their condition: how young and vulnerable they are; how their weight is controlled and restricted; how closely regulated their days are; how

many hours they work; and, importantly, how little they are paid, even though the Bank knows that the Shen Yun Defendants generate huge sums of money in revenue each year and are worth over a quarter of a billion dollars.

203.    The Bank's representatives personally observe that there are new infusions of recruits year after year, and they observe how the Performers in an orderly fashion (and under direction from the Shen Yun Defendants) sign up for new accounts at the Bank.

204.    Banks are required to assist U.S. government agencies in reporting suspicious activity that might signal unlawful activity and must design and maintain effective customer due diligence (or "know-your-client") programs to comply with those requirements.[22] In particular, substantial regulatory guidance alerts banks as to what constitutes red flags for human trafficking. All or nearly all of the identified warning signs were present in this case, including the following:

        a.    "A business customer does not exhibit normal payroll expenditures (e.g., wages, payroll taxes, social security contributions). Payroll costs can be non-existent or extremely low for the size of the customer's alleged operations, workforce and/or business line/model."[23] The Bank knew (or should have known) that the Shen Yun Defendants had hundreds of Performers

---

[22]    *See* FDIC, "Risk Management Manual of Examination Policies," Section 8.1-17, https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/risk-management-manual-complete.pdf ("An effective [customer due diligence] program protects the reputation of the institution by . . . [p]reventing unusual or suspicious transactions in a timely manner" and "[a]voiding criminal exposure from individuals who use the institution's resources and services for illicit purposes[.]"); Office of the Comptroller of the Currency, "Suspicious Activity Reports (SAR)," https://www.occ.treas.gov/topics/supervision-and-examination/bank-operations/financial-crime/suspicious-activity-reports/index-suspicious-activity-reports.html; *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2020-A008, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity," at 10 (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf ("A financial institution is required to file a SAR if it knows, suspects, or has reason to suspect a transaction conducted or attempted by, at, or through the financial institution involves funds derived from illegal activity, or attempts to disguise funds derived from illegal activity; is designed to evade regulations promulgated under the BSA; lacks a business or apparent lawful purpose; or involves the use of the financial institution to facilitate criminal activity.") (footnote omitted).

[23]    *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2014-A008, Appendix B: Human Trafficking Red Flags, at 9 (Sept. 11, 2014), https://www.fincen.gov/sites/default/files/advisory/FIN-2014-A008.pdf.

and generated tens of millions of dollars in business revenue each year, and it knew (or should have known) that none of the student Performers were paid over $1,000 per month and some were paid nothing at all.

b.      "Transactional activity (credits and/or debits) inconsistent with a customer's alleged employment, business or expected activity, or where transactions lack a business or apparent lawful purpose."[24] The Bank knew (or should have known) that certain Performers spent a decade or more at Shen Yun, that their pay was so low for such a long period of time (no more than $12,000 per year in the most generous case), that the Performers were often working six days per week and much longer than any normal business hours each day, and that the Shen Yun Defendants did not register with New York to have child performers until 2023.

c.      "Cash deposits or wire transfers are kept below $3,000 or $10,000 in apparent efforts to avoid record keeping requirements or the filing of Currency Transaction Reports (CTRs), respectively."[25] The Bank knew (or should have known) that no student Performer was paid more than $1,000 per month.

d.      "A customer establishes an account or visits a branch to conduct transactions while always escorted by a third party (e.g., under the pretext of requiring an interpreter). Correspondingly, the third party escorting the customer may always have possession of the customer's ID."[26] The Bank knew (or should have known) that the students could not travel on their own, generally could not leave the compound, had their identification documents held by the Shen Yun Defendants, and always had to be accompanied by a representative of the Shen Yun Defendants.

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

e.    "Common signer(s)/custodian(s) in apparently unrelated business and/or personal accounts. Similarly, common information (e.g., address, phone number, employment information) used to open multiple accounts in different names."[27] The Bank knew (or should have known) that hundreds of Performers opened accounts and shared the same custodian (Judy Siu), the same address (the Dragon Springs compound), and the same employment (a "student" who performed for Shen Yun).

f.    "Accounts of foreign workers or students where the employer or employment agency serves as a custodian."[28] The Bank knew (or should have known) that many of the Performers who opened bank accounts were foreign minors, many of whom could not speak English. It knew that many of them opened the accounts with the same custodian, a woman who worked for Hongzhi Li and Rui Li at Shen Yun.

g.    "A third party insists on being present for every aspect of the transaction."[29] The Bank knew (or should have known) that the students could not travel on their own, always had to be accompanied by a representative of the Shen Yun Defendants, and could only open accounts inside the Dragon Springs compound under the authority of the shared custodian, Judy Siu.

h.    "A third party maintains possession and/or control of all documents or money."[30] The Bank knew (or should have known) that the Shen Yun Defendants maintained possession of their passports and critical documents.

---

[27] *Id.*

[28] *Id.*

[29] *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2020-A008, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity," at 6 (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf.

[30] *Id.*

i.    "A third party attempts to open an account for an unqualified minor."[31] The Bank knew (or should have known) that many of the Performers were foreigners and did not speak English and that the Shen Yun Defendants required that the minor Performers open accounts with the Bank.

j.    "A customer shows signs of poor hygiene, malnourishment, fatigue, signs of physical and/or sexual abuse, physical restraint, confinement, or torture."[32] The Bank's employees and representatives observed the students at Dragon Springs and, in one case, participated in the labor to put on the show, observing that the Performers were often malnourished, injured, fatigued, and always confined to residing at the armed and guarded Dragon Springs compound.

205.    These red flags are in addition to New York legal requirements about the management of child performer accounts. In New York (as in other jurisdictions), "a child performer's employer is required to transfer fifteen percent of gross earnings to the custodian of the child performer's child performer trust account." N.Y. Est. Powers & Trusts Law § 7-7.1(2)(a). Child performer trust accounts are subject to a host of requirements for parents, guardians, and employers.[33]

206.    The Bank knew (or should have known) that the Shen Yun Defendants did not comply with any of these requirements. The custodian on the minors' accounts was a representative of the Shen Yun Defendants. She did not set up a child performer trust account, she

---

[31] *Id.*

[32] *Id.*

[33] *See* New York State Department of Labor, "Child Performer Trust Accounts," https://dol.ny.gov/child-performer-trust-accounts (imposing requirements on parents, guardians, and employers).

did not transfer fifteen percent of gross earnings to any such account, and she did not abide by any of the requirements under New York law.

207.    By August 2024, the Bank knew (or certainly should have known) that the Shen Yun Defendants' venture involved forced labor and trafficking. *The New York Times* published articles explicitly stating that "[e]ight former Shen Yun performers said they were not paid at all in their first year on tour," that "Shen Yun spends a far smaller share of its revenue on salaries than several other large nonprofit dance and theater companies based in New York," that "[s]tudents often worked six days a week and were made to feel like they should be grateful for any pay," and that by their mid-20s, "most of the former performers were being paid $12,000 a year or less[.]" The Bank's decision to continue participating in the the Shen Yun Defendants' venture shows the Bank's willfulness.

208.    Taken together, the Bank knew or should have known—from its observation of these trafficking and forced labor red flags across hundreds of Performers opening accounts at the Bank over more than ten (10) years—that the Shen Yun Defendants' venture involved trafficking and forced labor. The Bank ignored these red flags (among many) for forced labor and trafficking.

209.    The Bank's willingness to turn a blind eye to the Shen Yun Defendants' misconduct is in keeping with the Bank's propensity for reckless disregard of its obligations for suspicious activity reporting and customer due diligence. The Bank has been sanctioned for its failure to design policies that would sufficiently monitor suspicious activity or conduct regulation-compliant customer due diligence. In 2020, the Federal Deposit Insurance Corporation ("FDIC") and the State of Illinois Department of Financial and Professional Regulation found in a consent order that the Bank had engaged in "unsafe or unsound banking practices" in violation of the Bank Secrecy Act, *see* 31 U.S.C. §§ 5311–5330, and its accompanying regulations. The regulators required that

the Bank "develop, adopt, and implement a revised, effective written policy designed to ensure full compliance with" federal banking law and regulations concerning (among other things) "suspicious activity reporting, customer due diligence, and foreign correspondent accounts," "identification and proper reporting of all known or suspicious criminal activity," and "money laundering activity."

210.    The Bank's relationship with the Shen Yun Defendants is extraordinarily close and has been for many years. This relationship in part explains why the Bank is willing to look away from the Shen Yun Defendants' use of trafficking and forced labor.

211.    The Bank was founded in 1992, and the Bank's founders—Maria Yu Tai and her husband, Warren Tai—are both Falun Gong practitioners who view Hongzhi Li as having considerable authority and power.

212.    The Tais have a close, personal relationship with Hongzhi Li and Rui Li, whose daughter has used the registered address of a property owned by the Tais as her residence.

213.    The Tais continue to play a significant role inside the Bank. They serve as shareholder representatives and Warren Tai serves as an executive vice president.

214.    In addition, the head of business development at the Bank until November 2024 (the same month this lawsuit was filed) was David Cui. Cui has a close, personal relationship with Hongzhi Li and Rui Li. He had a romantic relationship with their daughter. After the relationship ended, the Lis paired Cui with one of the Shen Yun dancers, and they subsequently married.

215.    These close, personal relationships are supplemented with a variety of business-related entanglements. The Tais have given land to the Shen Yun Defendants, including land that is adjacent to what later became Dragon Springs. Maria Tai purchased a 150-acre plot of land in

Orange County. This plot of land was next to the land that became Dragon Springs, and in February 2003, Tai transferred that land to Defendant Dragon Springs Buddhist Inc.—for $0.

216.    Both of the Tais have also been involved with the media companies that are associated with the Shen Yun Defendants, including New Tang Dynasty TV and Chicago New Chinese Media, Inc. In particular, Warren Tai was the head of Chicago New Chinese Media (which produces content for New Tang Dynasty TV), and Chicago New Chinese Media was also an early promoter of Shen Yun.

217.    Notwithstanding her personal relationships with Hongzhi Li and Rui Li, Maria Yu Tai and her tax preparation and accounting firms—First Quality Financial Group, and Maria Tai & Associates—have served at various points as the "independent" auditor for Dragon Springs Buddhist Inc., providing clean audit reports for (at least) that entity's financial statements.

218.    The Bank, its founders, and its employees are thus deeply entangled both professionally and personally with the Shen Yun Defendants. This entanglement explains at least in part why the Bank participates in the Shen Yun Defendants' performing arts venture, why the Bank looks away from the various red flags for trafficking and forced labor, why the Bank benefits its participation in the venture, and why the Bank knows (or should have known) about the venture's involvement in forced labor and trafficking.

**Defendants Violated New York Labor Law and Failed to Pay Performers Minimum Wage and Overtime Payments**

219.    The Shen Yun Defendants employ non-exempt performers including dancers, musicians, emcees, and set designers to work in the Shen Yun productions.

220.    Dancers are not paid at all their first year on tour.

221.    In their second year on tour, and while on a student visa, Performers are paid five hundred dollars ($500.00) a month, despite working more than twelve (12) hours a day.

222.    Once Performers finished at Fei Tian College, they receive one thousand dollars ($1,000.00) a month in pay, despite working over twelve (12) hours a day.

223.    Performers are never paid based on the hours they worked.

224.    Performers are never paid any overtime payments for hours worked over forty in a week.

225.    Performers were never paid extra compensation for hours worked over ten in a day.

226.    By contrast, the American Ballet Theater in New York City pays its apprentices a starting pay of $986 per week, and its performers are eligible for overtime.

227.    While on tour, Performers worked every day, for over sixteen hours a day, Defendants told them that they should be grateful for any pay and would be paid in "virtue."

228.    In addition to performing, Performers (including child Performers) carried and set up heavy equipment before shows, rehearsed, and performed up to two shows per day.

229.    Performers' tour schedules were grueling: one tour showed a troupe that was scheduled to perform or travel on nine consecutive days – with no break – and including a 17-hour bus trip from Michigan to Texas.

230.    While traveling, male Performers were told to stay on the tour buses in overnight shifts, in case agents of the Chinese government tried to sabotage the vehicles.

231.    Performers never received sick pay and often worked when they were sick or physically injured.

232.    Performers never received wage statements or other wage notices.

233.    Performers (including those who were children) were not aware of having work permits or trust accounts.

234.    At all times relevant herein, the Shen Yun Defendants operated a willful and intentional scheme to deprive Plaintiff and other non-exempt workers of minimum wages and overtime compensation and sick pay.

235.    The New York State Department of Labor recently opened an inquiry into Shen Yun Performing Arts, following publication of several stories in *The New York Times* about substantial allegations of the Shen Yun Defendants' extensive use of unpaid labor, forced labor, and child labor, allegations materially identical to those alleged by Plaintiff here.[34]

236.    The Shen Yun Defendants violated New York State law for years, failing to obtain any certification for using Performers under the age of 18.

237.    Without underage and underpaid labor, the Shen Yun Defendants would not have been able to operate or profit from Shen Yun performances. None of the troupes that perform in the shows had enough professionals to stage a show without underage performers. A former Shen Yun Performer observed that as many as two-thirds of the musicians, for example, were underage performers: "That place would not run if they had to pay real musicians, like every other organization in the country does."

**Plaintiff Chang's Forced Labor as a Dancer for Shen Yun**

238.    Plaintiff was born on May 7, 1996.

239.    Plaintiff's mother was a Falun Gong practitioner.

240.    As a young child, Plaintiff was told that dancing for Shen Yun is of the highest honor because it allowed individuals to be close to Hongzhi Li.

---

[34] Nicole Hong and Michael Rothfeld, *Behind the Pageantry of Shen Yun, Untreated Injuries and Emotional Abuse*, THE NEW YORK TIMES (August 15, 2024), https://www.nytimes.com/2024/08/15/nyregion/shen-yun-dance-abuse.html.

241.    Plaintiff saw a Shen Yun performance in 2007 when she was 11 years old in Taipei, Taiwan.

242.    After the performance ended, the Shen Yun Defendants conducted "auditions" and recruited children ages 11-16.

243.    Plaintiff auditioned after the show but was not selected.

244.    Plaintiff re-auditioned in September 2009. She was asked to travel to New York and perform for Hongzhi Li and was accepted to Shen Yun.

245.    Plaintiff's father passed away when she was 11. Plaintiff felt an obligation to help her mother, and because she received a full scholarship from Fei Tian Academy of the Arts, she believed that dancing for Shen Yun would help her family.

246.    When Hongzhi Li offered Plaintiff a job dancing for Shen Yun, he asked if she was going to be able to accept suffering because being a part of Shen Yun was extremely difficult. He then asked her if she knew what Shen Yun was about and stated that it was about saving people.

247.    Plaintiff stayed in New York on a travel visa and immediately moved into Dragon Springs.

248.    Plaintiff was told she was being accepted as a student Fei Tian Academy of the Arts, and that she would receive a full scholarship.

249.    Every other student that Plaintiff met at Fei Tian Academy of the Arts and Fei Tian College also received a full scholarship.

250.    When she arrived at Dragon Springs, the Shen Yun Defendants took her passport and immigration documents, the I-20 form and F-1 visa, away.

251.    Because the Shen Yun Defendants took away her immigration documents and passport, Plaintiff was never in possession of any identifying documents.

252.    Plaintiff was told that she could not leave the compound without permission from Hongzhi Li or Rui Li. She saw guards at entrance of the compound so that she could not leave.

253.    For the first six months of her time in the United States, Plaintiff rehearsed for the upcoming Shen Yun season. She worked around 18 hours a day practicing for the show.

254.    In December 2009, Plaintiff performed with Shen Yun for the first time. She danced in seven shows at Radio City Music Hall.

255.    After the first season, Plaintiff returned to Taiwan for a few days, and then returned to Dragon Springs on a student visa.

256.    For the first year, Plaintiff received no pay at all, even when she worked as a dancer in shows. Hongzhi Li told her that she had not "saved enough people" to get paid.

257.    After the first year, Plaintiff received $500 a month in pay, even though she often worked ninety (90) hours a week.

258.    Plaintiff was paid only $500 a month until she "graduated" from Fei Tian College in 2019.

259.    In 2019, Plaintiff Chang's immigration status changed from a student to Optional Practical Training ("OPT"). OPT is temporary employment that is directly related to an F-1 student's major area of study and is applicable for twelve (12) months.

260.    At that time, her pay increased to $1,000 a month. The offer letter stated she would work 25 hours per week, but she was required to work approximately 90 hours per week.

261.    Plaintiff could not access her pay unless the Shen Yun Defendants accompanied her.

262.    From May through November, Plaintiff was required to rehearse for the upcoming season.

263.    From December to May, Plaintiff toured with Shen Yun.

264.    During each tour, Plaintiff worked as a Dancer for over a hundred shows, all over the United States and internationally.

265.    Although Plaintiff was enrolled in Fei Tian Academy of the Arts, and later, Fei Tian College, her purpose was to learn to dance, so that she could work as a dancer for Shen Yun.

266.    Plaintiff did not have to take any tests and did poorly in her academic work.

267.    While on tour, Plaintiff was given a tablet on the bus to do schoolwork, but it was pretense, because she wasn't given assignments or lectures.

268.    When it was time for Plaintiff to move from Fei Tian Academy of the Arts to Fei Tian College, the teachers were concerned that if she took any tests, she would fail. Jade Zhan, one of Hongzhi Li's agents, told Plaintiff that her English was not good enough to take a test to move on to Fei Tian College, and that the Shen Yun Defendants did not want any records of students doing poorly.

269.    Plaintiff never applied to be a student at Fei Tian College, but rather was moved from Fei Tian Academy of the Arts to Fei Tian College as part of the illusion that she was a student, and not a forced laborer.

270.    While at Fei Tian, Plaintiff had to follow all of Hongzhi Li and Rui Li's directives and could not deviate from the rules without risking a mass criticism session or threats of ostracization.

271.    The Shen Yun Defendants isolated Plaintiff from her family. Plaintiff was not allowed to see her mother, except for an approved two-week holiday break once a year.

272.    Plaintiff was allowed to call her mother once a week. The Shen Yun Defendants told Plaintiff that all her calls were being monitored, and she was not allowed to speak badly about the school or the Shen Yun Defendants or they would find out.

273.    Hongzhi Li told Plaintiff and other Dancers that they should not speak to their families about what went on at Shen Yun, and that being too attached to their parents would be detrimental. Hongzhi Li instructed Plaintiff and Dancers to only say "happy things" to their parents.

274.    Because of this, Plaintiff was afraid to let her mother know what was happening at Fei Tian and Shen Yun, and she became distant from her family.

275.    The Shen Yun Defendants and their agents told Plaintiff that she was not allowed to leave the compound.

276.    The Shen Yun Defendants and their agents told Plaintiff that she could not speak to anyone of the opposite sex.

277.    The Shen Yun Defendants and their agents told Plaintiff that she could not date anyone, at least not without the explicit permission of Rui Li.

278.    The Shen Yun Defendants and their agents told Plaintiff that she was not allowed to read unauthorized materials or media.

279.    The Shen Yun Defendants and their agents told Plaintiff she was not allowed to have a smart phone or use the internet.

280.    Plaintiff kept a diary, but stopped writing in it when she realized that the Shen Yun Defendants or their agents were reading her diary – which she learned after Plaintiff was called into an office one day and scolded about the contents of her diary.

281.    During her work with Shen Yun, Hongzhi Li told Plaintiff and other Dancers that by performing, they were saving audience members' souls and her own soul.

282.    In addition to saving audience members, Plaintiff Chang was told that Dancers that left would no longer be protected by Defendant Hongzhi Li and would bring calamities upon themselves and their families.

283.    Because of this, Plaintiff did not feel she could make any mistakes, and often danced through serious injuries.

284.    Plaintiff did not have health insurance and was not allowed to see any doctors while she worked for Shen Yun.

285.    In or around 2016 or 2017, Plaintiff sustained a serious injury in the arch of her foot and could not walk. It was obvious to her teachers and the Shen Yun Defendants that she was seriously injured as she was having trouble walking. However, Defendants told Plaintiff that she needed to pray to feel better, and they did not take her to see any doctors or offer medical care.

286.    When Plaintiff was fourteen (14) years old, she contracted measles. She was not allowed to see a doctor, but rather, Hongzhi Li told her that she should meditate to feel better. Plaintiff was denied any sick time while she was sick and had to work through the measles.

287.    On one occasion, Plaintiff was hit in the face with a metal rod during a performance. Although her face was bleeding and she needed stitches, the Shen Yun Defendants made her continue dancing and would not allow her to seek medical care. Plaintiff still has a scar on her face due to this incident.

288.    Plaintiff visited the dentist one time while she was working for Shen Yun, but that was only to get her teeth straightened. In her nine (9) years with Shen Yun, Plaintiff was not allowed to see a dentist for any preventative (non-cosmetic) care.

289.    Plaintiff witnessed Hongzhi Li yelling at other Dancers who had sustained injuries and accusing them of sustaining injuries because they were having moral failings.

290.    Because of this, Plaintiff tried to hide any physical injuries she sustained.

291.    Based on what the Shen Yun Defendants told her, Plaintiff was terrified that her physical pain and sicknesses were a moral failing on her part.

292.    Plaintiff is approximately 5 feet 6 inches tall. The Shen Yun Defendants or their agents told Plaintiff she had to keep her weight under 115 pounds. Due to the weight requirements and lack of food, Plaintiff did not have a menstrual cycle for five years, from ages 18 to 24.

293.    Due to the extreme physicality of the forced labor Plaintiff was forced to endure, it was difficult for her to keep her weight that low.

294.    The Shen Yun Defendants and their agents publicly shamed Plaintiff when her weight went above 115 pounds and berated her in public for eating too much. Due to this, Plaintiff was scared to eat, and tried to eat in private.

295.    The Shen Yun Defendants and their agents weighed Dancers every two or three days. If they were not under the weight imposed on them, the Shen Yun Defendants' agents wrote down their weight on a sheet of paper, circled it in red, and put it up where everyone could see it.

296.    For most of her time at Shen Yun, Plaintiff ate one meal a day of white porridge and vegetables.

297.    Plaintiff attended many meetings and mass criticisms wherein Hongzhi Li publicly called out individuals who had left Shen Yun by name, told Performers they could not speak to those who had left, and directed the community to ostracise them.

298.    When some Dancers approached Defendant Hongzhi Li to request permission to leave the Fei Tian schools or Shen Yun, he stated that they could not leave because they were no longer part of the ordinary world.

299.     Plaintiff Chang also learned that Defendant Hongzhi Li called Dancers' families to pressure them to stay when they wanted to leave.

300.     Plaintiff attended a mass criticism session after a Shen Yun Performer committed suicide. At the session, Hongzhi Li told Dancers that the individual committed suicide because he had left Shen Yun and Falun Gong and stated that this would happen to anyone who left.

301.     Due to Plaintiff's young age and Hongzhi Li's position, she believed everything that Hongzhi Li said, and she was terrified to leave Shen Yun because she felt that terrible harm would befall herself and her family if she did.

302.     Plaintiff observed that Dancers that asked questions, including questions about Defendant Hongzhi Li's wealth, or his conduct inconsistent with his teachings, were denounced by him as spies for the Chinese Communist Party.

303.     Plaintiff Chang was terminated from Shen Yun in 2020 when she was 24 years old and was sent back to Taiwan.

304.     Due to the coercion Plaintiff Chang faced at the hands of Defendants, she was diagnosed with clinical depression and post traumatic stress disorder.

**The Shen Yun Defendants' Retaliation Against Plaintiff**

305.     In the wake of the New York Times' reporting, in which Plaintiff was quoted, the Shen Yun Defendants have launched a retaliation campaign against not just her but her husband as well.

306.     For example, on September 13, 2024, on a Taiwanese news show Zhang accused Plaintiff and her husband of being "brainwashed" into becoming agents of the CCP and of having accepted money from the CCP for their dance studio business in Taiwan. Zhang also accused Plaintiff and her husband of kicking out several customers who were members of Falun Gong because of the CCP's investments in their Taiwanese dance studio.

307.    These statements were false and defamatory. The truth is that Plaintiff and her husband have never taken money from the CCP or any related entity in any capacity, including for their dance studio business in Taiwan, which they started in around 2022.

308.    More to the point, Zhang's statements in this regard were aimed at smearing and discrediting Plaintiff and her husband. And, given that Shen Yun members are taught to hate the CCP as one of the world's greatest evils, Zhang's statements in this regard were also designed to intimidate Plaintiff and her husband; to turn current students against them; and to demonstrate to current students what would happen to them if they were speak ill of Shen Yun.

309.    Similarly, on November 17, 2024, in his own YouTube show discussing current events, which currently has nearly 100,000 views, Zhang once again defamed Plaintiff. In particular, Zhang said that Plaintiff's dance studio in Taiwan had received investments after Plaintiff visited mainland China. Zhang then made clear that the implication was that Plaintiff had essentially been paid by the CCP to criticize Shen Yun.

310.    Again, Zhang's statements in this regard were meant in part to smear, discredit, and intimate Plaintiff, as well as to serve as an example to current students of how they would be treated if they were to speak ill of Shen Yun.

311.    Indeed, Plaintiff has learned that the Shen Yun Defendants have recently convened mass criticism sessions targeting Plaintiff to turn current Shen Yun students against her. Not only that, the Shen Yun Defendants, and particularly Rui Li, has said that the Shen Yun Defendants have agents in Taiwan who are keeping track of Plaintiff's every move, and that those agents are reporting on Plaintiff to the Shen Yun Defendants. Rui Li has also claimed to current students that Plaintiff has recanted her allegations against Shen Yun and regrets making them—which, as this lawsuit shows, could not be further from the truth.

312.    All this has left Plaintiff in fear of her life. And it is a prime example of why students are so afraid to speak out, and of how the Shen Yun Defendants use fear and intimidation to keep students in line.

## DANCER CLASS ALLEGATIONS

313.    Plaintiff asserts her Trafficking Victims Protection Reauthorization Act claims on behalf of a class of Dancers defined as follows:

> All persons who were Dancers for Shen Yun Defendants and lived at the Dragon Springs compound.

314.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

315.    <u>Numerosity</u>: The Dancers Class is so numerous that joinder of all class members is impracticable. Defendants report that 640 individuals perform in their shows each season. These class members can be identified based on Defendants' records.

316.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Dancers Class and predominate over any questions solely affecting individual members, including but not limited to:

a.    Whether the Shen Yun Defendants obtain labor by using serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

b.    Whether the Shen Yun Defendants' practice of ostracization, control, and threats of physical and psychological harm constitute serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

c.    Whether the Shen Yun Defendants obtain labor by using a scheme, plan, or pattern intended to cause a person to believe that, if they did not perform such labor or services, that person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

d.      Whether the Shen Yun Defendants' practice of forcing Dancers to labor in the Shen Yun performances by threatening physical and psychological harm constitutes a scheme, plan, or pattern intended to cause Dancers to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

e.      Whether the Shen Yun Defendants knowingly recruit Dancers for forced labor;

f.      Whether Defendants knowingly benefit from participation in a venture which obtains labor in violation of the TVPRA while "knowing or in reckless disregard of the fact" that the venture has obtained labor by that means;

g.      Whether Defendants knowingly benefit from their violations of the TVPRA;

h.      Whether Defendants conspired to violate 18 U.S.C. § 1589;

i.      Whether Defendants conspired to violate 18 U.S.C. § 1590;

j.      Whether Defendant attempted to violate 18 U.S.C. § 1589;

k.      Whether Defendants attempted to violate 18 U.S.C. § 1590;

l.      The proper measure of damages;

m.      The proper preliminary and permanent injunctive relief that must issue against each and both defendants; and

n.      The proper measure of punitive damages.

317.    Typicality: Plaintiff's claims are typical of the members of the Dancers Class. For example, Plaintiff, like other putative class members, labored for Shen Yun facilities and was subject to common policies and procedures. Further, the Shen Yun Defendants treated Plaintiff like they treated other class members, in accordance with their standard policies and practices.

318.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Dancers Class. Plaintiff is committed to the prosecution of this action and has retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiffs and the Dancers Class she seeks to represent.

319.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Dancers Class predominate over any questions affecting only individual members of the Dancers Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing Defendants' forced labor program are uniform across the Dancers Class. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Common questions of law and fact also predominate as to Plaintiff's claim that Defendants attempted to obtain, recruit, and benefit from forced labor in violation of the TVPRA. Defendants employed uniform structures, policies, and procedures in their attempt to obtain, recruit, and benefit from forced labor performed by Plaintiff and the Dancers Class. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

320.    Plaintiffs intend to send notice to all members of the Dancers Class to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendants' records and other available sources.

<strong>PERFORMER CLASS ALLEGATIONS</strong>

321.    Plaintiff asserts her New York Labor Law claims on behalf of a class of Performers defined as follows:

All individuals who worked for Shen Yun as non-exempt performers, including dancers, musicians, emcees, and set designers in New York in the previous six years.

322.    Plaintiff brings this claim as a class action pursuant to Rule 23.

323.    <u>Numerosity</u>: The Performers Class is so numerous that joinder of all class members is impracticable. Defendants report that 640 individuals perform in their shows each season. These class members can be identified based on Defendants' records.

324.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Performers Class and predominate over any questions solely affecting individual members, including but not limited to:

        a.    Whether the Shen Yun Defendants failed to pay Plaintiff and the members of the Performers Class minimum wages;

        b.    Whether the Shen Yun Defendants failed to pay Plaintiff and the Performers Class minimum overtime wages for hours that they worked in excess of 40 hours per work week;

        c.    Whether the Shen Yun Defendants failed to furnish Plaintiff and the Performers Class with an accurate statement of wages that included the hourly rate or rates of pay and overtime rate of rates of pay, as required by the Wage Theft Prevention Act;

        d.    Whether the Shen Yun Defendants failed to furnish Plaintiff and the Performers Class with an accurate notice at the time of hire, which included overtime rates, as required by the Wage Theft Prevention Act; and

        e.    Whether the Shen Yun Defendants failed to furnish Plaintiff and the Performers Class with an accurate annual notice, as required by the Wage Theft Prevention Act.

325.    <u>Typicality</u>: Plaintiff's claims are typical of the members of the Performers Class. For example, Plaintiff, like other putative class members, labored for Shen Yun and was subject

to common policies and procedures. Further, the Shen Yun Defendants treated Plaintiff consistent with other class members, in accordance with their standard policies and practices.

326.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Performers Class. Plaintiff is committed to the prosecution of this action and has retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiff and the Performers Class she seeks to represent.

327.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Performers Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing the Shen Yun Defendants' forced labor program emanate from their policy and are uniform across the Performers Class. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Common questions of law and fact also predominate as to Plaintiff's claim that the Shen Yun Defendants violated the New York Labor Law. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

328.    Plaintiff intends to send notice to all members of the Performers Class to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendants' records and other available sources.

## <u>COUNT ONE</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1589(a) and 1595(a) – Obtaining Trafficked Labor**

**(On behalf of Plaintiff and the Dancers Class against the Shen Yun Defendants)**

329.    All previous paragraphs are incorporated as though fully set forth herein.

330.    It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

331.    The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

332.    Defendants obtained the labor of Plaintiff and members of the Dancers Class through threats of serious harm, through a scheme to make Plaintiffs and the Classes believe they would suffer serious harm.

333.    Defendants kept Plaintiff and members of the Dancers Class laboring without pay under inhumane conditions by preying on their vulnerabilities.

334.    Defendants obtained unpaid labor from Plaintiff and members of the Dancers Class through serious harm and threats of serious harm both physical and nonphysical.

335.    Defendants refused to pay proper wages to Plaintiff and members of the Dancers Class for their hours worked and threatened them with psychological harm if they refused to labor without pay.

336.    Defendants kept Plaintiffs and members of the Dancers Class working under inhumane conditions by preying on their vulnerability as children and reliance on Defendant for food, housing, and by withholding wages for hours worked.

337.    Defendants' use of such means to obtain the labor of Plaintiff and members of the Dancers Class was knowing and intentional.

338.    Plaintiff and members of the Dancers Class suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiff and members of the Dancers Class provided to Defendants, as well as emotional distress and other damages.

339.    Plaintiff and members of the Dancers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT TWO

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1589(b) and 1595(a) – Benefitting from Trafficked Labor**

**(On Behalf of Plaintiff and the Dancers Class against all Defendants)**

340.    All previous paragraphs are incorporated as though fully set forth herein.

341.    It is a criminal violation of the TVPRA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

342.    An individual may bring a civil action against a "perpetrator [] or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. 18 U.S.C. § 1595(a).

343.    Defendants participated in a venture that obtained labor in violation of the TVPRA because they financially benefited from the forced labor, by which Defendants obtained labor in violation of the TVPRA.

344.    Defendants knowingly benefited from participation in the forced labor venture described herein by obtaining labor in its commercial operations without paying market wages and willfully benefiting from forced labor.

345.    Defendants Shen Yun, Fei Tian College, Fei Tian Academy, Dragon Springs, Hongzhi Li, and Rui Li have knowingly benefited from its participation in the forced labor venture described herein by obtaining labor without incurring payroll and tax obligations, allowing Defendants to repurpose funds that would otherwise be used to pay paid staff to perform these tasks.

346.    Defendants Shen Yun, Fei Tian College, Fei Tian Academy, Dragon Springs, Hongzhi Li, and Rui Li knowingly benefited from their participation in the ventures described herein because obtaining labor in violation of the TVPRA reduced the number of paid staff Defendants must recruit from other sources.

347.    Defendant International Bank of Chicago knowingly benefited from its participation in the ventures described herein. The Bank facilitated and benefited from the Shen Yun Defendants' commercial performing arts venture. The Bank knew or should have known, including from the red flags of forced labor, that the Shen Yun Defendants' venture was involved in forced labor and trafficking.

348.    Defendants knew or recklessly disregarded the fact that the ventures described herein engaged in obtaining forced labor.

349.    Plaintiff and the Dancers Class suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiff and Class members provided to Defendants, as well as emotional distress and other damages.

350.    Plaintiff and the Dancers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT THREE

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1590(a) and 1595(a) – Recruiting, Harboring, and Transporting Trafficked Labor**

**(On Behalf of Plaintiff and the Dancers Class against the Shen Yun Defendants)**

351.    All previous paragraphs are incorporated as though fully set forth herein.

352.    It is a violation of the TVPRA to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1590(a).

353.    Defendants knowingly recruited, harbored, and transported Plaintiff and the Dancers Class members in violation of the TVPRA through the means described herein.

354.    Plaintiff and the Dancers Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiff and the Dancers Class members provided to Defendants, as well as emotional distress and other damages.

355.    Plaintiff and the Dancers Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT FOUR

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1594(b) and 1595(a) – Conspiracy to Recruit, Harbor, Transport, Obtain, and Benefit from Trafficked Labor**

**(On Behalf of Plaintiff and the Dancers Class against all Defendants)**

69

356.    All previous paragraphs are incorporated as though fully set forth herein.

357.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1594(b).

358.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. §§ 1589(b), 1594(b).

359.    Defendants Shen Yun, Fei Tian College, Fei Tian Academy, Dragon Springs, Hongzhi Li, Rui Li, and Zhang conspired to recruit Plaintiff and the Dancers Class to the Fei Tian Schools and ultimately obtained their forced labor by coercing them to work for Shen Yun.

360.    All Defendants conspired to benefit from the Plaintiff and the Dancers Class's forced labor by ensuring they were not paid their proper wages and were unable to have access to their money.

361.    Plaintiff and Dancers Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiff and Dancers Class members provided to Defendants, as well as emotional distress and other damages.

362.    Plaintiff and the Dancers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT FIVE

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. §§ 1594(a) and 1595(a) – Attempted Trafficking**

**(On Behalf of Plaintiff and the Dancers Class against the Shen Yun Defendants)**

363.    All previous paragraphs are incorporated as though fully set forth herein.

364.    Attempts to violate the TVPRA are themselves violations of the TVPRA. 18 U.S.C. § 1594(a).

365.    Defendants attempt to violate 18 U.S.C. §§ 1589 and 1590 by knowingly using the structure, policies, and procedures of Shen Yun, the Fei Tian Schools, and Dragon Springs in an attempt to obtain the labor of Plaintiff and members of the Classes. Defendants also knowingly participate in a venture in an attempt to recruit, obtain, and benefit from forced labor by jointly creating and establishing the policies described herein.

366.    Plaintiff and the Dancers Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiff and Class members provided to Defendants, as well as emotional distress and other damages.

367.    Plaintiff and the Dancers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## <u>COUNT SIX</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. § 1590 and 1592(a) – Seizure of Documents**

**(On Behalf of Plaintiff and the Dancers Class against the Shen Yun Defendants)**

368.    All previous paragraphs are incorporated as though fully set forth herein.

369.    It is a violation of the TVPRA to "knowingly…confiscate[], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person— (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a); . . . (3) to prevent or restrict or to attempt to prevent or restrict,

without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000."

370.    Defendants took possession of the Dancers Class's passports and immigration paperwork so that they could not leave the country and would be forced to labor for Defendants.

371.    Plaintiff and Dancers Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiff and Dancers Class members provided to Defendants, as well as emotional distress and other damages.

372.    Plaintiff and the Dancers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT SEVEN

**New York State Minimum Wage Act, New York Labor Law § 650 et seq.;
N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.3, 146-2.9**

**(Brought by the Plaintiff on Behalf of Herself and the Performers Class
Against the Shen Yun Defendants)**

373.    All previous paragraphs are incorporated as though fully set forth herein.

374.    Defendants knowingly failed to pay Plaintiff and the Performer Class members the full New York State minimum wage for all hours worked.

375.    Defendants' failure to pay Plaintiff and the Performer Class members the minimum wage was willful within the meaning of N.Y. Lab. Law § 663.

376.    As a result of Defendants' willful and unlawful conduct, Plaintiff and the Performer Class are entitled to an award of damages, including liquidated damages, in amount to be

determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

## COUNT EIGHT

**New York State Overtime Violations, N.Y. Lab. L. §§ 650 et seq. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.3, 146-1.4, 146-2.9**

**(Brought by the Plaintiff on Behalf of Herself and the Performers Class Against the Shen Yun Defendants)**

377.    All previous paragraphs are incorporated as though fully set forth herein.

378.    During all relevant times, Plaintiff and the Performer Class did not qualify as exempt from the overtime requirements of the NYLL under 12 NYCRR § 142-3.12.

379.    Defendant knowingly failed to compensate Plaintiff and the Performer Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of NYLL and its supporting regulations. 12 NYCRR § 142-3.2.

380.    Due to Defendant's violations of the NYLL, Plaintiff and the Performer Class Members are entitled to recover from Defendant their unpaid overtime wages, attorneys' fees, costs, prejudgment interest and liquidated damages. NYLL § 198 (1-a).

381.    Due to Defendant's violations of NYLL § 195(3), Plaintiff and the Performer Class are entitled to statutory penalties as provided for in NYLL § 198 (1-d).

## COUNT NINE

**New York Spread of Hours Provisions, N.Y. Lab. L. §§ 650 et seq. N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.6**

**(Brought by the Plaintiff on Behalf of Herself and the Performers Class Against the Shen Yun Defendants)**

382.    All previous paragraphs are incorporated as though fully set forth herein.

383.    Plaintiffs and the Class Members regularly had workdays that lasted more than ten (10) hours.

384.    Defendants willfully and intentionally failed to compensate Plaintiff and the Performer Class members one hour's pay at the basic New York minimum hourly wage rate when their workdays exceeded ten (10) hours, as required by New York law.

385.    As a result of Defendants' willful and unlawful conduct, Plaintiff and the Performer Class are entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

## COUNT TEN

### New York Notice Requirements, N.Y. Lab. L. §§ 195, 198

**(Brought by the Plaintiff on Behalf of Herself and the Performers Class Against the Shen Yun Defendants)**

386.    All previous paragraphs are incorporated as though fully set forth herein.

387.    Defendants did not provide Plaintiffs and members of the Performer Class with the notices required by N.Y. Lab. Law §§ 195(1) and 195(3).

388.    As a result of Defendants' willful and unlawful conduct, Plaintiffs and members of the Performer Class are entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, and costs and attorneys' fees.

## COUNT ELEVEN

### New York State Late Payment of Wages Violations
### New York Minimum Wage Act, N.Y. Stat. § 190 et seq.

**(Brought by the Plaintiff on Behalf of Herself and the Performers Class Against the Shen Yun Defendants)**

389.    All previous paragraphs are incorporated as though fully set forth herein.

390.    At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the NYLL, § 190, et seq. At all relevant times, Defendants have employed "employee[s]," including Plaintiff and the Class Members. Defendants did not pay Plaintiff and the Performer Class members all of their earned wages on a weekly basis.

391.    By their aforesaid conduct, Defendants willfully violated the provisions of the NYLL regarding timely payment of wages, NYLL Art. 6 § 191, et seq.

392.    Plaintiff and the Performer Class members are thereby entitled to recover from Defendants, jointly and severally, liquidated damages in the amount of Plaintiff's and the Performer Class members' respective untimely paid wages, as well as compensatory damages for bank fees paid by Plaintiff and the Performer Class members, interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the Classes, pray for relief as follows:

A.    Determining that this action may proceed as a class action under Rule 23(b)(2)-(3) of the Federal Rules of Civil Procedure;

B.    Designating Plaintiff as representative for the Classes and designating Plaintiff's counsel as counsel for the Classes;

C.    Issuing proper notice to the Classes at Defendants' expense;

D.    Leave to add additional plaintiffs and/or state law claims by motion or any other method approved by the Court;

E.    Declaring that all Defendants committed violations of the TVPRA;

F.    Preliminary and permanent injunctive relief requiring Defendants to cease violations of the TVPRA and prohibiting violations in the future;

G.      Awarding damages as provided by the TVPRA, including punitive damages;

H.      Declaring that Defendants committed violations of the NYLL;

I.      Awarding damages as provided by the NYLL;

J.      Awarding reasonable attorneys' fees and costs as provided by law; and

K.      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR A JURY TRIAL

Plaintiff, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demands a trial by jury.

Dated: March 5, 2025                    Respectfully submitted,

Mariyam Hussain (NY Bar No. 5492475)
**BERGER MONTAGUE PC**
1820 West Division Street
Chicago, IL 60622
Tel.: (773) 666-4316
mhussain@bm.net

Michael Dell'Angelo
Michaela Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-3000
mdellangelo@bm.net
mwallin@bm.net

/ s / Adam Farra
Times Wang*
Adam Farra
**FARRA & WANG PLLC**
1300 I Street, N.W. Suite 400E
Washington, D.C. 20005
Tel.: 202-505-6227
twang@farrawang.com
afarra@farrawang.com

*Attorneys for Plaintiff and the Proposed Class*

*\* Pro hac vice forthcoming*