# FARRA & WANG

Adam Farra
afarra@farrawang.com
(202) 505-5990

June 6, 2025

Hon. Philip M. Halpern
United States District Court
Southern District of New York
300 Quarropas St.
White Plains, NY 10601

Re:     *Chun-Ko Chang et al. v. Shen Yun Performing Arts, Inc. et al.*, No. 24-cv-8980 (S.D.N.Y.)

Dear Judge Halpern:

The Shen Yun Defendants ("SY Defendants") operate a commercial performing arts venture that relies on forced labor—including forced child labor—for which they are under state and federal civil and criminal investigation. *See* Dkt. 68 ¶¶ 4, 24. The International Bank of Chicago participated in this venture, rendering the Bank liable under the Trafficking Victims Protection Act ("TVPA") for (in Count 2) benefiting and (in Count 4) conspiring to benefit from its participation in the venture. *See id.* ¶¶ 537-48, 554-560.

***The SAC states plausible claims against the Bank.*** The TVPA authorizes victims to "bring a civil action against . . . whoever [1] knowingly benefits[] or attempts or conspires to benefit . . . from [2] participation in a venture which [3] that person knew or should have known has engaged in an act" of forced labor or trafficking. 18 U.S.C. § 1595(a); *id.* § 1589(b). The SAC addresses each element of the claims—participation, benefit, and knowledge.

First, the Bank actively participated in the Shen Yun commercial performing arts venture. The Bank—based entirely in Illinois—in 2012 opened a bespoke branch 15 minutes away from the SY Defendants' Dragon Springs compound in New York to target and service the venture. Dkt. 68 ¶¶ 253–54. The Bank annually sends teams of Bank employees into the SY Defendants'

secretive and guarded compound to sign up minor recruits with accounts at the Bank. *Id.* ¶¶ 256–57. The Bank set up the Performers' accounts so that they would be directly controlled by the SY Defendants—the adult custodian across hundreds of accounts opened for minors was Siu Qing (a/k/a "Judy Siu"), a direct assistant to Defendants Hongzhi Li and Rui Li, the masterminds of the venture. *Id.* ¶¶ 263–65. The Bank also helped the SY Defendants maintain physical control over the Performers, including by setting the account limits very low, preventing them from buying tickets to leave. *Id.* ¶ 264.

The Bank also participated in the venture by repeatedly violating banking laws. Banks are required to report suspicious activity, and federal guidance identifies red flags that banks must watch for to detect trafficking and forced labor. *Id.* ¶¶ 270–72. The Bank repeatedly refused to report any suspicious activity to the authorities despite a litany of red flags. For example, the Bank failed to report: that the SY Defendants do not "exhibit normal payroll expenditures" (¶ 270(a)); that the SY Defendants' payments to Performers were far too low to be lawful (¶ 270(b)); that the SY Defendants repeatedly made cash deposits of less than $3,000 or $10,000—trying to avoid triggering recordkeeping requirements (¶ 270(c)); that the Performers had a common custodian across hundreds of accounts (¶ 270(e)); that the Performers were often foreigners, and their employer (the SY Defendants) was serving as a custodian of the accounts (¶ 270(f)); that the SY Defendants were aware of each of the Performers' transactions (¶ 270(g)); that the SY Defendants kept control of the Performers' critical documents, including passports (¶ 270(h)); and that the Performers showed signs of malnourishment, fatigue, and physical restraint, and were confined at a compound guarded by armed guards and German Shepherds (¶ 270(j)). The Bank also knew that

New York has special legal requirements for management of "child performer accounts," requiring that a certain percentage of a child's gross earnings be maintained in a trust account—and the Bank did not establish any trust accounts. ¶¶ 271–72.

Second, the Bank benefitted from its participation in this venture. The Bank—a relatively small bank—received a pipeline of new accounts from the minor Performers, banking business with the SY Defendants themselves and their $260+ million in cash, and banking business with the network of companies associated with the SY Defendants such as *The Epoch Times* and New Tang Dynasty TV. *Id.* ¶¶ 246-47, 266(a)-(c).

Third, the Bank knew or should have known that the venture was engaged in trafficking and forced labor. *The New York Times* published investigative articles about Shen Yun's forced labor and trafficking scheme in August 2024. *Id.* ¶ 273. But the Bank knew about the scheme for much longer. As noted above, the Bank's representatives regularly visited the compound for years where they would witness the minor Performers and their deplorable conditions. The Bank also knows how little the Performers are paid, the regularity of those payments, and the details of the SY Defendants' substantial business relative to those small payments. *Id.* ¶¶ 268–69. The Bank's founders also have a longstanding and intimate personal and professional relationship with the ringleaders of the venture, Hongzhi Li and Rui Li. *Id.* ¶ 180. The Bank's supposedly "independent" auditor of Defendant Dragon Springs Buddhist Inc., one of the Bank's founders, gave a 150-acre plot of land adjacent to the compound in New York to Dragon Springs Buddhist Inc. for $0. *Id.* ¶¶ 281, 283. The Bank's former head of business development also has a close, personal relationship with the Lis. *Id.* ¶ 280. The Bank's awareness of the red flags discussed above further confirms

that the Bank should have reported that the venture was engaged in trafficking and forced labor, but chose not to.

Taken together, these facts—which at this stage must be accepted as true and viewed in the light most favorable to Plaintiffs—are more than sufficient to state a claim. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 397 (S.D.N.Y. 2023) (Rakoff, J.) (denying motions to dismiss similar claims against banks for benefitting from the banking services they provided to Jeffrey Epstein, which Epstein used in connection with sex trafficking).

***The Bank's arguments fail to address the SAC's allegations.*** Several of the Bank's arguments boil down to the same point: that there is not enough "factual support" as to each element of the claim. *See* Dkt. 83 at 2–4. But that isn't true. The SAC substantiates its allegations with names of specific Bank employees and executives (e.g., Dkt. 68 ¶¶ 257, 277–81), specific transactions (e.g., *id.* ¶¶ 266(b), 270(b), 281, 499), and specific banking laws that the Bank broke (e.g., *id.* ¶¶ 270, 271). In reversing the dismissal of TVPA claims, the Second Circuit cautioned courts to "keep in mind" that "[s]pecific facts are not necessary" for satisfying the plausibility standard, and that a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 92 (2d Cir. 2019) (citations and quotations omitted). The SAC far exceeds this low bar.

The Bank's assertion that Plaintiffs fail to show "a causal relationship between [the Bank's] alleged 'facilitation' of forced labor and the benefits that [the Bank] allegedly received" (Dkt. 83 at 4) rests on a legal premise that is incorrect. The statute does not require that the Bank directly participate in the *forced labor or trafficking*, but rather requires that the Bank benefit from

4

participation in a *venture* involved in such conduct. *See Deutsche Bank*, 671 F. Supp. 3d at 408 ("[T]he Court is not convinced that the benefit element should be read in this way[.]"); *Cho v. Chu*, No. 1:21-CV-02297 (PGG) (SDA), 2022 WL 2532446, at *3 (S.D.N.Y. May 12, 2022); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 548 (7th Cir. 2023) ("[W]e reject defendant's arguments . . . that to knowingly benefit requires that the sex trafficker provide the participant with a benefit because of the participant's facilitation of a sex-trafficking venture and that the participant must have known that this was the reason for the benefit."). In any event, the SAC alleges that the Bank obtained the benefit of a pipeline of new accounts and business from the Shen Yun Defendants and affiliates in exchange for not reporting suspicious activity. *See* Dkt. 68 ¶¶ 266(a), 267, 270–72.

Finally, the Bank's threadbare arguments about the conspiracy claim fail. The Bank's one-sentence argument that the 2023 amendment to the TVPA isn't retroactive is directly contradicted by Congress's statement that insertion of the conspiracy language was merely a "technical and clarifying update," as opposed to a substantive change. *See* ABOLISH TRAFFICKING REAUTHORIZATION ACT OF 2022, Pub. L. No. 117-347, January 5, 2023, 136 Stat. 6199. Similarly, the Bank's argument that there is no evidence of an agreement between the Bank and the SY Defendants is directly contradicted by the SAC's allegations that the Bank built an entire system of bank accounts with the SY Defendants to help them control the minor Performers. *See* Dkt. 68 ¶¶ 254–58. The Bank's argument about its lack of knowledge fail for the same reasons they fail above. *See id.* ¶¶ 267–74.

The SAC's allegations easily clear the low bar of establishing plausible claims against the Bank. Plaintiffs respectfully request that the Court deny the Bank's request.

Respectfully submitted,

*Adam Farra*

Adam Farra

*Counsel for Plaintiffs*

Cc:     All counsel of record (via ECF)