# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHUN-KO CHANG, YI RAN WANG, GUANEE XIE, and HOFMANN ZHU, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 24-8980 (PMH) (JCM) |
| v. | SECOND AMENDED CLASS ACTION COMPLAINT |
| SHEN YUN PERFORMING ARTS, INC., FEI TIAN COLLEGE, FEI TIAN ACADEMY OF THE ARTS, DRAGON SPRINGS BUDDHIST INC., INTERNATIONAL BANK OF CHICAGO, SHUJIA GONG a/k/a TIANLIANG ZHANG, HONGZHI LI, and RUI LI a/k/a SANDY REBECCA LEE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 9

PARTIES ............................................................................................................................ 9

   A.   Plaintiffs ................................................................................................................ 9

   B.   Shen Yun Defendants ........................................................................................... 9

   C.   Shujia Gong a/k/a Tianliang Zhang .................................................................. 11

   D.   International Bank of Chicago ............................................................................ 11

FACTUAL ALLEGATIONS ........................................................................................... 12

   A.   Shen Yun Background ....................................................................................... 12

   B.   The Shen Yun Defendants' Centralized Organizational Structure ................... 17

   C.   Shen Yun's Core Motive is Commercial ........................................................... 21

   D.   The Shen Yun Defendants' Use of Forced Labor ............................................. 25

   E.   The Bleak Reality of Life in Shen Yun at Dragon Springs .............................. 31

      1.   The Shen Yun Defendants' System of Coercion and Control ..................... 34

         a.   Control of Physical Movement ................................................................. 36

         b.   Control of Communication ....................................................................... 38

         c.   Control of Access to Information .............................................................. 39

         d.   Control of Access to Medical Care ........................................................... 41

         e.   Control of Eating Habits ........................................................................... 42

         f.   Control Through Public Humiliation ........................................................ 44

         g.   Control of Romantic and Family Relationships ........................................ 46

         h.   Control of Finances .................................................................................. 47

      2.   Performers Reasonably Fear That They Will Face Grave Harm If They Cease their Labor ................................................................................................................ 48

i

F.    The International Bank of Chicago Facilitated and Benefitted from the Shen Yun Defendants' Venture ................................................................. 51

G.    Defendants Violated New York Labor Law and Failed to Pay Performers Minimum Wage and Overtime Payments .................................................. 65

H.    Plaintiffs' Forced Labor for Shen Yun's Commercial Enterprise ................... 67

    1.    Plaintiff Koko Chang's Forced Labor as a Dancer for Shen Yun .............. 67

    2.    Plaintiff Daisy Wang's Forced Labor as a Dancer for Shen Yun.............. 77

    3.    Plaintiff Nathan Xie's Forced Labor as a Musician for Shen Yun ............ 85

    4.    Plaintiff Hofmann Zhu's Forced Labor as a Musician for Shen Yun......... 91

TVPRA CLASS ALLEGATIONS ............................................................. 98

NEW YORK LABOR LAW CLASS ALLEGATIONS ................................. 101

COUNT ONE ........................................................................................ 103

COUNT TWO ....................................................................................... 104

COUNT THREE .................................................................................... 106

COUNT FOUR ...................................................................................... 107

COUNT FIVE ........................................................................................ 108

COUNT SIX........................................................................................... 109

COUNT SEVEN .................................................................................... 110

COUNT EIGHT ..................................................................................... 111

COUNT NINE ....................................................................................... 111

COUNT TEN ......................................................................................... 112

COUNT ELEVEN .................................................................................. 112

COUNT TWELVE.................................................................................. 113

PRAYER FOR RELIEF .......................................................................... 114

DEMAND FOR A JURY TRIAL............................................................. 114

Chun-ko "Koko" Chang, Yi Ran "Daisy" Wang, Guanee "Nathan" Xie, and Hofmann Zhu ("Plaintiffs"), on behalf of themselves and all others similarly situated, seek damages and injunctive relief against Shen Yun Performing Arts, Inc. ("Shen Yun"), Fei Tian College, Fei Tian Academy of the Arts, Dragon Springs Buddhist Inc. ("Dragon Springs"), Hongzhi Li, Rui Li (together, "the Shen Yun Defendants"), Shujia Gong a/k/a Tianliang Zhang ("Zhang"), and the International Bank of Chicago (collectively, "Defendants"), as follows:

## INTRODUCTION

1.      Shen Yun touts itself as a nonprofit dance company devoted to highlighting traditional Chinese culture and morality and to exposing the cruelty of the Chinese Communist Party ("CCP"). But the truth is Shen Yun is a huge commercial enterprise that has generated hundreds of millions of dollars via forced child labor of vulnerable minors, for the financial benefit of Hongzhi Li, his wife Rui Li, and the rest of the Defendants.

2.      Hongzhi Li works with and through the other Shen Yun Defendants to target children as young as eleven years old, whom they recruit to work as dancers and musicians for Shen Yun and to live at the Dragon Springs compound in New York (the "Performers"). Many Performers are recruited from abroad, and all Performers are children of adherents of a movement called Falun Gong. Because of their young age, Performers cannot have joined or participated in Shen Yun or Falun Gong voluntarily.

3.      Hongzhi Li founded and leads Falun Gong. Falun Gong is a practice that combines teachings for self-improvement and meditation exercises. Hongzhi Li is the source of these teachings. Shen Yun's child workers call him Master Li, and Rui Li is called the "Master's Wife." Hongzhi Li has repeatedly asserted—both publicly and to adherents—that Falun Gong is not a religion.

4.      The families who send their children to live at Dragon Springs are led to believe that Hongzhi Li will protect their children and provide them with an education and opportunities for advancement. However, once uprooted from their families, the Shen Yun Defendants instead subject Performers to a system of coercion and control that extends to nearly every aspect of the Performers' lives, cuts them off from much of the outside world, threatens them with grave physical harm if they do not comply with the harsh conditions or try to leave, and forces the Performers to labor long hours for the Shen Yun Defendants' monetary gain.

5.      Falun Gong has been banned by the Chinese Communist Party (CCP) and its members have been targeted for persecution by the CCP. But the tragic irony is that the Lis have adopted some of the CCP's most abusive practices, including subjecting offenders to large-scale, public humiliation reminiscent of the Cultural Revolution's mass criticism sessions, which were used to break the spirit of those the CCP viewed as enemies. The Lis use this tactic on Shen Yun Performers, starting from when they are vulnerable minors, to ensure the Performers' compliance in a forced labor scheme that lines the Lis' pockets.

6.      Hongzhi Li established himself as the ultimate authority within the Falun Gong community and centralized his power at Dragon Springs, where he resides. Hongzhi Li uses Shen Yun to exploit his authority for commercial gain. The Shen Yun Defendants teach the child Performers that defying Hongzhi Li's authority will result in a loss of his protection, ostracization from the community, destruction of their reputation, and expose them to physical and moral peril. Ensconced in the world of Shen Yun at an impressionable age, Performers reasonably believe that they cannot refuse Hongzhi Li's directives that they perform for Shen Yun without facing grave harm.

7.    From the start of their time at the Dragon Springs compound, the Performers' schedules are tightly controlled by the Shen Yun Defendants. The Performers are allegedly recruited to attend the Fei Tian Academy of the Arts or Fei Tian College (the "Fei Tian Schools"), but in reality, the Fei Tian Schools operate as a cover for the forced labor scheme.

8.    Fei Tian Academy houses students in grades six through twelve, after which students typically matriculate into the Fei Tian College. However, any purported education provided by the Fei Tian Schools is perfunctory at best, and grossly deficient at worst, with little to no academic requirements for advancement; instead, Performers are required to spend long hours rehearsing and practicing for Shen Yun performances.

9.    While ostensibly at Dragon Springs as students, Performers are quickly directed toward fulfilling the Defendants' goal of perpetuating their forced labor scheme: performing uncompensated or undercompensated labor as Performers in Shen Yun performances, so that Defendants may reap massive financial benefits.

10.    Within mere months of their arrival at the Fei Tian Schools, Performers are incorporated into the Shen Yun tours. They tour from December through May and travel across the country and abroad to perform for large audiences. During this time, Performers do not attend any classes or receive any formal education. While on tour, Performers typically have no days off, and they regularly work over 16-hour days, engaging in pre-show rehearsal, setting up the set and the show, performing in at least one or more shows a day, breaking down and packing up the set, and traveling to the next location.

11.    Performers are not properly compensated for these long hours in a lawful manner. In their first year on tour, Performers are generally not paid at all. Starting in their second year on tour, Performers are generally paid between $300 and $500 dollars per month. Even after they

graduate from Fei Tian College and are considered "professional" performers, the Shen Yun Defendants only pay Performers $1,000 a month. All Performers for Shen Yun are largely paid according to the same inadequate schedule. These amounts do not vary based on the number of hours Performers worked, they fall well below the minimum wage guidelines, and they never include overtime pay—notwithstanding the work regularly extending to more than 40 hours per week and often more than 80 hours per week. These blatant violations of New York State law are currently being investigated by the New York Department of Labor.

12.     The Shen Yun Defendants profit handsomely from this arrangement. With their scheme ensuring a ready supply of forced child labor, the Shen Yun Defendants keep overhead low, sidestep requirements to pay Performers minimum wages, overtime, payroll taxes, or benefits, and thereby maximize their revenues from their coercive exploitation of children. Indeed, Shen Yun has pocketed hundreds of millions of dollars as revenue from its performances and, among its other assets, reportedly holds over $249 million in cash.

13.     The mastermind of the forced labor scheme, Hongzhi Li, and his wife, Rui Li, effectively control Shen Yun's considerable assets, and personally and secretively benefit from that control by living a life of privilege via arrangements that obscure their beneficial ownership, all the while espousing to Performers the importance of sacrificing their material desires and well-being in order to make Shen Yun possible.

14.     Performers labor for little to no compensation because they reasonably believe that disobeying Hongzhi Li's directives to perform for Shen Yun will result in grave harm to themselves and their families. The Shen Yun Defendants have established protocols and practices whereby Hongzhi Li's directives govern nearly every aspect of Performers' lives and foreclose

any opportunities for outside influence or support, consequently making a challenge to the authority of Shen Yun seems insurmountable.

15.     The Shen Yun Defendants aggressively police Performers' physical movement and intellectual freedom in order to prevent them from leaving. For example, Performers are not permitted to leave the Dragon Springs compound without the Shen Yun Defendants' permission, even after they reach adulthood. The enforcement of this rule begins when the Shen Yun Defendants confiscate Performers' passports and immigration documentation upon arrival at Dragon Springs, and it continues when armed guards and German Shepherds stationed at the gates keep Performers inside the compound. The Shen Yun Defendants further isolate Performers—who begin with Shen Yun at a young age—from persons outside the forced labor scheme by restricting their access to the internet and smart phones, limiting communication with the Performers' own families, and forbidding contact with any individuals that reject the authority of Hongzhi Li. Performers are also prohibited from consuming unapproved media, with most of the approved media originating from affiliates of Hongzhi Li.

16.     The Shen Yun Defendants control the Performers' bodies and personal lives. The Shen Yun Defendants regularly deprive Performers of necessary medical care and instruct them that injury or illness is a result of imperfect adherence to Hongzhi Li's teachings. The Shen Yun Defendants also control and dictate Performers' eating habits and weight. The Shen Yun Defendants control also extends to Performers' family and romantic relationships, providing that Rui Li's permission is required not only for any romantic or marital relationships, but also that she must sanction whether a married couple may become pregnant.

17.     The Shen Yun Defendants also use their control to force Performers to engage in illegal conduct. On multiple occasions, minor Performers—while traveling back to the United

States from Shen Yun shows in Europe—were forced by their company managers to carry large amounts of cash on their person into the United States ($10,000 per performer) and not declare it on any customs documentation, like the required Currency Reporting Form (FinCEN Form 105). The Performers were instructed to lie about the source and purpose of the cash if questioned by government officials.

18.     The Shen Yun Defendants, primarily through Rui Li, also use their authority to organize green card marriages in which non-citizen Performers pair up with Performers who are U.S. citizens. This allows the Shen Yun Defendants to maintain a non-citizen Performer's residence in the United States—and exploitation in the Shen Yun Defendants' forced labor scheme—without the Shen Yun Defendants having to pay the considerable costs associated with work visas for the non-citizen Performer.

19.     The Shen Yun Defendants regularly demonstrate to Performers the perils of disobeying any of these rules. Even from a young age, Performers who are perceived to fall short of Hongzhi Li's directives and expectations are subjected to mass criticism sessions wherein they are berated on stage in front of the entire community, publicly humiliated, and made to apologize for their alleged shortcomings. These are terrifying, traumatizing sessions for the Performers. Being subject to or witnessing this public humiliation creates a deep atmosphere of fear and coercion—especially for children. Violations that lead to mass criticism can include acts as miniscule as looking at comic books. Performers accordingly fear stepping out of line with respect to any of the numerous rules that govern life under the auspices of Shen Yun.

20.     Still, the Shen Yun Defendants save the harshest treatment for those who have left the community. Individuals that leave Shen Yun are ostracized by the broader community, the community members are instructed to publicly shame them, and their reputation is destroyed. What

is more, the Shen Yun Defendants tell Performers that grave harm has befallen these individuals because of their rejection of Hongzhi Li, including violent death, suicide, deadly illness, moral depravity, destitution, or becoming a tool of the CCP.

21.    Performers are also warned that they will face monetary harm if they leave Shen Yun. Although all Performers who enroll at the Fei Tian Academy and Fei Tain College are given "scholarships" including room and board, the Shen Yun Defendants do not issue the scholarships as an act of generosity. Rather, they are another means for trapping Performers in the forced labor system, as the Shen Yun Defendants have told many former Performers that quitting Shen Yun would contractually require them to repay the cost of tuition. The Shen Yun Defendants value the scholarships at approximately $50,000 per year, which amounts to as much as $550,000 for a student that passed through every grade in the middle and high school classes at Fei Tian Academy and four years of Fei Tian College.

22.    The Shen Yun Defendants' practices, individually and taken together, are intended to and do in fact cause Plaintiff and Performers to believe that they would face serious harm if they did not perform labor as Shen Yun Performers.

23.    The International Bank of Chicago ("Bank") is the Shen Yun Defendants' financial institution. Founded by close personal friends of the Lis, the Bank serves as the bank to the Shen Yun Defendants and the Performers, turning a blind eye to the obvious coercion and control of children taking place at the Fei Tian Schools. All Defendants knew or should have known about the Shen Yun Defendants' offenses and misconduct, and the International Bank of Chicago, along with all participants, is jointly and severally liable for the physical, emotional, psychological, and economic harm caused to Plaintiffs and Performers.

24.     The Shen Yun Defendants' practices are being investigated criminally and civilly, by both federal and state regulators and law enforcement, including the U.S. Attorney's Office for the Southern District of New York, the U.S. State Department's Diplomatic Security Service, the U.S. Department of Homeland Security, and New York Department of Labor.

25.     Plaintiffs allege violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") against Defendants on behalf of a proposed class of individuals who were dancers and musicians for the Shen Yun Defendants and lived at the compound at Dragon Springs ("Performers"). Plaintiffs also allege violations of the New York Labor Law on behalf of a proposed class of individuals who worked for Shen Yun as non-exempt performers, including dancers and musicians in New York in the previous six years ("Performers"). Plaintiffs do not allege employment discrimination. Nor do Plaintiffs seek reinstatement or related relief, such as front pay. Nor do Plaintiffs seek any relief that would require the Shen Yun Defendants to accept Performers that the Shen Yun Defendants do not want, or that would penalize the Shen Yun Defendants for terminating an unwanted Performer.

26.     Plaintiffs were forced to work as Shen Yun Performers from when they were minors until their mid-20s. They bring this case to protect other similarly situated individuals, for damages that they and other similarly situated individuals suffered as a result of Defendants' scheme to force them to labor under threat of serious harm and without pay, and to enjoin Defendants from continuing their unlawful practices, including the systemic practice of coercing children into forced labor for Defendants' commercial benefit.

27.     Plaintiffs' investigation is ongoing. Discovery will yield more information about Defendants' violations of law.

## JURISDICTION AND VENUE

28.     Jurisdiction is proper under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely 18 U.S.C. § 1581 *et seq.*, and because 18 U.S.C. § 1595(a) provides that such actions may be brought "in an appropriate district court of the United States[.]"

29.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### A.     Plaintiffs

30.     Plaintiff Chun-ko Chang is a former dancer who worked for Shen Yun throughout the United States, including in the state of New York, and she is an adult resident of Taiwan.

31.     Plaintiff Yi Ran "Daisy" Wang is a former dancer who worked for Shen Yun throughout the United States, including in the state of New York, and she is an adult resident of Vancouver, Canada.

32.     Plaintiff Guanee "Nathan" Xie is a former musician who worked for Shen Yun throughout the United States, including in the state of New York, and he is an adult resident of New York, New York.

33.     Plaintiff Hofmann Zhu is a former musician who worked for Shen Yun throughout the United States, including in the state of New York, and he is an adult resident of the United States.

### B.     Shen Yun Defendants

34.     Defendant Shen Yun Performing Arts, Inc. ("Shen Yun") is a nonprofit organization established in New York State. Shen Yun operates as a dance and music company.

35.     Defendant Fei Tian Academy of the Arts ("Fei Tian Academy") is a nonprofit secondary school, serving grades six through twelve, based in New York State. Fei Tian Academy's headquarters are located at 140 Galley Hill Road, Cuddebackville, New York, 12729.

36.     Defendant Fei Tian College ("Fei Tian College") is a nonprofit college based in New York State that offers baccalaureate and Hongzhi Li's programs in Music and Classical Chinese Dance. Fei Tian College's headquarters are located at 140 Galley Hill Road, Cuddebackville, New York, 12729.

37.     Defendant Dragon Springs Buddhist, Inc. ("Dragon Springs") is a nonprofit organization established in New York State. Dragon Springs' headquarters are located at 140 Galley Hill Road, Cuddebackville, New York, 12729.

38.     Defendant Hongzhi Li is the founder and leader of Falun Gong or Falun Dafa ("Falun Gong") and he founded and created Defendants Shen Yun Foundation, Shen Yun, Fei Tian College, and Fei Tian Academy of the Arts, as well as the Dragon Springs compound.

39.     Defendant Rui Li (a/k/a Sandy Rebecca Lee) is married to Defendant Hongzhi Li and helps Defendant Hongzhi Li manage Defendants Shen Yun Foundation, Shen Yun, Fei Tian College, and Fei Tian Academy of the Arts, as well as the Dragon Springs compound.

40.     Shen Yun, Fei Tian Academy, Fei Tian College, Dragon Springs (the "Shen Yun Entity Defendants") serve as alter egos for the individual defendants Hongzhi Li and Rui Li.

41.     None of the Shen Yun Entity Defendants adhere to corporate formalities: Hongzhi Li and Rui Li manage the day-to-day operations of each of those entities, transitioning from tasks for Shen Yun to tasks for Fei Tian Academy to tasks for Fei Tian College to tasks for Dragon Springs.

42.    The individuals who purportedly run the respective entities all report to Hongzhi Li. Li, in turn, supervises all of those individuals who follow his directives.

43.    All the Shen Yun Entity Defendants work towards the same primary goal: generating tens of millions of dollars in revenue from Shen Yun performances each year. Each entity plays a clear role in that goal: Fei Tian Academy lures minors to become Performers; Fei Tian College lures those minors into staying into their early adulthood, providing even more of their labor to performing for Shen Yun; and Dragon Springs houses all these entities, the individual Defendants, and the Performers under one roof.

### C.    Shujia Gong a/k/a Tianliang Zhang

44.    Defendant Shujia Gong a/k/a Tianliang Zhang ("Zhang") is an agent and employee of Shen Yun, Fei Tian Academy, and Fei Tian College. Among other things, Zhang taught history to students. Zhang is also a public relations spokesperson for the Shen Yun Defendants' efforts, including (as discussed in further detail below) their public efforts to justify the misconduct alleged herein, as well as their efforts to publicly retaliate against and intimidate those who speak out, including Plaintiff. Zhang is also the founder of a nonprofit called the Tianliang Alliance, Inc., located at 99 Galley Hill Road, Cuddebackville, New York, 12729, to which he claims to devote 40 hours per week, and which claims as its mission: "Support Art, Education and mass communication projects that can elevate society." In fiscal years 2021 and 2022, Tianliang Alliance claims to have not had any paid employees, but did have over $1 million in revenues, most (if not all) of which was from Shen Yun or Falun Gong related activities.

### D.    International Bank of Chicago

45.    Defendant International Bank of Chicago is a bank organized under the laws of the State of Illinois. It has its principal place of business in Chicago, Illinois. It has a branch located at 2 West Main Street, Port Jervis, New York, 12771, from which it services the Shen Yun

Defendants. The Bank's president and CEO is Y. Frank Wang. The Bank is a unit of IBC Bancorp Inc.

## FACTUAL ALLEGATIONS

46.    The factual allegations in this complaint are based on an investigation drawing on an array of public and non-public information, including information obtained from: witnesses with direct and indirect knowledge of the facts; press reports, including investigative journalism and foreign language sources; academic research; internal documents shared with Plaintiffs' counsel; information obtained from government sources via Freedom of Information Act requests; public and private statements made by the Shen Yun Defendants; and Plaintiffs' own knowledge.

### A.    Shen Yun Background

47.    Shen Yun is a massively successful performing arts company that stages hundreds of dance and musical performances across the world each year. Shen Yun is registered as a non-profit, but the company rakes in hundreds of millions of dollars that inure to the benefit of Defendants.

48.    Shen Yun was founded in 2006 by Hongzhi Li in the Hudson Valley region of New York. Shen Yun operates out of Dragon Springs in Cuddebackville, NY, where its offices and rehearsal spaces are based.

49.    Dragon Springs is geographically isolated from its surroundings.



50. Shen Yun's stated mission is to "revive traditional Chinese culture" and achieve "a revival of the beauty and goodness of China before communism" by showcasing the beauty and technical excellence of traditional Chinese dance.[1] These performances also highlight the threats Shen Yun perceives to traditional Chinese culture: the influence of the Chinese Communist Party as well as its persecution of those who practice Falun Gong.[2]

51. Shen Yun is clear that their shows serve a political agenda. It describes itself as "[a] performing arts company up against the world's biggest dictatorship."[3] Shen Yun explains that "[b]y performing 'China before communism,' as our tagline says, Shen Yun also allows people to envision a China without communism."[4]

---

[1] Shen Yun Performing Arts, *Shen Yun Factsheet*, https://pl.shenyun.org/shen-yun-factsheet (last visited Nov. 23, 2024).

[2] Shen Yun Performing Arts, *Challenges We Face*, https://www.shenyun.org/challenges-we-face (last visited Nov. 23, 2024).

[3] *Id.*

[4] *Id.*

52.     Shen Yun is organized into eight companies that are staffed by Performers. Each company includes approximately eighty (80) dancers, orchestra musicians, singers, emcees, and production crews.[5]

53.     Large-scale group dance accompanied by orchestra music is at the center of Shen Yun productions. Each company performs what Shen Yun describes as classical Chinese dances done by "elite performers." The technique is highly specialized. Shen Yun explains that "[o]nly Shen Yun performs classical Chinese dance in its purest form, preserving its traditional aesthetic the way it was originally passed down."[6]



54.     The Shen Yun choreography incorporates "leaps, flips, spins and other difficult tumbling techniques, forming an extensive and independent dance system."[7] These movements are extremely difficult.

55.     Learning and performing the most advanced technical moves used in Shen Yun choreography requires extensive, specialized training and high levels of discipline.

---

[5] Shen Yun Performing Arts, *FAQ*, https://www.shenyun.org/faq (last visited Nov. 23, 2024).

[6] Shen Yun Performing Arts, *9 Characteristics That Make Shen Yun Unique*, https://www.shenyun.org/classical-chinese-dance-music-costumes-singers-and-more (last visited November 22, 2024).



56.    Shen Yun targets children and young adults to perform these techniques. As Shen

Yun puts it:

> Shen Yun's primary art form, classical Chinese dance, is a young person's game.
> Its standards—for form, flexibility, tumbling and flipping, and other special
> techniques—are more precise and difficult skill-wise than what is required in many
> other dance forms, and make classical Chinese dance highly akin to gymnastics or
> other elite sports in terms of the level of athleticism required. And much like

---

[8] Shen Yun Performing Arts, *Classical Chinese Dance*, https://www.shenyun.org/classical-chinese-dance (last visited Nov. 23, 2024).

gymnastics (where, for example, the average age of female Olympic gold medalists is 18), the golden years for classical Chinese dancers are their mid-teens into early 20s.[9]

57.    Shen Yun markets aggressively to audiences world-wide by using mailers, billboards, online ads, and commercials. Every year, local organizations and individuals associated with Shen Yun spend tens of millions of dollars on its ubiquitous advertising in the United States alone.

58.    Shen Yun's companies regularly perform in approximately 200 cities across five continents. Shen Yun reported that its 2024 season was its biggest tour ever and broke records by featuring 810 performances across 209 cities in 22 countries.

59.    Shen Yun is a vast enterprise that is extremely lucrative, selling millions of dollars in tickets during its season each year. These tickets range in cost from approximately $80 to $300, with the average cost of a ticket at approximately $220.

60.    The Shen Yun companies pack this incredible volume of performances into only 4.5 to 5 months per year, typically organizing tours from Christmas to early May. Performers dance and play in over 100 shows in a season and often perform multiple shows per day. For example, in a recent tour that took place in March and April 2025, one company performed eighteen (18) shows over the course of fifteen (15) days at New York City's David H. Koch Theater at Lincoln Center.

61.    Shen Yun expends strikingly little on overhead to conduct its tours. Shen Yun performs by invitation only and is hosted and "presented" by local organizations or individuals who wish to bring Shen Yun to their communities. The local organizers pay to rent the performance

---

[9] Shen Yun Performing Arts, *New York Times Coverage of Shen Yun Riddled with Inaccuracies and Exudes Bias*, https://www.shenyunperformingarts.org/news/view/article/e/fiplEp2lQYA/new-york-times-coverage-riddled-with-inaccuracies-bias.html (last visited Nov. 23, 2024).

venue, promote the show, and sell tickets. After the expenses of the local organizers are covered through ticket sales, all proceeds go to Shen Yun. If the show makes no profits, the local organizers are not reimbursed and are out the money they put in to bring the show to their city, i.e., Shen Yun has outsourced its downside risk of putting on the show to the local organizers.

62.     As a result, the primary cost associated with putting on these productions for Shen Yun is the labor of the Performers. However, instead of appropriately and lawfully compensating the employees, Shen Yun has established a complex forced and child labor scheme to avoid these costs and ensure that Defendants pocket all the proceeds on the backs of the Performers who work crushing schedules to make those performances happen.

63.     While the Shen Yun Defendants have successfully staffed most of their performances with individuals that began with the program as children, they have had to at times supplement their ranks with a small number of professional adult musicians.

64.     The Shen Yun Defendants would frequently recruit these professional musicians from European countries where the cost of living was relatively low and where professional musicians were paid little, thereby enabling the Shen Yun Defendants to pay them low salaries.

65.     Even with their relatively meager salaries, these professional musicians were paid more than the Performers. Yet the Performers often worked more overall and performed more grueling labor, particularly on performance days where the Performers had to set up and tear down the performance sets.

66.     The professional adult musicians were often not Falun Gong practitioners, did not live at Dragon Springs, did not follow Hongzhi Li's teachings, and had high levels of attrition.

**B.     The Shen Yun Defendants' Centralized Organizational Structure**

67.     The commercial enterprise that constitutes Shen Yun has a hierarchal decision-making structure. At the top of it is Hongzhi Li, whose authority is absolute and unquestioned.

68.     After this lawsuit was filed, a paper founded and operated by Falun Gong practitioners, *The Epoch Times*, sought to downplay Hongzhi Li's role, calling him the "artistic director" of Shen Yun Performing Arts and asserting that Li "holds no administrative position in any of the organizations or projects" relating to Shen Yun and does not "run their daily operations."

69.     These statements are misleading. Hongzhi Li is the founder and ultimate authority on every decision pertaining to Shen Yun. He has absolute administrative authority across Shen Yun, Dragon Springs, and the Fei Tian Schools.

70.     He shares that authority with his right-hand lieutenant—his wife, Rui Li—who serves in a chief operating officer role for Shen Yun. Rui Li is also a company manager.

71.     Several administrators directly report to the Lis to implement their various commands. Together with the Lis, they work out of what is referred to as "the office" at Dragon Springs. The office is the nerve center for all of the Shen Yun Defendants.

72.     These administrators have included, for example, Siu Qing (a/k/a Judy Siu), who (before her death) was often one of the first points of contact between the Shen Yun Defendants and new Performers. She advised Performers of the rules and restrictions on their behavior and served as the custodian on all International Bank of Chicago accounts opened for minor Performers.

73.     Reporting to the Lis are also the administrators of the Fei Tian Schools, the company managers who operate the Shen Yun performances, and the administrators of Dragon Springs—the entity that operates the compound. Teachers report to the Fei Tian administrators.

74.     Performers are at the bottom of the hierarchy, subject to discipline, control, and forced to labor for thousands of hours each year for the benefit of the Shen Yun commercial enterprise, all of which is enforced through the decision-making structure described above.

75.    Within this structure, decision-making authority is deeply centralized within Hongzhi Li and Rui Li. The Lis make ultimate decisions about, for example, whether Performers are ever permitted to leave Dragon Springs, what companies Performers should be placed in, hiring and firing and expulsion decisions over any person within the Shen Yun commercial enterprise, whether Performers may meet with their parents on certain occasions, and the like.

76.    The Lis set both the tone and operational protocol of the Shen Yun enterprise. Hongzhi Li has claimed that he, for example, came up with the idea to use minors as the primary labor for Shen Yun.[10] No significant decisions are made without the Lis' input or knowledge.

77.    Hongzhi Li and Rui Li also have considerable influence and power over the non-defendant parallel media outlets closely affiliated with Shen Yun: *The Epoch Times*, a media company and newspaper that generated $121 million in revenue in 2021, and Universal Communications, a global television network doing business as "New Tang Dynasty TV" (or "NTD") that generated $48.9 million in revenue in 2022. Together, these businesses (Shen Yun, *The Epoch Times*, and NTD) generate hundreds of millions of dollars.

78.    Hongzhi Li has referred to *The Epoch Times* and NTD as "our media." Employees at the organizations fear speaking negatively in public about those businesses' inner workings because to do so is considered "tantamount to disobeying" Li.

79.    *The Epoch Times* and NTD staff regularly visit Dragon Springs to have non-public meetings with Li. And *The Epoch Times*' top editors have traveled to Dragon Springs to meet with

---

[10]    Li Hongzhi, "Fa Teaching Given at the NTDTV Meeting" (June 6, 2009), https://en.minghui.org/html/articles/2009/8/20/110204.html ("Back in the days when Shen Yun Performing Arts was being established, I made up my mind and decided to use young Dafa disciples for this[.]") (date accessed: April 20, 2008).

Hongzhi Li on "editorial and strategic decisions," showing he acts "as a kind of shadow publisher."[11]

80.    References in this complaint to the Shen Yun Defendants as a group thus reflects that the Shen Yun Defendants operate as one organization that is the alter ego—or at minimum the agent—of Hongzhi Li and Rui Li. The administrators, company managers, teachers, other workers, and Performers who operate the Shen Yun Defendants comprise this group and work at the direction and under the supervision of Hongzhi Li and Rui Li.

81.    The Shen Yun Defendants are not treated as independent profit centers. Rather, all of the entities serve only one purpose: the Shen Yun performing arts commercial venture.

82.    The Shen Yun Defendants subsidize Hongzhi Li and Rui Li's personal lives. The Lis (much of the time) live at Dragon Springs, and they involve their employees in their personal matters.

83.    There is complete overlap in the Shen Yun Defendants' leadership and ultimate decision-makers: the Lis.

84.    The Shen Yun Defendants do not exercise individual business discretion. Rather, they do what they are told by the Lis.

85.    The Shen Yun Defendants do not deal with each other at arm's length.

86.    The Shen Yun Defendants all share property used by the other Shen Yun Defendant. They each operate out of Dragon Springs.

---

[11] *See* Kevin Roose, *How The Epoch Times Created a Giant Influence Machine*, THE NEW YORK TIMES (updated March 9, 2021), https://www.nytimes.com/2020/10/24/technology/epoch-times-influence-falun-gong.html ("Many employees and Falun Gong practitioners contacted by The [New York] Times said they were instructed not to divulge details of the outlet's inner workings. They said they had been told that speaking negatively about The Epoch Times would be tantamount to disobeying Mr. Li, who is known by his disciples as 'Master.'").

### C.    Shen Yun's Core Motive is Commercial

87.    Despite its non-profit designation, Shen Yun's core motive is commercial. Shen Yun generated revenues of $51.5 million in 2023 alone, with holdings valued above $265 million dollars (most of which is in cash).

88.    Hongzhi Li and the other Shen Yun Defendants generate extraordinary profits from the Shen Yun performances. Hongzhi Li and his wife Rui Li effectively control those assets and live a life of privilege. The Lis have owned many luxurious houses over the years, including a New Jersey house that is in Rui Li's name that was purchased for $2.3 million dollars in 2005. The Lis employ a bodyguard/driver. They routinely use their wealth to engage in high-end shopping for luxury brands like Rolex and Chanel. They own an ultra-high end luxury vehicle (a Mercedes-Maybach) that sells for approximately $170,000 (a photo of the car at Dragon Springs is below):



89.    The Lis extend the benefits of their commercial enterprise to their family members, who receive favorable treatment that others do not. The Lis' daughter, who has also been a dancer for Shen Yun, is treated like a princess at Dragon Springs, receiving favorable treatment and

particular luxuries. Unlike the other dancers and musicians, the Lis' daughter had the freedom to leave Dragon Springs at will, to skip dance lessons, and to live in a dormitory with only one other person. When she has complained about the quality of a hotel while Shen Yun was traveling on tour, her parents transferred her and her dance company to the nicest hotel they could find. By contrast, other Performers did not have the freedom to leave Dragon Springs, were berated if they skipped dance or music lessons, shared dormitory rooms in groups of four, and were punished for weakness or disloyalty if they ever complained about anything pertaining to their experience with Shen Yun.

90.     The Shen Yun Defendants are highly motivated to ensure the Shen Yun performances continue to rake in millions of dollars, and they have orchestrated the forced labor scheme to ensure the steady supply of cheap or uncompensated labor that makes the performances possible.

91.     Notably, while Hongzhi Li is the founder and leader of the Falun Gong movement and Shen Yun describes its approach as guided by the principles of the Falun Gong spiritual practice, neither Shen Yun's activity nor the acts undertaken by the Shen Yun Defendants in furtherance of the forced labor scheme are religious in character.

92.     Falun Gong describes itself as a practice grounded in self-improvement through the study of teachings, and gentle exercises and meditation.

93.     The Falun Gong movement is not a religion. Hongzhi Li himself has made this point clear, and he has directed his followers to clearly relay this message. For example, in an interview, Hongzhi Li said—in response to a question about whether Falun Gong was a religion—

that "[w]e do not get involved in faiths," and that instead Falun Gong "is a practice that can remove illnesses, keep people fit and make one live longer," likening it to "a morning exercise."[12]

94.     Moreover, the Shen Yun Defendants or those affiliated with them have taken the position that Shen Yun is not affiliated with Falun Gong and that they are not religious in nature in connection with legal proceedings in other jurisdictions. For example, Shen Yun has been involved in several legal proceedings in Korea. Some of those cases involve venues cancelling Shen Yun shows and Shen Yun suing for breach of contract. Others involve Shen Yun suing reporters for defamation. In those proceedings, the issue of whether Shen Yun was affiliated with Falun Gong, and whether Falun Gong was a cult, has arisen. In connection with certain of those proceedings, the Shen Yun Defendants (or their affiliates) took the position in court that "Shen Yun's performances have nothing to do with Falun Gong."[13] Also in connection with certain of those proceedings, the Shen Yun Defendants (or their affiliates) issued public statements that Shen Yun and Falun Gong are nothing more than "a fine art group that restores traditional Chinese culture," and that Falun Gong is nothing more than a "traditional cultivation system based on qigong and meditation, [and] not a specific faith or religion."[14]

95.     Shen Yun's promotional materials likewise describe Falun Gong as "a practice that combines teachings for self-improvement and meditation exercises."[15] They note that the Falun Gong exercises are "part of our daily schedule, and every day has time slots allotted to group meditation and study sessions."[16] The promotional materials describe Falun Gong as a

---

[12] *See* "The Way We Live Now: 8-8-99: Questions for Li Hongzhi; Eye of the Storm," *The New York Times Magazine* (Aug. 8, 1999).

[13] Translated from Korean.

[14] Translated from Korean.

[15] Shen Yun Performing Arts, *FAQ*, https://www.shenyun.org/faq (last visited Nov. 23, 2024).

[16] Shen Yun Performing Arts, *Life at Shen Yun*, https://www.shenyun.org/life-at-shen-yun (last visited Nov. 23, 2024).

philosophical, moral, and political but non-religious practice that helps Performers center themselves. Shen Yun explains that, "[i]n ancient China, artists would practice meditation and seek inner stillness and a connection with the universe . . . Shen Yun's artists follow this noble tradition."[17]

96.    Falun Gong originated during China's secular "Qigong boom" of the 1980s and 1990s, a social phenomenon that saw an explosive rise in the popularity of Qigong, a tai chi-like practice that claimed to promote health and inner well-being through specific movements and breathing techniques. Falun Gong is a prominent sub movement of Qigong first taught publicly in 1992 and it incorporates a moral, not religious philosophy. These teachings "are centered on three main principles—truth, compassion, and forbearance."[18]

97.    Consistent with this, none of the advertising for the Shen Yun performances portrays the group or performances as religious in nature.

98.    While Performers are frequently minors who are recruited from Falun Gong families, the Shen Yun Defendants also employ adult musicians who are not practitioners.

99.    The messaging during the show is not religious and does not involve proselytizing or evangelizing. To the extent there is messaging, it is aesthetic, historical, or a political critique of the Chinese Communist Party.

100.    Indeed, Falun Gong has positioned itself as a political movement in that it is staunchly anti-communist and is an outspoken critic of the Chinese Communist Party.

101.    Shen Yun describes its performances as aligned with this political position. "Shen Yun's mission is to revive traditional Chinese culture, the same heritage of five millennia that the

---

[17] Shen Yun Performing Arts, *FAQ*, https://www.shenyun.org/faq (last visited Nov. 23, 2024).

[18] *Id*.

Chinese Communist Party (CCP) has spent a century destroying." The performances also tell of the dangers of the Chinese Communist Party and its suppression of the Falun Gong community. The Performers are tasked solely with communicating the evils of the CCP and portraying classical Chinese dance and music.

102.    The tragic irony, however, is that the Shen Yun Defendants now rely on the exploitation and abuse of the members of the same vulnerable group—their own Performers, the children of adherents of Falun Gong—to put on these performances. Worse still, in so doing, they use many of the same tactics as the CCP to threaten, frighten, and control those subject to their authority.

103.    Given the Shen Yun Defendants' repeated assertions that they are not a religion, any claim by the Shen Yun Defendants that the Shen Yun performances involve religious practice or that Falun Gong is a religion is insincere.

**D.    The Shen Yun Defendants' Use of Forced Labor**

104.    As part of their commercial performing arts enterprise, the Shen Yun Defendants have established a sophisticated operation that is designed to identify and recruit vulnerable minors to work as Performers, ensnare them in a system that dominates every aspect of their lives, and force them to work grueling hours through multiple methods of control and coercion. The Shen Yun Defendants have created these structures and practices of coercion and control to power the enterprise that is Shen Yun and generate significant profit off the Performers' unpaid or underpaid labor.

105.    As noted above, Hongzhi Li and his wife, Rui Li, preside over Dragon Springs, a guarded compound from which Hongzhi Li directs the activities of Defendants Shen Yun, the Fei Tian Academy, Fei Tian College, and Dragon Springs.

106.    The Shen Yun Defendants are based in and operate from the Dragon Springs compound. The Dragon Springs compound includes all of Shen Yun's administrative and rehearsal facilities and two performing arts boarding schools: Defendants Fei Tian College and Fei Tian Academy for the Arts.

107.    Hongzhi Li works with and through the other Shen Yun Defendants to target children as young as 11 years old, whom they recruit to work as Performers for Shen Yun and live at the Dragon Springs compound.

108.    The Shen Yun Defendants acknowledge that they recruit children because they view "the golden years for classical Chinese dancers [to be a dancer's] mid-teens into early 20s." However, the Shen Yun Defendants' focus on children also has a darker purpose: children are more easily coerced. This is particularly true where, as here, children are uprooted from their home and family environments and become exclusively reliant on the Shen Yun Defendants to meet their basic needs.

109.    The Shen Yun Defendants also specifically recruit only the children of Falun Gong practitioners, thereby preying on individuals particularly vulnerable to their influence. Practitioners believe they are subject to persecution by the CCP, and they view Hongzhi Li as an ultimate authority. Many families who send their children are also based abroad and have no contacts in the United States other than the Shen Yun Defendants, and the children have little to no ability to interact with the outside world without the strict supervision of the Defendants.

110.    The Shen Yun Defendants tell the families that they will enroll the Performers in the Fei Tan Schools. The families who send their children to live at Dragon Springs believe that Hongzhi Li will protect their children, ensure their children's and their families' well-being, and provide their children with an education and opportunities for advancement.

111.    But once uprooted from their families, the Shen Yun Defendants subject Performers to a system of coercion and control that extends to nearly every aspect of their lives and forces the Performers to labor long, brutal hours for little to no pay.

112.    Hongzhi Li and Rui Li direct the activities of the Fei Tian Schools.

113.    The Performers are allegedly recruited to attend the Fei Tian Academy of the Arts or Fei Tian College, but, in fact, these sham schools operate as a cover for the forced labor scheme. For, under the cover of their purported educational purpose, the Fei Tian Schools ensure an ongoing supply of forced child labor to Shen Yun without attracting scrutiny.

114.    All Performers since at least 2008 arrived as students at the Fei Tan Schools and were under the age of 18.

115.    Fei Tian Academy of the Arts, established in March 2007, purports to be a secondary boarding school that accepts students from grades six to twelve. During the 2024-2025 academic year, Fei Tian Academy had approximately 169 students.

116.    Fei Tian College, established in June 2011, purports to offer baccalaureate and masters' degrees. During the 2023-2024 academic year, Fei Tian College had approximately 139 students.

117.    Fei Tian Academy operates as a feeder to Fei Tian College.

118.    Both schools operate primarily as feeders for Shen Yun.

119.    The schools are shams. Any promise of traditional schooling is perfunctory, if not grossly deficient. The Fei Tian Schools conduct minimal formal education and ignore academic standards.

120.    Academic instruction takes place for only three hours per weekday—whether at the College or the Academy. The rest of the day is devoted to rehearsals and training for performances.

In place of an academic curriculum, students at Dragon Springs are subject to rigorous schedules where they must spend as many as twelve hours per day or more engaged in dance and musical training and read Hongzhi Li's writings.

121.    All or nearly all students are trained by the Fei Tian Schools to act as Shen Yun Performers and perform with Shen Yun during the annual performance season. Pulling from the students of Fei Tian Academy, Performers are recruited to dance for Shen Yun as young as 11 and range in age up to 28 years old. Teachers at the Fei Tian Schools generally do not assign homework. Students are told and understand that performing in Shen Yun was their intended focus, not academics.

122.    When touring for five to six months of the year, the Fei Tian Schools do not provide Performers any substantive education. There are no lectures, no classes, no classroom time, and no academic teachers or tutors on tour. There is generally no homework. Some Performers are sometimes given a "packet" while on tour that takes a few hours to complete over the course of the entire months-long tour. Rather, Performers are required only to work for the Shen Yun Defendants' commercial enterprise.

123.    Some Performers are given tablets during their travel time, with which they are ostensibly to do schoolwork. However, this is a pretense, as the students are provided no curriculum, instructors, or books to guide them. Nor do the tablets themselves contain substantive educational material. Instead, they contain a limited set of "approved media." For example, while on the tour bus, Plaintiff Chang was given a tablet and told she could watch the sitcom series "Leave It to Beaver" to learn English. These tablets do not have access to the internet, so Performers cannot communicate with their families or otherwise access the outside world.

124.    The Fei Tian Schools generally do not employ teachers who have schooling in the subject matter they are supposed to teach. An electrical engineering PhD (Defendant Gong), for example, teaches Chinese Civilization and Chinese History at Fei Tian College. At Fei Tian Academy, a math teacher was a former dancer who the Shen Yun Defendants thought was reasonably good at math.

125.    When accreditors came to visit the Fei Tian Schools, Plaintiffs and their fellow Performers were coached: they were told to "be careful," "say how much you like it here," "don't say bad things," and there were entire sessions with Performers to coach them on how to deal with the accreditors and answer questions—so as to give the appearance that the Fei Tian Schools were legitimate educational institutions, when they were not. The Fei Tian Schools would select particular classes with particular students to be on display for the accreditors, and they would shut down other classes for the day for fear that the accreditors would have a complete picture of deficient educational life at Dragon Springs. Other students would be told to avoid the accreditors completely and stay out of their way.

126.    The Fei Tian Schools also provide false and misleading information on transcripts. Performers generally do not see their transcripts, and the Fei Tian Schools resist requests by Performers who seek their transcripts to further obstruct their ability to leave. When certain Performers have persisted in obtaining the transcripts, they have learned that the transcripts contain false and misleading information.

127.    There are little to no academic requirements for advancement. Instead, the schools are designed and operate to ensure that students remain ensnared in the forced labor scheme as they transition from grade to grade and from secondary school to college. Indeed, Plaintiffs' ascension from secondary school at Fei Tian Academy to college at Fei Tian College was arranged

almost entirely without their involvement. Plaintiff Chang, for example, was told that her academic work was poor but that the Shen Yun Defendants' personnel would make it appear stronger than it actually was so that she could advance.

128.   Plaintiffs Wang likewise did not apply to attend Fei Tian College. Plaintiffs Zhu and Xie were handed a short form one day in class and told by their teacher to complete the form in class; that form was the "application" to Fei Tian College. Plaintiffs were effectively automatically enrolled at Fei Tian College after "graduating" Fei Tian Academy of the Arts.

129.   All Performers at the Fei Tian schools receive a "scholarship" to attend. Shen Yun estimates that that the "full scholarship, which includes room and board, . . . amounts to about $50,000/year."[19] While masked as generosity, the scholarship program in fact has a sinister purpose—for the Shen Yun Defendants threaten Performers that if they leave Shen Yun, they will be required to pay back the "scholarship," which can amount to hundreds of thousands of dollars. This is a daunting sum for anyone, but its coercive means is compounded by the fact that many Performers come from modest backgrounds and are not properly compensated by Shen Yun for their work. Rui Li, for example, threatened Plaintiff Xie with tuition reimbursement when he tried to permanently leave Shen Yun.

130.   While purportedly at Dragon Springs as students, Performers are quickly transitioned to fulfilling the goal of the commercial enterprise: performing uncompensated or undercompensated labor as performers in Shen Yun performances, all in violation of the law, as alleged more specifically below.

---

[19] Shen Yun Performing Arts, *New York Times Coverage of Shen Yun Riddled with Inaccuracies and Exudes Bias*, https://www.shenyunperformingarts.org/news/view/article/e/fiplEp2lQYA/new-york-times-coverage-riddled-with-inaccuracies-bias.html (last accessed November 22, 2024).

131.    Performers are incorporated into the Shen Yun tours within months of their arrival at the schools.

132.    All Performers start at Shen Yun when they are children and still students at the Fei Tan Schools and cannot choose not to perform for Shen Yun.

**E.    The Bleak Reality of Life in Shen Yun at Dragon Springs**

133.    The Performers' days overwhelmingly revolve around preparing for and performing in Shen Yun performances.

134.    From May to December, Performers live at Dragon Springs and prepare for the upcoming Shen Yun season. This includes participating in rehearsals six (6) days a week, from Tuesday to Sunday.

135.    The Performers are typically required to engage in hours of unpaid rehearsals each day. The remainder of Performers' schedules are minutely controlled by the Shen Yun Defendants, with directives regarding meditation and other tasks for the compound.

136.    Performers then are forced to perform in the Shen Yun tours from December until May or June.

137.    While on tour, the musicians' schedule is brutal.

a.    Musicians wake up at 7:00 a.m. and begin work at 8:00 a.m., unloading the truck with sound equipment, instruments, heavy cables, and the like—with pieces ranging from 90 to 200 pounds. This set up is done primarily by musicians, who have mostly been children.

b.    While setting up for the performance, musicians sometimes work alongside the concert worker labor unions employed by the performing arts venues, performing the same work as a worker in a labor union.

c.    On very rare occasions, the musicians have not been allowed to set up the performance—because certain venues have agreements with their respective concert worker labor

31

unions that prohibit anyone other than union members from performing work reserved for professionals.

        d.      After approximately three to four hours of this heavy labor, the musicians have lunch, change clothes, and conduct a dress rehearsal. After the dress rehearsal, they practice for the rest of the day until they have dinner before the show. Shows typically begin around 7:30 p.m. and last for approximately 2.5 hours.

        e.      If a show is the final performance at a particular venue, musicians then—after the show ends—break down the entire set, lifting all of the heavy equipment described above back on the truck and packing it up. On such days, musicians' workdays end around 11:30 or 11:45 p.m., and they are back at the hotel by midnight.

        f.      If another show is scheduled in the same location, musicians return to the hotel after the show ends at 10:00 p.m.

        g.      This is a 15 to 16-hour day, and there are approximately 100 shows per season.

138.    Dancers had a very similar schedule on performance days.

        a.      Dancers generally began work at 9 or 10 a.m.

        b.      Dancers rehearse for hours at the venue or at their hotel prior to the show.

        c.      Shen Yun performances last approximately 2.5 hours, including intermission. Often, dancers have two shows a day.

        d.      Dancers then work to break down and pack up the set, alongside musicians.

139.    During the tour, the eight Shen Yun companies typically move from city to city by bus. Performers often end their day by traveling to the next performance location.

140.    The Shen Yun Defendants provide Performers with no breaks on the tours; rather, the only time Performers rest is on the bus.

141.    Performers spend long hours on the bus. The pace of travel is relentless, as the same tour company is regularly scheduled to visit many cities in a tight time frame.

142.    To maintain this pace, the Shen Yun Defendants often will not permit the buses to stop so that Performers can use the bathroom. What is more, the Shen Yun Defendants control of Performers is so pervasive and extreme that, although there is a bathroom on the bus, the Shen Yun Defendants sometimes prohibit Performers from using the bathroom. As the bus rarely stops, Performers have urinated in bottles or defecated on themselves.

143.    As noted, Performers do not partake in any substantive academic studies while on tour. While on tour, for five to six months of the year, the Performers have no formal lectures, classroom time, instruction, tutoring, or homework (except for the perfunctory packet, which only certain Performers had to complete). They are not accompanied by teachers. Rather, they are required only to work for the Shen Yun Defendants' commercial enterprise.

144.    Performers tour duties do not include any responsibilities for educating others about Falun Gong, inculcating Falun Gong's teachings, or training others to live according to Falun Gong's teachings.

145.    Overall, the Performers' schedules are overwhelmingly dictated by the Shen Yun Defendants. This is true whether Performers are on tour or rehearsing at Dragon Springs. The constant is the extensive work that the Shen Yun Defendants force Performers to do, whether on stage in front of an audience or in rehearsal at Dragon Springs.

146.    The Performers adhere to this grueling schedule as a direct result of the Shen Yun Defendants' system of coercion and control that causes the Performers to reasonably believe that they will face serious harm if they refuse to labor.

### 1.    The Shen Yun Defendants' System of Coercion and Control

147.    Hongzhi Li is the ultimate authority within the Shen Yun and Dragon Springs community. Hongzhi Li and the other Shen Yun Defendants teach the child Performers that defying Hongzhi Li's authority will result in a loss of his protection, ostracization from the community, destruction of their reputation, and open them up to physical and moral peril.

148.    Hongzhi Li and his affiliates repeatedly tell Performers from a young age that individuals who reject Hongzhi Li's authority face physical harm, in the form of disease or violent death through incidents like suicide or car accidents, as well as moral condemnation.

149.    Understanding that they perform at Hongzhi Li's direction, Performers approach each show with unwavering gravity. Performers push themselves to their physical and mental limits, in part, because they fear the consequences of disobedience.

150.    Some troupe managers, under the Shen Yun Defendants' directives, seize on Performers' errors after the show ends and shame those who make mistakes in front of their peers. The mistakes are often cast as a moral failing.

151.    Moreover, Performers fear grave harm will befall them or their families if they cease performing for Shen Yun without Hongzhi Li's permission, as this amounts to a rejection of Hongzhi Li's authority and protection.

152.    Hongzhi Li perpetuates the narrative that performing for Shen Yun is one of the greatest honors, and that being near him on at Dragon Springs will bring security and improve the lives of Performers and their families. Performers reasonably believe what Hongzhi Li tells them, as well as what others say about him, because of his position and authority.

153.     Because Performers are primarily recruited while they are children, they are particularly impressionable to what Defendants tell them and carry these fears and beliefs into adulthood.

154.     Performers reasonably fear what may come to them and their family if they disobey Hongzhi Li's commands.

155.     The Shen Yun Defendants have established many interlocking methods of control, whereby they limit Performers' agency and ensure Performers will follow the Shen Yun Defendants' instructions. As detailed below, these methods of control include:

     a.     Restricting Performers' physical movements, including by prohibiting them from leaving the compound without permission and confiscating their passports and immigration paperwork;

     b.     Restricting Performers' contact with the outside world, including limiting contact with Performers' own families and restricting consumption of unapproved media that originates outside the Falun Gong movement;

     c.     Exerting control over every aspect of Performers' lives, including what they eat, how much they weigh, who they date, whether they may marry or have children, and whether they receive medical care;

     d.     Requiring that any person who steps out of line with the Shen Yun Defendants' directives be subject to social ostracism and disparagement, including large-scale public humiliation sessions; and

     e.     Inculcating the belief that Performers will face serious harm, including physical harm, if they do not follow and obey Hongzhi Li.

156.    These limitations operate in many, interconnecting ways to ensnare the Performers within the Shen Yun Defendants' control and ensure their continued labor. For instance, the Shen Yun Defendants not only physically restrain Performers from leaving and stopping their work for Shen Yun, they also restrict Performers' contact with outsiders that could challenge the merits of Hongzhi Li's teachings and support the Performers in leaving Shen Yun.

157.    Further, by exerting control over Performers' most fundamental needs, such as food, medical care, and companionship, the Shen Yun Defendants usurp Performers' basic bodily autonomy and make it unthinkable for most Performers to reject their authority.

158.    Finally, the Shen Yun Defendants seek to limit Performers' contacts and community to only those within Shen Yun and Dragon Springs, and the Shen Yun Defendants leverage this isolation to make threats of public approbation and ostracism from this community an extremely compelling deterrent to rejecting the Shen Yun Defendants' authority. To be rejected by Shen Yun would amount to a loss of the Performers' primary community and would leave Performers, many of them children, without any support network.

159.    The Shen Yun Defendants encouraged Performers to inform on one another when someone broke the rules. This created an environment of distrust and surveillance even when the Shen Yun Defendants or their agents were not physically present.

160.    The Shen Yun Defendants' methods of control over Performers include, but are not limited to, the following:

### a.    Control of Physical Movement

161.    When Performers first arrive at Dragon Springs, Hongzhi Li and his agents confiscate Performers' passports and immigration documentation and do not return them until Performers are terminated from Shen Yun.

162.     The Shen Yun Defendants keep Performers' passports and immigration documents even while they are living at Dragon Springs.

163.     For example, Plaintiff Chang was forced to hand over her passport and immigration documentation to Defendants at the age of 13. She generally did not have custody of her documents again until she left Shen Yun at age 24, except on the rare occasion when the Shen Yun Defendants let her visit her family once per year.

164.     When Plaintiff Chang returned from visiting her family, the Shen Yun Defendants required that she turn over her passport and immigration documents to them as soon as she arrived.

165.     While at the compound, Performers are not permitted to leave without Hongzhi Li or Rui Li's permission.

166.     Armed guards and German Shepherds are stationed at the gates of Dragon Springs, and they do not allow anyone to come in or go out without Hongzhi Li or Rui Li's permission.

167.     The Shen Yun Defendants routinely deny permission to Performers who ask to leave the compound, even after they reach adulthood.

168.     When traveling on tour, each Plaintiff—like all Performers—was similarly not permitted to leave the hotel, except with the Shen Yun Defendants' permission. This was true even after they became adults.

169.     The Shen Yun Defendants also used the Performers to smuggle money for them across international borders with the purpose of evading declaration of the full amount to the U.S. government.

170.     For example, in 2015, the Shen Yun Defendants' company managers gave a troupe of Performers stacks of $10,000 and instructed them to hide the bills on their bodies and in their hand luggage while traveling from Barcelona to New York and to smuggle the money into the

United States. Performers did not know where the money came from. The Shen Yun Defendants told Performers that if U.S. customs personnel asked them about the cash, they should lie and state that their parents had given them money. When the Performers arrived back in New York, they had to hand the cash over to the Shen Yun Defendants. This happened multiple times.

171.    The Shen Yun Defendants used the COVID-19 pandemic to tighten their control even further. All phones were confiscated. This was so that Performers could not contact the outside world, because the Shen Yun Defendants feared that their continued operation during the pandemic would invite public scrutiny.

172.    Performers were instructed to duct-tape their windows, so that no light would be visible by outsiders and neighbors.

173.    On one occasion during the pandemic, the police arrived at Dragon Springs, but they were not permitted to enter and did not have a warrant. Terrified of public scrutiny, the Shen Yun Defendants installed speakers in the dormitories and in every common area, so that they could announce to Performers if the police were coming. The Shen Yun Defendants then instructed the Performers to run and hide and eliminate any traces of people living at Dragon Springs if the police were able to make their way into the compound.

### b.    Control of Communication

174.    The Shen Yun Defendants teach Performers to mistrust the outside world and limit the Performers' contact with even their own families. This is particularly insidious because many Performers are brought to the United States as young children who do not speak English and have no other contacts apart from Defendants.

175.     The Shen Yun Defendants tell Performers not to reveal the realities of life at Dragon Springs and with Shen Yun to their family members. Rui Li instructed Plaintiffs and Performers to only say "happy things" to their parents.

176.     Hongzhi Li also tells the Performers that they should not communicate with their families too often and that being too attached to their parents would be detrimental.

177.     When Performers arrive at Dragon Springs, they are isolated from the outside world and prevented from continuing friendships with people outside Shen Yun.

178.     After working to alienate Performers from their friends and families at a young age, the Shen Yun Defendants encourage Performers to rely on Hongzhi Li and Rui Li as parental figures.

179.     The Shen Yun Defendants also do not permit Performers to communicate with anyone outside of the Dragon Springs complex by forcing them to delete their social media accounts and monitoring their computer and internet usage.

180.     By instilling a fear and mistrust of the world outside the compound, the Shen Yun Defendants undermine any other support system for Performers and make it difficult for Performers to leave Dragon Springs and Shen Yun.

### c.     Control of Access to Information

181.     The Shen Yun Defendants tightly control Performers' access to information.

182.     The Shen Yun Defendants do not allow Performers to have a smartphone before they reach their early 20s. Performers who had phones had "dumb" phones, meaning they could not access the internet.

183.    The Shen Yun Defendants restrict Performers' internet usage. In recent years, Performers have been allowed to browse the internet for just 15 minutes a day, only from designated computers, and only to designated websites.

184.    When Performers arrived at Dragon Springs, they were instructed to delete all their social media accounts and generally cease interacting with the outside world. The Shen Yun Defendants periodically check to see if Performers have re-activated their social media accounts and punish them if they have.

185.    The Shen Yun Defendants require that Performers sign a "contract" promising to adhere to these restrictions:



186.    The Shen Yun Defendants restrict the media that Performers are permitted to consume. They prohibit Performers from looking at so-called "ordinary media," the term used for unapproved news outlets. The approved outlets are overwhelmingly media that is produced by the media outlets Hongzhi Li controls, such as *The Epoch Times* and New Tang Dynasty TV.

187.    The Shen Yun Defendants repeatedly tell Performers that they know what they are doing while online.

188.    Performers are allowed to use the internet in one of the few designated computer rooms that were continuously patrolled by a monitor such that there is no privacy.

189.    The Shen Yun Defendants control the music Performers listen to, the movies they watch, and the books they read. They prohibit Performers from reading any unauthorized materials, including novels, comic books, and magazines. Performers that do not follow these requirements are publicly criticized and accused of rejecting the authority of Hongzhi Li.

### d.    Control of Access to Medical Care

190.    In yet another measure of their control, the Shen Yun Defendants direct Performers to forego modern medical care as a sign of their commitment to Hongzhi Li's teachings. Hongzhi Li tells Performers that true healing only occurs by following his teaching, and thus medical care is not necessary. The Shen Yun Defendants tell Performers that seeking medical care means that something is wrong with their moral state, for their injuries or illnesses will "self-heal" if they send forth righteous thoughts.

191.    Accordingly, when Performers, dancers in particular, are injured due to their grueling rehearsal and performance schedule, they are forced to work through their injuries, including instances involving broken bones, sprains, and dislocated joints. Instead of allowing Performers to seek medical attention, Hongzhi Li urges Performers to purge the bad energy that causes illness. This often makes the injuries worse.

192.    For example, on one occasion, a dancer fell and injured her knee so badly that it was swollen and dark purple. Plaintiff Chang witnessed Hongzhi Li tell that dancer to cure herself by sitting in full lotus position, a pose that involves sitting cross-legged with ankles on top of

opposite thighs, and which is very difficult on the knees. Plaintiff Chang heard Hongzhi Li instruct the injured dancer to stay in full lotus for over an hour. Although the other dancer was crying in pain, Hongzhi Li instructed the other dancers not to help her. The injured dancer was never taken to see a doctor.

193.    On other occasions, Performers were injured or became sick but did not feel they could seek medical care because doing so would signal that they were unworthy and had not properly followed Hongzhi Li's teachings. Consequently, some dancers resorted to stitching themselves up with hotel sewing kits when they cut themselves and could not access medical care.

194.    On another occasion, a dancer seriously injured her knee during a warm-up. But Rui Li had made clear on many occasions that failing to carry on was not an option and would represent failure on the part of the injured person, so the dancer continued performing in the show, until she literally could not perform and was dragged off the stage halfway through the show.

195.    On another occasion, when a Performer requested approval to leave Dragon Springs to make and attend an eye doctor appointment, Siu Qing (a/k/a Judy Siu) accused her of looking at some unspecified prohibited content that had deteriorated her eyesight.

196.    There is no provision or discussion of mental health care at Dragon Springs. The Shen Yun Defendants do not allow Performers to try to access mental health care. Several Performers suffered mental breakdowns while working for Shen Yun. Rather than arranging for care, the Shen Yun Defendants expelled them.

### e.    Control of Eating Habits

197.    The Shen Yun Defendants also extend their control to directing Performers' dietary habits and scrutinizing their bodyweight. Although all Performers are expected to stay slim, the Shen Yun Defendants institute strict weight limits for dancers and use surveillance and shaming

to enforce these requirements. As a result, dancers frequently suffer from eating disorders and body dysmorphia.

198.    Dancers are required to attend weigh-ins every two to three days. Their weight is recorded on a sheet posted in a classroom, with the names of those deemed to be overweight scrawled in red.

199.    Despite being forced to participate in the daily grueling physical rehearsals and performances, some dancers eat only once a day to keep their weight down. If dancers gain weight, their instructors berate them in front of their peers.

200.    Dancers were frequently subject to verbal abuse regarding their weight and appearance. The Shen Yun Defendants' instructors would frequently tell teenage girls they were fat and asked them how they could expect to perform to Master Li's expectations if their faces and bodies were fat. Plaintiff Wang observed this frequently, with one incident where Rui Li berated a fellow dancer for having a single scoop of ice cream.

201.    Dancers are encouraged to inform on one another and report whether others are eating snacks.

202.    Many dancers develop eating disorders due to the pressure, expectations, and emotional abuse around their weight. One dancer's eating disorder became so dire that her nails started coming off and she was not able to hold on to props for the show. Another dancer's eating disorder became so pronounced that she could no longer function, and so the Shen Yun Defendants expelled her. On another occasion, a dancer was subject to a mass criticism session because she was not meeting her weight goals.

203.    There are no therapists or nutritionists at Dragon Springs.

204.    Dancers that cannot adhere to the weight requirements are reassigned to non-performance jobs, such as working in the warehouse to design patterns for Shen Yun costumes, and may even be forced to leave the compound.

205.    Sometimes, Performers are given food that has expired, such as expired ramen noodles, biscuits, and beef jerky. Hongzhi Li's agents told Performers that it was disrespectful to refuse anything given to them by Hongzhi Li, including the expired food, and that they had to eat it. When Performers experienced gastrointestinal distress in connection with eating the expired food, they were told that it was their own fault because of their moral failings.

206.    One time, the Shen Yun Defendants gave Plaintiff Chang expired food which resulted in her having diarrhea. They told her that Hongzhi Li gave her the expired food to eat to cleanse herself from the inside out.

207.    By ordering Performers to ignore their bodily needs, refusing them medical care, denying them food, or forcing them to eat expired food as a display of their respect, the Shen Yun Defendants exert control over the Performers' most fundamental needs and well-being.

208.    Further, the Shen Yun Defendants' severe food restrictions ensure that Performers, most of them vulnerable minors, are cognitively and emotionally distracted and therefore easier to manipulate and coerce into forced labor.

### f.    Control Through Public Humiliation

209.    The Shen Yun Defendants also exert control and ensure compliance over Performers through threat of public shaming and ostracization. They have established a practice wherein any individual who rejects the authority of Hongzhi Li, or is perceived to do so, is subject to group criticism and faces grave reputational harm.

210.    Hongzhi Li and his adherents conduct mass criticism sessions where they gather everyone residing at Dragon Springs, well over 100 people, and publicly criticize individuals who the Shen Yun Defendants identify as having violated their directives.

211.    During a mass criticism session, the Shen Yun Defendants make the offender go on stage and Hongzhi Li and Rui Li take turns berating them. Then lower-level management stand up and admonish the offender, often telling them that Hongzhi Li gave them a great opportunity, and that the offender's actions betrayed Hongzhi Li. The offender is then forced to apologize in front of the whole community. Many times, individuals apologize even if they had not done the purported offense, because they do not feel they have a choice. After the offender apologizes, the community members are sent to separate classrooms where they discuss the offender's flaws and berate the offender in smaller groups.

212.    The Shen Yun Defendants extend the mass criticisms even to individuals who otherwise profess adherence to Hongzhi Li's teachings but are perceived to break one of the many rules imposed on Performers. For instance, on one occasion, a 13-year-old resident of Dragon Springs was subjected to a mass criticism session for reading anime.

213.    The most virulent mass criticisms, however, are for those who have left Shen Yun. The Shen Yun Defendants target individuals who left Shun Yun for mass criticism and often tell the Performers that various purported harms that befell these individuals were a result of their rejection of Hongzhi Li's authority. These harms include illness, death from illness, and violent death through suicide or accidents. After Plaintiff Xie, for example, successfully escaped Shen Yun, Rui Li called a mass criticism session in which she berated him for 45 minutes in front of hundreds of people and called him an "ungrateful bastard."

214.    The Shen Yun Defendants often exaggerate or fabricate these harms or misfortunes in an effort to make Performers fear that they, too, would be subject to such harm if they ever left Shen Yun. The Shen Yun Defendants use the mass criticism practice to reinforce messages regarding the peril of abandoning Shen Yun.

215.    For example, Hongzhi Li told Performers that an orchestra member who left Shen Yun had died. When Plaintiff Chang left Shen Yun, she found out from others who had left Shen Yun that the orchestra member was actually alive and well, and Hongzhi Li told the Performers he had died so that Performers would be scared to leave themselves.

### g.    Control of Romantic and Family Relationships

216.    The Shen Yun Defendants' control extends even to Performers' relationships.

217.    The Shen Yun Defendants generally prohibit Performers from speaking to any members of the opposite sex, and they forbid homosexuality.

218.    Rui Li, however, regularly directs the romantic relationships of Performers for green card purposes by arranging relationships between foreign Performers and U.S. citizens. Rui Li's goal in this matchmaking is that, once no longer on a student visa, the foreign Performers could marry U.S. citizens and thereby stay in the United States and continue laboring for the Shen Yun Defendants. Rui Li told Plaintiff Wang, for example, that she would match her when Plaintiff Wang was ready and of age.

219.    Even once married, however, Rui Li's permission is required for the couple to become pregnant—another measure of control to ensure that the pool of labor is plentiful. And Rui Li has withheld this permission. Pregnant dancers eventually cannot perform, which hurts the Shen Yun Defendants' bottom line.

220.    On one occasion, Rui Li set up an American female dancer with a French male dancer and they married. However, when that couple became pregnant without Rui Li's permission, they were subject to a mass criticism session.

221.    With respect to relationships with family members, the Shen Yun Defendants instruct Performers not to share information with their family members about what happens at Dragon Springs and to mislead their family members by repeating that Dragon Springs is a wonderful experience.

222.    In other cases, the Shen Yun Defendants instruct Performers not to speak to their parents at all. For example, Rui Li discouraged Plaintiff Wang from contacting her parents— because Rui Li accused them of being communists and bad influences (they are neither). Instead, Rui Li would tell Plaintiff Wang that she saw herself as Plaintiff Wang's parent, a tactic human traffickers often use to condition and trap their victims—telling them that they are family and bonded to each other.

### h.    Control of Finances

223.    The Shen Yun Defendants also exercise financial control over the Performers.

224.    Since approximately 2011, the Shen Yun Defendants have required that every new Performer who joins Shen Yun open an account with the International Bank of Chicago (some Performers were excepted if they already had a bank account). It is into this account that the Shen Yun Defendants pay their unlawfully low wages of somewhere between $0 and (at most) $12,000 per year per Performer. The Shen Yun Defendants had, for example, both Plaintiff Zhu and Plaintiff Chang open International Bank of Chicago accounts.

225.    The Shen Yun Defendants tightly restrict Performers' control and access to those accounts.

226.    Opening a bank account requires multiple forms of identification: a passport, ID, social security information, immigration documentation for foreign nationals like many Performers, etc. Yet the Shen Yun Defendants confiscate Performers' passports and immigration documents.

227.    Minors generally cannot open bank accounts without a parent or guardian to serve as a shared account holder. Yet the Shen Yun Defendants isolate Performers from their families (who are often in far-flung places like Taiwan and Australia) and discourage and obstruct attempts at communication with them.

228.    The minor Performers cannot access their International Bank of Chicago accounts electronically. And because their freedom of movement is restricted, they cannot physically access their accounts either.

229.    The Performers thus largely depend on the Shen Yun Defendants to access their bank accounts. Indeed, Performers are dependent on the Shen Yun Defendants to allow them to exit the compound and take them to the bank branch or an ATM, in order for them to access their resources.

230.    The meager wages the Shen Yun Defendants pay Performers often make their way back to Shen Yun. Some Performers buy food at Dragon Springs, and they end up using the unlawfully low wages they are paid by the Shen Yun Defendants to purchase food from the Shen Yun Defendants.

### 2. Performers Reasonably Fear That They Will Face Grave Harm If They Cease their Labor

231.    The Shen Yun Defendants explicitly and implicitly threaten the Performers with grave harm if they were to cease dancing for Shen Yun without the Shen Yun Defendants' permission.

232.    The Shen Yun Defendants use the threat of public criticism and reputational harm to enforce their control over multiple aspects of Performers' lives. Performers, who begin at Shen Yun as children, reasonably fear being the subject of a mass criticism session, which in turn motivates them to follow the organization's rules so as not to be lambasted in public.

233.    The Shen Yun Defendants also tell Performers that physical harm will befall any who tried to leave. The Shen Yun Defendants conduct mass criticism sessions for former Performers and tell the community that these people had committed suicide or died due to illness. Hongzhi Li stated that those people had died because they left Shen Yun or ceased adhering to Hongzhi Li's directives. The Shen Yun Defendants often fabricate or exaggerate the harms that purportedly befall those who leave, so as to keep Performers afraid of rejecting Hongzhi Li's authority.

234.    This threat of physical harm is actively leveled against individuals who try to leave. On one occasion, when Hongzhi Li discovered that Plaintiff Chang's best friend wanted to leave Shen Yun, he tasked Plaintiff with helping to prevent that from happening, and he communicated that the best friend was likely to commit suicide otherwise.

235.    The Shen Yun Defendants often actively work to destroy the reputation of individuals that leave Shen Yun by spreading misinformation about them. For instance, after Plaintiff Chang left Shen Yun and began speaking out about her time there, persons affiliated with the Shen Yun Defendants publicly asserted that she and her husband were doing so on behalf of the CCP.

236.    The extreme fabrications spread about defectors reinforce the Shen Yun Defendants' hold over Performers. Performers often suspect or fear that similar lies will be spread about them if they leave, smearing their reputation.

237.    As Dragon Springs and Shen Yun are most Performers' only or primary community in the United States, leaving Shen Yun risks being shamed and ostracized from the only community they have known in their young lives.

238.    The Shen Yun Defendants also tell Performers that they will have to repay the tuition for the scholarships they were given at the Fei Tian Schools. For example, Rui Li threatened Plaintiff Xie with tuition reimbursement when he tried to leave. Shen Yun values these scholarships at $50,000 a year. Even one year of tuition, room, and board at $50,000 is a daunting sum for anyone, and some students spend as many as ten years at the Fei Tian Schools, which would amount to tuition of half a million dollars.

239.    The coercive means of the scholarship repayment threat is compounded by the fact that most Performers come from modest backgrounds. Further, because the Shen Yun Defendants do not pay Performers a proper wage and the time commitment required of Performers allows for no additional work, Performers cannot independently earn enough to pay back the alleged tuition and room and board themselves.

240.    Dancers are typically only allowed to leave Shen Yun when they become too old to dance or are otherwise unable to keep dancing, at which point they are terminated. Some former dancers become administrative staff or teachers or continue working in other capacities to support the Shen Yun commercial enterprise. The Shen Yun Defendants typically aggressively oppose permitting any dancers who wish to leave Shen Yun before this point. The exception is those students that the Shen Yun Defendants deem to be troublemakers, burdensome, or otherwise not worth keeping on as dancers; those individuals typically are abruptly expelled.

241.    Musicians are told that they will continue working for Shen Yun for their entire lives, from childhood all the way through adulthood. The Shen Yun Defendants typically aggressively oppose permitting any musicians who wish to leave Shen Yun.

242.    On one occasion, when a dancer tried to leave the organization while on tour in Europe, Hongzhi Li personally flew to Europe and berated the dancer into returning to Shen Yun.

243.    Hongzhi Li regularly tells Performers who wish to leave that they will face grave harm if they abandon Shen Yun and his protection.

244.    The Shen Yun Defendants also make it difficult for Performers to leave by withholding their school transcripts so that they cannot attend another college or graduate school. On some occasions, when the Shen Yun Defendants become aware that a Performer has applied to another school, they threaten to fail or expel the student, such that the student will not be accepted into the new school. For example, the Shen Yun Defendants delayed providing Plaintiff Xie and Plaintiff Wang their respective transcripts for months even after they left Shen Yun, obstructing their ability to try to enroll in another academic institution.

245.    In the face of the control and coercion that the Shen Yun Defendants exert over every aspect of their lives, as well as the direct and indirect threats these Defendants make to Performers who might leave Shen Yun, Performers reasonably feel that they must work as Performers for Shen Yun because to do otherwise would result in grave harm.

### F.    The International Bank of Chicago Facilitated and Benefitted from the Shen Yun Defendants' Venture

246.    The Bank facilitated and benefited from the Shen Yun Defendants' commercial performing arts venture. The Bank ignored clear signs of forced labor in violation of its regulatory obligations in favor of associating with Shen Yun and the network of lucrative businesses associated with the Shen Yun Defendants, including *The Epoch Times* and NTD.

247.   Shen Yun is big business. With approximately $266 million in (mostly cash) holdings, and tens of millions of dollars more generated each year, Shen Yun's profit margins are unusually high because it relies on trafficking and forced labor, including forced child labor.

248.   As noted above, Shen Yun is also at the heart of a group of lucrative businesses with close ties to Hongzhi Li. The businesses include *The Epoch Times*, a media company and newspaper that generated $121 million in revenue in 2021, and Universal Communications, a global television network doing business as "New Tang Dynasty TV" that generated $48.9 million in revenue in 2022. Together, these businesses have generated hundreds of millions of dollars.

249.   Hongzhi Li has considerable influence and power over these businesses and their employees. This ecosystem of businesses—Shen Yun, *The Epoch Times*, and New Tang Dynasty TV—reinforce one another, especially financially. *The Epoch Times*, for example, has run more than 17,000 articles about Shen Yun since 2009, contributing to its ubiquitous advertising. In 2021, *The Epoch Times* made a $10.4 million grant to Shen Yun Performing Arts and a $2.5 million grant to Fei Tian College. In 2022, *The Epoch Times* made a $41.4 million grant to Universal Communications (New Tang Dynasty). Large amounts of money flows between these businesses.

250.   The same senior executives have controlled both *The Epoch Times* and Universal Communications. In 2021, for example, Zhong Tang (a/k/a "John Tang") was the CEO and Treasurer of Epoch Times Association Inc. (the organization that owns *The Epoch Times*) and also the president of Universal Communications Network Inc. (the organization operating New Tang Dynasty). Similarly, Weidong Guan (a/k/a "Bill Guan") was the CFO of both the Epoch Times Association Inc. and Universal Communications Network Inc.

251.   At the time all this money was moving between Shen Yun, *The Epoch Times*, and Universal Communications, Bill Guan (the CFO of both *The Epoch Times* and Universal

Communications) was running what federal prosecutors have described as "a sprawling, transnational scheme to launder at least $67 million of illegally obtained funds" for the benefit of *The Epoch Times*.[20] Guan is currently under federal indictment in the Southern District of New York. Given the sums of money involved and transmitted, it is plausible that some of the laundered funds were transmitted to Shen Yun.

252.    In light of the lucrative nature of these businesses and the amount of cash transmitted between them, the International Bank of Chicago turned a blind eye to scores of red flags that should raise concerns for any bank in order to participate in the Shen Yun Defendants' performing arts venture. Indeed, the Bank repeatedly gave the Shen Yun Defendants special treatment in order to support the performing arts venture and ingratiate the Bank with the Shen Yun Defendants.

253.    The Bank is generally based in Chicago and is a small bank with only six branches. The Bank has opened only one bespoke branch outside of Illinois—to service the Shen Yun Defendants and their members.

254.    This branch is in Port Jervis, New York, at a location that is 8.5 miles (a 15-minute drive) from the Dragon Springs compound. The Bank's CEO, Y. Frank Wang, confirmed its motivation when the Bank opened the branch, stating that "the bank's target market includes . . . Chinese performance artists in the region," referring to "members of Shen Yun Performing Arts, [the] traditional Chinese dance group based in Cuddlebackville." Maria Yu Tai, one of the Bank's founders and a close personal connection to Hongzhi Li, made the purchase offer for the property that became the Bank's Port Jervis branch.

---

[20] *See* Indictment ¶ 1, *United States v. Weidong Guan* (a/k/a "Bill Guan"), Case No. 24-cr-322 (S.D.N.Y.).

255.    The Bank serves as a financial arm of the Shen Yun Defendants' performing arts venture. Shen Yun sets up and largely controls bank accounts for the minor Performers. Shen Yun does so in partnership with the Bank. By ensuring the Performers have Bank accounts, the Bank confers outside markers of legitimacy on the relationship between Shen Yun and the Performers, cloaking it in the trappings of standard working relationship. This imprimatur of legitimacy allows Shen Yun to better conceal the forced labor that is at the heart of the performing arts venture. Further, by establishing the bank accounts through and with the Shen Yun Defendants, the Bank enables the Shen Yun Defendants to further control the Performers though control of and access to these accounts.

256.    The Bank demonstrated a striking level of closeness with the Shen Yun Defendants and access to the otherwise highly secretive and guarded Dragon Springs compound. In compliance with the Shen Yun Defendants' directives, the Bank—multiple times each year for more than a decade—has sent a team of its representatives into Dragon Springs to sign up the new Shen Yun recruits for accounts at the Bank.

257.    One of the Bank representatives responsible for setting up the minor accounts was Lina Wu, a customer service representative. She operated out of the Port Jervis branch. Wu frequently traveled to Dragon Springs, setting up accounts and conducting bank business for the minors inside the compound.

258.    While inside the compound, Wu also worked in the hairdressing and costume departments, performing additional work for the benefit and success of the Shen Yun Defendants' performing arts venture. This signaled the degree to which Wu and the Bank were committed to the success of the venture.

259.    As noted, the Shen Yun Defendants directed minors to set up accounts with the Bank. It was into those accounts that the Shen Yun Defendants made their meager payments to the Performers—ranging from $0 to $1,000 per month.

260.    The Bank's process for opening these accounts was as follows. A minor Performer was told by representatives of the Shen Yun Defendants that Wu or one of her colleagues was looking for them. This was a direction; the Shen Yun Defendants directed the minor to follow Wu or the Bank colleague's instructions. The minor then met with Wu or one of the Bank's other representatives, typically in the cafeteria inside the Dragon Springs compound. The Bank then opened the account upon the minor's signing of a few forms.

261.    Minors generally cannot open bank accounts on their own. They need an adult custodian on the account. The Bank opened all the accounts with the same custodian: Siu Qing (a/k/a Judy Siu), the unpaid bookkeeper of the Shen Yun Defendants and a top aide to Hongzhi Li and Rui Li. After Siu Qing died, she was replaced by Lois Yang.

262.    When the minor Performers signed the forms to open their accounts, Siu was often not present. Rather, the Bank automatically named her as the joint account holder.

263.    Siu's involvement as a joint account holder was a means by which the Shen Yun Defendants exercised power and access over the Performers' Bank accounts. Siu was so intensely devoted to the Lis that she worked for nothing. She not only followed the Lis' directives unwaveringly, but the Lis also had access to her personal finances. When she developed kidney cancer, she refused to see a doctor because Hongzhi Li espoused the view that mediation and reading his texts would keep the body healthy instead of medical care. By 2019, when her weight as a 66-year-old woman fell to seventy (70) pounds, her children finally persuaded her to seek medical care. But she could not afford it, because (as she revealed to her children) she had given

all her money to the Shen Yun Defendants. Yet Siu's children also learned that someone inside Shen Yun had used Siu's credit card to go shopping at Saks Fifth Avenue, Hermes, Van Cleef & Arpels, Ferragamo, Tiffany & Company, and to buy custom billiard cues (Hongzhi Li is an "avid pool player").[21] With Siu as the custodian on all the minors' accounts, the Shen Yun Defendants likewise could access and control the Performers' bank accounts that were also held in Siu's name.

264.    Once opened, the Bank managed the accounts in accordance with the restrictive conditions that the Shen Yun Defendants placed on the Performers. For example, the minor Performers' Bank accounts were structured with very low limits, so that they generally could not use their debit cards for more than $100 at a time. This limitation that worked to keep the minor Performers from using their meager earnings to leave Dragon Springs.

265.    What little access was provided to the accounts was done in adherence to the Shen Yun Defendants' control, with behavior sometimes far outside normal banking practice. For example, the minor Performers were subject to the most severe restrictions on their movement during the COVID-19 pandemic. To ensure the Performers would not leave the compound during this time, the Bank's representatives brought duffle bags of cash into the Dragon Springs compound for the students to make "withdrawals" from their accounts.

266.    The Bank benefits from its participation in the Shen Yun Defendants' performing arts venture. In exchange for its provision of banking services and corresponding imprimatur of legitimacy to the Shen Yun Defendants' performing arts venture, the Bank received the following benefits:

---

[21] *See* Michael Rothfield and Nicole Hong, *How Shen Yun Tapped Religious Fervor to Make $266 Million*, THE NEW YORK TIMES (Dec. 29, 2024), https://www.nytimes.com/2024/12/29/nyregion/shen-yun-money-falun-gong.html.

a.    First, it obtained an exclusive pipeline of accounts from the Performers, constituting hundreds of new bank accounts into which the Bank knew the Shen Yun Defendants would make deposits. For a bank of modest size, this is an important pipeline of new clients and deposits.

b.    Second, it obtained a competitive edge with the lucrative network of businesses associated with the Shen Yun Defendants. Like *The Epoch Times* and Universal Communications, certain of the Bank's representatives have very close ties to Hongzhi Li and are eager to ingratiate themselves with him given that Hongzhi Li has substantial influence over a whole network of businesses, including various media outlets like *The Epoch Times* and New Tang Dynasty TV. The Bank's maintenance of its relationship with Li ensures that the Bank can grow its business with the entire network. For example, one of the Bank's largest loans is a $22 million loan made to New Tang Dynasty TV.

c.    Third, the Bank obtained banking business from the Shen Yun Defendants themselves. The International Bank of Chicago has a relatively modest amount of $1 billion in assets. The Shen Yun Defendants, by contrast, possess over a quarter of a billion dollars, mostly in cash. For a modestly sized bank, the Shen Yun Defendants are thus a major client. Obtaining— through deposits, fees, lending, or other banking business—even a fraction of the cash generated from the Shen Yun Defendants' business represents an outsized percentage of the Bank's overall holdings.

267.    The Bank knew or should have known that the Shen Yun Defendants' performing arts venture is engaged in forced labor and trafficking violations. At a minimum, the Bank facilitates the Shen Yun Defendants' venture by providing an imprimatur of legitimacy while

turning a blind eye to the red flags of unlawful activity that any other legitimate bank would immediately catch.

268.    The Bank's representatives directly observed, during their visits to the compound to open new accounts, the Performers and their condition: how young and vulnerable they are; how their weight is controlled and restricted; how closely regulated their days are; how many hours they work; and, importantly, how little they are paid, even though the Bank knows that the Shen Yun Defendants generate huge sums of money in revenue each year and are worth over a quarter of a billion dollars.

269.    The Bank's representatives personally observe that there are new infusions of recruits year after year, and they observe how the Performers in an orderly fashion (and under direction from the Shen Yun Defendants) sign up for new accounts at the Bank.

270.    Banks are required to assist U.S. government agencies in reporting suspicious activity that might signal unlawful activity and must design and maintain effective customer due diligence (or "know-your-client") programs to comply with those requirements.[22] In particular, substantial regulatory guidance alerts banks as to what constitutes red flags for human trafficking. All or nearly all of the identified warning signs were present in this case, including the following:

---

[22]    *See* FDIC, "Risk Management Manual of Examination Policies," Section 8.1-17, https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/risk-management-manual-complete.pdf ("An effective [customer due diligence] program protects the reputation of the institution by . . . [p]reventing unusual or suspicious transactions in a timely manner" and "[a]voiding criminal exposure from individuals who use the institution's resources and services for illicit purposes[.]"); Office of the Comptroller of the Currency, "Suspicious Activity Reports (SAR)," https://www.occ.treas.gov/topics/supervision-and-examination/bank-operations/financial-crime/suspicious-activity-reports/index-suspicious-activity-reports.html; *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2020-A008, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity," at 10 (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf ("A financial institution is required to file a SAR if it knows, suspects, or has reason to suspect a transaction conducted or attempted by, at, or through the financial institution involves funds derived from illegal activity, or attempts to disguise funds derived from illegal activity; is designed to evade regulations promulgated under the BSA; lacks a business or apparent lawful purpose; or involves the use of the financial institution to facilitate criminal activity.") (footnote omitted).

a. "A business customer does not exhibit normal payroll expenditures (e.g., wages, payroll taxes, social security contributions). Payroll costs can be non-existent or extremely low for the size of the customer's alleged operations, workforce and/or business line/model."[23] The Bank knew (or should have known) that the Shen Yun Defendants had hundreds of Performers and generated tens of millions of dollars in business revenue each year, and it knew (or should have known) that none of the student Performers were paid over $1,000 per month and some were paid nothing at all.

b. "Transactional activity (credits and/or debits) inconsistent with a customer's alleged employment, business or expected activity, or where transactions lack a business or apparent lawful purpose."[24] The Bank knew (or should have known) that certain Performers spent a decade or more at Shen Yun, that their pay was so low for such a long period of time (no more than $12,000 per year in the most generous case), that the Performers were often working six days per week and much longer than any normal business hours each day, and that the Shen Yun Defendants did not register with New York to have child performers until 2023.

c. "Cash deposits or wire transfers are kept below $3,000 or $10,000 in apparent efforts to avoid record keeping requirements or the filing of Currency Transaction Reports (CTRs), respectively."[25] The Bank knew (or should have known) that no student Performer was paid more than $1,000 per month.

d. "A customer establishes an account or visits a branch to conduct transactions while always escorted by a third party (e.g., under the pretext of requiring an

---

[23] *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2014-A008, Appendix B: Human Trafficking Red Flags, at 9 (Sept. 11, 2014), https://www.fincen.gov/sites/default/files/advisory/FIN-2014-A008.pdf.

[24] *Id.*

[25] *Id.*

interpreter). Correspondingly, the third party escorting the customer may always have possession of the customer's ID."[26] The Bank knew (or should have known) that the students could not travel on their own, generally could not leave the compound, had their identification documents held by the Shen Yun Defendants, and always had to be accompanied by a representative of the Shen Yun Defendants.

        e.     "Common signer(s)/custodian(s) in apparently unrelated business and/or personal accounts. Similarly, common information (e.g., address, phone number, employment information) used to open multiple accounts in different names."[27] The Bank knew (or should have known) that hundreds of Performers opened accounts and shared the same custodian (Siu Qing, a/k/a Judy Siu), the same address (the Dragon Springs compound), and the same employment (a "student" who performed for Shen Yun).

        f.     "Accounts of foreign workers or students where the employer or employment agency serves as a custodian."[28] The Bank knew (or should have known) that many of the Performers who opened bank accounts were foreign minors, many of whom could not speak English. It knew that many of them opened the accounts with the same custodian, a woman who worked for Hongzhi Li and Rui Li at Shen Yun.

        g.     "A third party insists on being present for every aspect of the transaction."[29] The Bank knew (or should have known) that the students could not travel on their own, always had to be accompanied by a representative of the Shen Yun Defendants and could only open

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2020-A008, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity," at 6 (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf.

accounts inside the Dragon Springs compound under the authority of the shared custodian, Siu Qing (a/k/a Judy Siu).

h. "A third party maintains possession and/or control of all documents or money."[30] The Bank knew (or should have known) that the Shen Yun Defendants maintained possession of their passports and critical documents.

i. "A third party attempts to open an account for an unqualified minor."[31] The Bank knew (or should have known) that many of the Performers were foreigners and did not speak English and that the Shen Yun Defendants required that the minor Performers open accounts with the Bank.

j. "A customer shows signs of poor hygiene, malnourishment, fatigue, signs of physical and/or sexual abuse, physical restraint, confinement, or torture."[32] The Bank's employees and representatives observed the students at Dragon Springs and, in one case, participated in the labor to put on the show, observing that the Performers were often malnourished, injured, fatigued, and always confined to residing at the armed and guarded Dragon Springs compound.

271. These red flags are in addition to New York legal requirements about the management of child performer accounts. In New York (as in other jurisdictions), "a child performer's employer is required to transfer fifteen percent of gross earnings to the custodian of the child performer's child performer trust account." N.Y. Est. Powers & Trusts Law § 7-7.1(2)(a).

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

Child performer trust accounts are subject to a host of requirements for parents, guardians, and employers.[33]

272.    The Bank knew (or should have known) that the Shen Yun Defendants did not comply with any of these requirements. The custodian on the minors' accounts was a representative of the Shen Yun Defendants. She did not set up a child performer trust account, she did not transfer fifteen percent of gross earnings to any such account, and she did not abide by any of the requirements under New York law.

273.    By August 2024, the Bank knew (or certainly should have known) that the Shen Yun Defendants' venture involved forced labor and trafficking. *The New York Times* published articles explicitly stating that "[e]ight former Shen Yun performers said they were not paid at all in their first year on tour," that "Shen Yun spends a far smaller share of its revenue on salaries than several other large nonprofit dance and theater companies based in New York," that "[s]tudents often worked six days a week and were made to feel like they should be grateful for any pay," and that by their mid-20s, "most of the former performers were being paid $12,000 a year or less[.]" The Bank's decision to continue participating in the Shen Yun Defendants' venture shows the Bank's willfulness.

274.    Taken together, the Bank knew or should have known—from its observation of these trafficking and forced labor red flags across hundreds of Performers opening accounts at the Bank over more than ten (10) years—that the Shen Yun Defendants' venture involved trafficking and forced labor. The Bank ignored these red flags (among many) for forced labor and trafficking.

---

[33] *See* New York State Department of Labor, "Child Performer Trust Accounts," https://dol.ny.gov/child-performer-trust-accounts (imposing requirements on parents, guardians, and employers).

275.    The Bank's willingness to turn a blind eye to the Shen Yun Defendants' misconduct is in keeping with the Bank's propensity for reckless disregard of its obligations for suspicious activity reporting and customer due diligence. The Bank has been sanctioned for its failure to design policies that would sufficiently monitor suspicious activity or conduct regulation-compliant customer due diligence. In 2020, the Federal Deposit Insurance Corporation ("FDIC") and the State of Illinois Department of Financial and Professional Regulation found in a consent order that the Bank had engaged in "unsafe or unsound banking practices" in violation of the Bank Secrecy Act, *see* 31 U.S.C. §§ 5311–5330, and its accompanying regulations. The regulators required that the Bank "develop, adopt, and implement a revised, effective written policy designed to ensure full compliance with" federal banking law and regulations concerning (among other things) "suspicious activity reporting, customer due diligence, and foreign correspondent accounts," "identification and proper reporting of all known or suspicious criminal activity," and "money laundering activity."

276.    The Bank's relationship with the Shen Yun Defendants is extraordinarily close and has been for many years. This relationship in part explains why the Bank is willing to look away from the Shen Yun Defendants' use of trafficking and forced labor.

277.    The Bank was founded in 1992, and the Bank's founders, Maria Yu Tai and her husband, Warren Tai, are both Falun Gong practitioners who view Hongzhi Li as having considerable authority and power.

278.    The Tais have a close, personal relationship with Hongzhi Li and Rui Li, whose daughter has used the registered address of a property owned by the Tais as her residence.

279.    The Tais continue to play a significant role inside the Bank. They serve as shareholder representatives and Warren Tai serves as an executive vice president.

280.    In addition, the head of business development at the Bank until November 2024 (the same month this lawsuit was filed) was David Cui. Cui has a close, personal relationship with Hongzhi Li and Rui Li. He had a romantic relationship with their daughter. After the relationship ended, the Lis paired Cui with one of the Shen Yun dancers, and they subsequently married.

281.    These close, personal relationships are supplemented with a variety of business-related entanglements. The Tais have given land to the Shen Yun Defendants, including land that is adjacent to what later became Dragon Springs. Maria Tai purchased a 150-acre plot of land in Orange County. This plot of land was next to the land that became Dragon Springs, and in February 2003, Tai transferred that land to Defendant Dragon Springs Buddhist Inc. **for $0.**

282.    Both of the Tais have also been involved with the media companies that are associated with the Shen Yun Defendants, including New Tang Dynasty TV and Chicago New Chinese Media, Inc. In particular, Warren Tai was the head of Chicago New Chinese Media (which produces content for New Tang Dynasty TV), and Chicago New Chinese Media was also an early promoter of Shen Yun.

283.    Notwithstanding her personal relationships with Hongzhi Li and Rui Li, Maria Yu Tai and her tax preparation and accounting firms—First Quality Financial Group, and Maria Tai & Associates—have served at various points as the "independent" auditor for Dragon Springs Buddhist Inc., providing clean audit reports for (at least) that entity's financial statements.

284.    The Bank, its founders, and its employees are thus deeply entangled both professionally and personally with the Shen Yun Defendants. This entanglement explains at least in part why the Bank participates in the Shen Yun Defendants' performing arts venture, why the Bank looks away from the various red flags for trafficking and forced labor, why the Bank benefits

its participation in the venture, and why the Bank knows (or should have known) about the venture's involvement in forced labor and trafficking.

**G.    Defendants Violated New York Labor Law and Failed to Pay Performers Minimum Wage and Overtime Payments**

285.    The Shen Yun Defendants employ non-exempt performers including dancers and musicians to work in the Shen Yun productions and the Shen Yun Defendants are employers as defined by the NYLL.

286.    Performers are not typically paid at all their first year on tour despite working more than twelve (12) hours a day.

287.    In their second year on tour, and while on a student visa, Performers are paid a few hundred dollars per month (between $300 and $500 dollars), despite working more than twelve (12) hours a day.

288.    Once Performers finished at Fei Tian College, they receive one thousand dollars ($1,000.00) a month in pay, despite working over twelve (12) hours a day.

289.    Performers are never paid based on the hours they worked.

290.    Performers are never paid any overtime payments for hours worked over forty in a week.

291.    Performers were never paid extra compensation for hours worked over ten in a day.

292.    By contrast, the American Ballet Theater in New York City pays its apprentices a starting pay of $986 per week, and its performers are eligible for overtime.

293.    While on tour, Performers worked every day, sometimes over sixteen hours a day, and the Shen Yun Defendants told them that they should be grateful for any pay and would be paid in "virtue."

294.    In addition to performing, Performers (often children) carried and set up heavy equipment before shows, rehearsed, and performed up to two shows per day.

295.    Performers' tour schedules were grueling: one tour showed a troupe that was scheduled to perform or travel on nine consecutive days—with no break—and including a 17-hour bus trip from Michigan to Texas.

296.    While traveling, male Performers were told to stay on the tour buses in overnight shifts, in case agents of the Chinese government tried to sabotage the vehicles.

297.    Performers never received sick pay and often worked when they were sick or physically injured.

298.    Performers never received wage statements or other wage notices.

299.    Performers (including those who were children) were not aware of having work permits or trust accounts.

300.    At all times relevant herein, the Shen Yun Defendants operated a willful and intentional scheme to deprive Plaintiffs and other non-exempt workers of minimum wages and overtime compensation and sick pay.

301.    The New York State Department of Labor recently opened an inquiry into Shen Yun Performing Arts, following publication of several stories in *The New York Times* about substantial allegations of the Shen Yun Defendants' extensive use of unpaid labor, forced labor, and child labor, allegations materially identical to those alleged by Plaintiff here.[34]

302.    The Shen Yun Defendants violated New York State law for years, failing to obtain any certification for using Performers under the age of 18.

---

[34] Nicole Hong and Michael Rothfeld, *Behind the Pageantry of Shen Yun, Untreated Injuries and Emotional Abuse*, THE NEW YORK TIMES (August 15, 2024), https://www.nytimes.com/2024/08/15/nyregion/shen-yun-dance-abuse.html.

303.    Without underage and underpaid labor, the Shen Yun Defendants would not have been able to operate or profit from Shen Yun performances. None of the troupes that perform in the shows had enough professionals to stage a show without underage performers. A former Shen Yun Performer observed that as many as two-thirds of the musicians, for example, were underage performers: "That place would not run if they had to pay real musicians, like every other organization in the country does."

**H.    Plaintiffs' Forced Labor for Shen Yun's Commercial Enterprise**

304.    Trapped in a compound patrolled by armed guards and German Shepherds, Defendants' system of control and coercion instills in each Performer, and in each Plaintiff, the fear of serious harm to themselves, their families, their reputations, and their livelihoods.

**1.    Plaintiff Koko Chang's Forced Labor as a Dancer for Shen Yun**

305.    Plaintiff Chang was born on May 7, 1996.

306.    Plaintiff Chang's mother was a Falun Gong practitioner.

307.    As a young child, Plaintiff Chang was told that dancing for Shen Yun is of the highest honor because it allowed individuals to be close to Hongzhi Li.

308.    Plaintiff Chang saw a Shen Yun performance in 2007 when she was 11 years old in Taipei, Taiwan.

309.    After the performance ended, the Shen Yun Defendants conducted "auditions" and recruited children ages 11-16.

310.    Plaintiff Chang auditioned after the show but was not selected.

311.    Plaintiff Chang re-auditioned in September 2009. She was asked to travel to New York and perform for Hongzhi Li and was accepted to Shen Yun.

312.    Plaintiff Chang's father passed away when she was 11. Plaintiff Chang felt an obligation to help her mother, and because she received a full scholarship from Fei Tian Academy of the Arts, she believed that dancing for Shen Yun would help her family.

313.    When Hongzhi Li offered Plaintiff Chang a job dancing for Shen Yun, he asked if she was going to be able to accept suffering because being a part of Shen Yun was extremely difficult. He then asked her if she knew what Shen Yun was about and stated that it was about saving people.

314.    Plaintiff Chang stayed in New York on a travel visa and immediately moved into Dragon Springs.

315.    Plaintiff Chang was told she was being accepted as a student of Fei Tian Academy of the Arts, and that she would receive a full scholarship.

316.    Every other student that Plaintiff Chang met at Fei Tian Academy of the Arts and Fei Tian College also received a full scholarship.

317.    When she arrived at Dragon Springs, the Shen Yun Defendants took her passport and immigration documents, the I-20 form and F-1 visa, away.

318.    Because the Shen Yun Defendants took away her immigration documents and passport, Plaintiff Chang was never in possession of any identifying documents.

319.    Plaintiff Chang was told that she could not leave the compound without permission from Hongzhi Li or Rui Li. She saw guards at the entrance of the compound so that she could not leave.

320.    For the first six months of her time in the United States, Plaintiff Chang rehearsed for the upcoming Shen Yun season. She worked around 18 hours a day practicing for the show. She was not paid, except for Hongzhi Li giving her $20 in cash per month.

321.    By February 2010, Plaintiff Chang was performing with Shen Yun, dancing in seven shows at Radio City Music Hall.

322.    After the first season, Plaintiff Chang returned to Taiwan for a few days, and then returned to Dragon Springs on a student visa.

323.    When she began touring, Plaintiff Chang received a few hundred dollars per month in pay, even though she often worked ninety (90) hours a week.

324.    Plaintiff Chang was paid only a few hundred dollars per a month until she "graduated" from Fei Tian Academy. She continued to receive several hundred dollars per month after she graduated and while attending Fei Tian College. The salary payments were also intermittent; sometimes she was paid a salary, and certain months she was not.

325.    In 2019, Plaintiff Chang's immigration status changed from a student to Optional Practical Training ("OPT"). OPT is temporary employment that is directly related to an F-1 student's major area of study and is applicable for twelve (12) months.

326.    At that time, her pay increased to $1,000 a month. The offer letter stated she would work 25 hours per week, but she was required to work approximately 90 hours per week.

327.    Plaintiff Chang could not access her pay unless the Shen Yun Defendants accompanied her to a bank or ATM.

328.    From May through November, Plaintiff Chang was required to rehearse for the upcoming season. She attended school for three hours per day, with the rest of the day devoted to preparing to tour.

329.    From December to May, Plaintiff Chang toured with Shen Yun. Like the other dancers, Plaintiff Chang's day while on tour typically began at 9:00 or 10:00 a.m. and ended after 10:00 p.m.

330.    During each tour, Plaintiff Chang worked as a dancer for over a hundred shows, all over the United States and internationally.

331.    Although Plaintiff Chang was enrolled at Fei Tian Academy of the Arts, and later, Fei Tian College, she understood and was told that her purpose was to dance, so that she could work as a dancer for Shen Yun.

332.    Plaintiff Chang did not have to take any tests while at school and she generally received no homework. While on tour, Plaintiff Chang was given a tablet on the bus to do schoolwork, but it was pretense, because she wasn't given assignments or lectures. Plaintiff Chang struggled in her academic work, given the deficient and cursory instruction.

333.    When it was time for Plaintiff Chang to move from Fei Tian Academy of the Arts to Fei Tian College, the teachers were concerned that if she took any tests, she would fail. Jade Zhan, one of Hongzhi Li's agents, told Plaintiff Chang that her English was not good enough to take a test to move on to Fei Tian College, and that the Shen Yun Defendants did not want any records of students doing poorly.

334.    Plaintiff Chang never applied to be a student at Fei Tian College, but rather was moved from Fei Tian Academy of the Arts to Fei Tian College as part of the illusion that she was a student, and not a forced laborer.

335.    While at Fei Tian, Plaintiff Chang had to follow all of Hongzhi Li and Rui Li's directives and could not deviate from the rules without risking a mass criticism session or threats of ostracization.

336.    The Shen Yun Defendants isolated Plaintiff Chang from her family. Plaintiff Chang was not allowed to see her mother, except for an approved two-week holiday break once a year.

337.    Plaintiff Chang was allowed to call her mother once a week. The Shen Yun Defendants told Plaintiff Chang that all her calls were being monitored, and she was not allowed to speak badly about the school or the Shen Yun Defendants or they would find out.

338.    Hongzhi Li told Plaintiff Chang and other Performers that they should not speak to their families about what went on at Shen Yun, and that being too attached to their parents would be detrimental. Hongzhi Li instructed Plaintiff Chang and Performers to only say "happy things" to their parents.

339.    Because of this, Plaintiff Chang was afraid to let her mother know what was happening at Fei Tian and Shen Yun, and she became distant from her family.

340.    The Shen Yun Defendants and their agents told Plaintiff Chang that she was not allowed to leave the compound.

341.    The Shen Yun Defendants and their agents told Plaintiff Chang that she could not speak to anyone of the opposite sex.

342.    The Shen Yun Defendants and their agents told Plaintiff Chang that she could not date anyone, at least not without the explicit permission of Rui Li.

343.    The Shen Yun Defendants and their agents told Plaintiff Chang that she was not allowed to read unauthorized materials or media.

344.    The Shen Yun Defendants and their agents told Plaintiff Chang she was not allowed to have a smart phone or use the internet.

345.    Plaintiff Chang kept a diary but stopped writing in it when she realized that the Shen Yun Defendants or their agents were reading her diary. She learned this after Plaintiff Chang was called into an office one day and scolded about the contents of her diary.

346.    Plaintiff Chang was told that dancers that left would no longer be protected by Hongzhi Li and would bring calamities upon themselves and their families.

347.    Because of this, Plaintiff Chang did not feel she could make any mistakes, and often danced through serious injuries.

348.    Plaintiff Chang did not have health insurance and was not allowed to see any doctors while she worked for Shen Yun.

349.    In or around 2016 or 2017, Plaintiff Chang sustained a serious injury in the arch of her foot and could not walk. It was obvious to her teachers and the Shen Yun Defendants that she was seriously injured as she was having trouble walking. However, Defendants told Plaintiff Chang that she needed to pray to feel better, and they did not take her to see any doctors or offer medical care.

350.    When Plaintiff Chang was fourteen (14) years old, she contracted what she believed was measles. She was not allowed to see a doctor (so there was no formal diagnosis or reporting), but rather, Hongzhi Li told her that she should meditate to feel better. Plaintiff Chang was denied any sick time while she was sick and had to work through the measles.

351.    On one occasion, Plaintiff Chang was hit in the face with a metal rod during a performance. Although her face was bleeding and she needed stitches, the Shen Yun Defendants made her continue dancing and would not allow her to seek medical care. Plaintiff Chang still has a scar on her face due to this incident.

352.    Plaintiff Chang visited the dentist one time while she was working for Shen Yun, but that was only to get her teeth straightened. In her nine (9) years with Shen Yun, Plaintiff Chang was not allowed to see a dentist for any preventative (non-cosmetic) care.

353.    Plaintiff Chang witnessed Hongzhi Li yelling at other Performers who had sustained injuries and accusing them of sustaining injuries because they were having moral failings.

354.    Because of this, Plaintiff Chang tried to hide any physical injuries she sustained.

355.    Based on what the Shen Yun Defendants told her, Plaintiff Chang was terrified that her physical pain and sicknesses were a moral failing on her part.

356.    Plaintiff Chang is approximately 5 feet 6 inches tall. At Shen Yun, she was told to keep her weight under 115 pounds. Due to the weight requirements and lack of food, Plaintiff Chang did not have a menstrual cycle for five years, from ages 18 to 24.

357.    Due to the extreme physicality of the forced labor Plaintiff Chang was forced to endure, it was difficult for her to keep her weight that low.

358.    The Shen Yun Defendants and their agents publicly shamed Plaintiff Chang when her weight went above 115 pounds and berated her in public for eating too much. Due to this, Plaintiff Chang was scared to eat and tried to eat in private. Plaintiff Chang herself developed a skewed version of herself.

359.    The Shen Yun Defendants and their agents weighed dancers every two or three days. If they were not under the weight imposed on them, the Shen Yun Defendants' agents wrote down their weight on a sheet of paper, circled it in red, and put it up where everyone could see it.

360.    For most of her time at the Fei Tian Schools, Plaintiff Chang ate one meal a day of white porridge and vegetables because she was scared to gain weight and be publicly berated.

361.    Plaintiff Chang attended many meetings and mass criticisms wherein Hongzhi Li publicly called out individuals who had left Shen Yun by name, told Performers they could not speak to those who had left, and directed the community to ostracize them.

362.    When some Performers approached Defendant Hongzhi Li to request permission to leave the Fei Tian schools or Shen Yun, he stated that they could not leave because they were no longer part of the ordinary world.

363.    Plaintiff Chang also learned that Defendant Hongzhi Li called Performers' families to pressure them to stay when they wanted to leave.

364.    Plaintiff Chang attended a mass criticism session after a Shen Yun Performer committed suicide. At the session, Hongzhi Li told Performers that the individual committed suicide because he had left Shen Yun and Falun Gong and stated that this would happen to anyone who left.

365.    Due to Plaintiff Chang's young age and Hongzhi Li's position, she believed everything that Hongzhi Li said, and she was terrified to leave Shen Yun because she felt that terrible harm would befall herself and her family if she did.

366.    Plaintiff Chang observed that Performers that asked questions, including questions about Defendant Hongzhi Li's wealth, or his conduct inconsistent with his teachings, were denounced by him as spies for the Chinese Communist Party.

367.    Plaintiff Chang was terminated from Shen Yun in 2020 when she was 24 years old and was sent back to Taiwan.

368.    Due to the coercion Plaintiff Chang faced at the hands of Defendants, she was diagnosed with clinical depression and post traumatic stress disorder.

369.    In the wake of *The New York Times'* reporting, in which Plaintiff was quoted, the Shen Yun Defendants have launched a retaliation campaign against not just her but her husband as well.

370.    For example, on September 13, 2024, on a Taiwanese news show Defendant Zhang accused Plaintiff and her husband of being "brainwashed" into becoming agents of the CCP and of having accepted money from the CCP for their dance studio business in Taiwan. Defendant Zhang also accused Plaintiff and her husband of kicking out several customers who were members of Falun Gong because of the CCP's investments in their Taiwanese dance studio.

371.    These statements were false and defamatory. The truth is that Plaintiff Chang and her husband have never taken money from the CCP or any related entity in any capacity, including for their dance studio business in Taiwan, which they started around 2022.

372.    More to the point, Defendant Zhang's statements in this regard were aimed at smearing and discrediting Plaintiff Chang and her husband. And, given that Shen Yun members are taught to hate and fear the CCP as one of the world's greatest evils, Defendant Zhang's statements in this regard were also designed to intimidate Plaintiff and her husband; to turn current students against them; and to demonstrate to current students what would happen to them if they were to speak ill of Shen Yun.

373.    Similarly, on November 17, 2024, in his own YouTube show discussing current events, which currently has nearly 100,000 views, Defendant Zhang once again defamed Plaintiff Chang. In particular, Defendant Zhang said that Plaintiff Chang's dance studio in Taiwan had received investments after Plaintiff visited mainland China. Defendant Zhang then made clear that the implication was that Plaintiff Chang had essentially been paid by the CCP to criticize Shen Yun.

374.    Again, Defendant Zhang's statements in this regard were meant in part to smear, discredit, and intimate Plaintiff Chang, as well as to serve as an example to current students of how they would be treated if they were to speak ill of Shen Yun.

375.    Indeed, Plaintiff Chang has learned that the Shen Yun Defendants have recently convened mass criticism sessions targeting Plaintiff to turn current Shen Yun students against her. Not only that, the Shen Yun Defendants, and particularly Rui Li, has said that the Shen Yun Defendants have agents in Taiwan who are keeping track of Plaintiff's every move, and that those agents are reporting on Plaintiff to the Shen Yun Defendants. Rui Li has also claimed to current students that Plaintiff has recanted her allegations against Shen Yun and regrets making them— which, as this lawsuit shows, could not be further from the truth.

376.    On February 10, 2025, after Plaintiff Chang filed the instant lawsuit, the Shen Yun Defendants escalated their retaliation by causing two meritless lawsuits to be filed in Taiwan against not just Plaintiff Chang but also her husband. Both lawsuits were filed by individuals close to the Lis.

377.    The first lawsuit was filed by Juanjuan Wei, also known as Xian Yuan, against both Plaintiff Chang and her husband. Xian Yuan is a devoted practitioner who lives at Dragon Springs, and thus is under the direct supervision of Hongzhi Li. She is an Associate Professor at Fei Tian College and holds a position at a Shen Yun-affiliated institute called the Shen Yun Arts Proficiency Assessment Center. She sued Plaintiff Chang and her husband over statements they made on a YouTube show about what they'd heard from others about the circumstances surrounding the death of Xian Yuan's son, statements that were critical of the Lis, Shen Yun, and Falun Gong, but not of Xian Yuan herself.

378.    The second lawsuit was filed by Bojian Li, who used to date the Lis' daughter, and who is a former Shen Yun dancer. He sued Plaintiff and her husband over statements they made on the same YouTube show about the circumstances surrounding the death of Bojian Li's ex-

fiancée. As with the first lawsuit, these statements were critical of the Lis, Shen Yun, and Falun Gong, but not of Bojian Li himself.

379.    Despite being of apparently modest means, both Xian Yuan and Bojian Li hired the same Taiwanese law firm, Formosa Transnational, which is one of Taiwan's largest and most expensive law firms. It does not appear that either has sued anyone else over the statements, including the host of the YouTube show, or others who have made similar statements.

380.    Considering that: (1) the critical focus of the statements in both cases was the Lis, Shen Yun, and Falun Gong, as opposed to Xian Yuan and Bojian Li; (2) both lawsuits were filed shortly after Plaintiff Chang filed this lawsuit, but long after the statements were made; (3) the fact that, apparently, only Plaintiff Chang and her husband have been sued over the statements; and (4) the fact that both Xian Yuan and Bojian Li hired the same high-priced Taiwanese law firm, it is reasonable to infer that Xian Yuan and Bojian Li filed these lawsuits at the direction of the Lis, with their financial support, and in retaliation for Plaintiff Chang filing this lawsuit.

381.    This targeted, concerted retaliation has left Plaintiff Chang publicly humiliated, embarrassed, and in fear. She is being forced to pay to defend against these frivolous suits. It is a prime example of why Performers are so afraid to speak out, and of how the Shen Yun Defendants use fear and intimidation to keep Performers in line.

### 2.    Plaintiff Daisy Wang's Forced Labor as a Dancer for Shen Yun

382.    Plaintiff Wang was born on December 27, 1995.

383.    Plaintiff Wang's grandmother and guardian is a Falun Gong practitioner. As a young child, Plaintiff Wang was told that dancing for Shen Yun is of the highest honor because it allowed individuals to be close to Hongzhi Li.

384.    Plaintiff Wang auditioned for Shen Yun in 2008. She was asked to travel to New York and audition at Dragon Springs. At the audition, Plaintiff Wang was selected for Shen Yun.

385.    Although Plaintiff Wang went to New York on a tourist visa, not on a student visa, the Shen Yun Defendants instructed her to stay at Dragon Springs as soon as she was accepted. She immediately began working, training, and rehearsing for Shen Yun.[35]

386.    Plaintiff Wang was told she was being accepted as a student of Fei Tian Academy of the Arts, and that she would receive a full scholarship. Every other student Plaintiff Wang met at the Fei Tian Schools also received a full scholarship.

387.    The Shen Yun Defendants took Plaintiff Wang's passport and immigration documents. Plaintiff Wang was required to give Siu Qing her passport and was only in possession of it while traveling with Shen Yun. Because the Shen Yun Defendants took away the passport and immigration documents, Plaintiff Wang was never in possession of any identifying documents.

388.    As soon as Plaintiff Wang was accepted, Siu Qing, who worked as an administrator, told her the rules. Plaintiff Wang learned that Performers were not allowed to leave Dragon Springs without special permission from the Shen Yun Defendants, and often from Rui Li directly. The rules regarding leaving the campus did not change for Performers once they turned eighteen years old. When Plaintiff Wang became an adult, she still could not leave Dragon Springs without the Shen Yun Defendants' explicit permission. Plaintiff Wang knew she could not walk off the compound because she saw the gates, German Shepherds, and armed guards who refused to let individuals in and out without Hongzhi Li and Rui Li's permission.

---

[35] *See* U.S. Department of State, "Student Visa," https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html ("You must have a student visa (F or M visa) to travel to the United States to study. You may not study after entering on a visitor (B) visa, unless you are eligible for and have obtained a change of status from USCIS, or through the Visa Waiver Program (VWP), except to undertake recreational (non-credit) study as part of a tourist visit.") (date accessed: April 20, 2025). Neither exception applied to Plaintiff Wang.

389.    After a few months of living at Dragon Springs, Plaintiff Wang was directed to go to Vancouver and returned to Dragon Springs to obtain an F-1 student visa. She returned with the F-1 student visa to Dragon Springs.

390.    By 2009, Plaintiff Wang was performing with Shen Yun as a dancer. Plaintiff Wang first went on tour from December 2009 to May or June 2010.

391.    Plaintiff Wang's schooling at the Fei Tian Schools was grossly deficient. While at Dragon Springs, Plaintiff only had academic instruction three hours per day—whether at college or pre-college. The rest of the day involved performance-related training, rehearsal, and more practice for the Shen Yun performance season, often late into the evening.

392.    Plaintiff Wang learned that the academic teachers at both Fei Tian Schools were often not accredited teachers, but rather volunteers. For instance, her math teacher was a former dancer with no teaching experience. Plaintiff Wang understood that the math teacher simply got this job because someone deemed him to be good at math.

393.    Plaintiff Wang was assigned very little to no homework the entire time she was a student at the Fei Tian Schools.

394.    While on tour, Plaintiff Wang received no academic instruction, and she did not receive any significant schoolwork. Rather, she was instructed to "write a journal entry" each week, which took a few minutes to complete. She did not receive any grades on tour.

395.    Plaintiff Wang was supposed to "graduate" from Fei Tian Academy of the Arts with a high school degree in 2013. However, she and the rest of her class were purposefully held back for two years because the Fei Tian College could not yet teach international students, and the Shen Yun Defendants wanted Plaintiff Wang and the other international Performers to continue laboring for them under the auspices of their F-1 visas. By keeping them at Fei Tian Academy of

the Arts, the Shen Yun Defendants were able to maintain Plaintiff Wang's and other international students' immigration status on their F-1 visas and the Shen Yun Defendants could continue to benefit from their labor.

396.    When Plaintiff Wang was finally transferred to Fei Tian College in 2015, she was required to take the SAT so that the Fei Tian Schools could report it to New York State, but she did not fill out a college application or otherwise take any steps to transition from Fei Tian Academy of the Arts to Fei Tian College.

397.    Plaintiff Wang and other Performers that graduated in her year were automatically moved from Fei Tian Academy of the Arts to Fei Tian College by the Shen Yun Defendants.

398.    Plaintiff Wang was restricted from communicating with her family. Rui Li, for example, told Plaintiff Wang that she could not travel to China or Hong Kong to visit her parents. Rui Li often discouraged Plaintiff Wang from speaking to her parents, stating that they were communists and a bad influence on her. (They are neither.)

399.    Although Plaintiff Wang and other Performers had a non-smart phone, she could not call her parents using that phone because they were located in China.

400.    The Shen Yun Defendants encouraged Plaintiff Wang and other Performers to tell their family members only good things about life at Dragon Springs and on tour, and they discouraged her and the others from mentioning anything bad that was happening.

401.    In 2017, Plaintiff Wang's parents planned to travel to Taiwan to see their daughter while her company was on tour there. Rui Li, however, told Plaintiff Wang that she was not allowed to see her parents because she was "not on vacation, but on tour." Rui Li then told Plaintiff Wang that she considered herself Plaintiff Wang's mother.

402. The internet was extremely restricted for Plaintiff Wang and other Performers. She was allowed to use the internet in the computer room, but Performers' internet searches and usage were not private. The only websites Plaintiff Wang could access were her email, *The Epoch Times*, and other prior-approved sources.

403. Hongzhi Li, Rui Li, and their agents told Performers that someone was constantly monitoring their internet usage and email traffic.

404. On her first tour, Plaintiff Wang received $100 a month and was told that she should be grateful for getting any money from Hongzhi Li.

405. Around 2012, her monthly income increased to $500 a month, and then later, to $1000 a month. At no point was Plaintiff Wang asked to record her hours.

406. While Plaintiff Wang was on tour, for six (6) months of the year, she did not attend any school, but rather, worked for the Shen Yun Defendants for meager pay.

407. Plaintiff Wang performed in approximately 100 shows while on tour each year, often performing in two shows a day.

408. On show days, Plaintiff Wang worked for approximately 13 to 16 hours a day, which included practicing, rehearsing, and performing in the show.

409. Plaintiff Wang sustained many injuries while working for the Shen Yun Defendants, including multiple sprained ankles. Although everyone, including her teachers and Hongzhi Li and Rui Li, could see that she was injured, she was never offered medical care. Rather, she was told to "send forth righteous thoughts."

410. At one point, Plaintiff Wang saw another dancer break her knee during the warmup to a show. She still performed in half the show before she could not go on any longer and was removed from the stage. The dancer was not offered any medical care.

411.    While at Dragon Springs, Plaintiff Wang was never taken to a doctor for preventative care or an annual checkup.

412.    The Shen Yun Defendants required that Plaintiff Wang and other dancers be weighed continuously. They were consistently weighed before and after their annual two week break so as to ensure that they did not eat too much and gain weight while away from Dragon Springs.

413.    Plaintiff Wang saw many dancers develop eating disorders and make themselves vomit after eating. Plaintiff Wang herself developed bulimia so severe it left her with internal damage.

414.    Plaintiff Wang saw many dancers faint because of lack of food and disordered eating.

415.    Plaintiff Wang and other Performers did not have access to therapy or nutritionists despite their disordered eating being well known by the Shen Yun Defendants, including Rui Li.

416.    Instead, Rui Li often berated dancers for their weight, contributing to their disordered eating. On one occasion, Plaintiff Wang witnessed Rui Li screaming at a dancer for eating a scoop of ice cream on tour in front of the entire troupe, saying, "how dare you eat ice cream, don't you know you are fat!" During meetings with the dancers, Rui Li told them not to eat so much, and that they would not die if they skipped meals.

417.    Plaintiff Wang was constantly aware of and berated about her weight. Plaintiff Wang was made to run three miles daily in addition to her heavily physical schedule to keep her weight down.

418.    The Shen Yun Defendants created and fostered conditions in which Performers were competing to lose weight and be skinny. Performers often used a cup to measure out food and allowed themselves only one cup of food a day.

419.    The Shen Yun Defendants controlled Plaintiff Wang financially. Plaintiff Wang's wages were so small, for example, that she did not have the financial ability to leave and go back to her family in Canada.

420.    The Shen Yun Defendants controlled Plaintiff Wang's romantic relationships. Rui Li told Plaintiff Wang that when she came of age, she would set her up with someone. Plaintiff Wang observed Rui Li often act as a matchmaker and set up U.S. citizens with non-citizens for the purpose of acquiring a green card for the non-citizen so they could easily stay in the U.S. and continue laboring for the Shen Yun Defendants.

421.    Plaintiff Wang told Rui Li that she wanted to leave Dragon Springs on multiple occasions, but Rui Li told Plaintiff Wang that "without us, you're a nobody. You have no purpose. You have nothing going for you." Plaintiff Wang believed her and felt she did not have a future outside of Shen Yun.

422.    Plaintiff Wang witnessed mass criticism sessions, and those sessions further instilled a fear in her that breaking any of the rules imposed by Hongzhi Li, Rui Li, and the Shen Yun Defendants would subject her to humiliation, public attack, and ridicule.

423.    Hongzhi Li and Rui Li and their employees made Performers fear leaving Shen Yun by telling them, including Plaintiff Wang, that individuals that left Shen Yun committed suicide, suffered death and disease, and failed at life. Plaintiff Wang feared meeting a similar fate if she were to leave.

424. By 2017, however, Plaintiff Wang was suffering from severe depression and the grueling physical job was taking a serious toll on her body. Though she feared harm from leaving, Plaintiff Wang felt that it was impossible for her to continue working at Shen Yun.

425. Plaintiff Wang realized that in order to be able to find a job outside of Shen Yun, she would need to complete additional schooling because the Fei Tian Schools did not provide her an adequate education. She applied to a number of universities for undergraduate school.

426. In order to apply to the colleges, Plaintiff Wang required her school transcript. However, when she went to the Shen Yun Defendants' office, she was told that they would not give her the transcript, and instead would expel her so that her transcript would reflect she did not finish her undergraduate degree and she could not transfer to another undergraduate school. Plaintiff Wang understood this as a threat designed to keep her working for Shen Yun.

427. On a day when she knew Rui Li was not at Dragon Springs, Plaintiff Wang decided to act. She contacted a family friend to pick her up. Plaintiff Wang spent several hours trying to convince the office to let her leave. After hours, Hongzhi Li gave her permission to leave.

428. Two days later, Rui Li called Plaintiff Wang, interrogated her about why she had left, and told her that she would personally change her expulsion to a "withdrawal."

429. Plaintiff Wang kept requesting her transcripts, but it took the Shen Yun Defendants many months to send them to her.

430. When Plaintiff Wang finally saw her grades for the first time, she realized that they contained false and misleading information. Plaintiff Wang's transcript, for example, says she took "World History & Geography" five times. She did not. She was on tour internationally during those semesters, and the Shen Yun Defendants after-the-fact deemed being on tour internationally as "World History & Geography."

431.   Ultimately, none of Plaintiff Wang's credits from her purported education at Fei Tian College were accepted by her new institution, so she had to completely restart her undergraduate degree.

### 3.   Plaintiff Nathan Xie's Forced Labor as a Musician for Shen Yun

432.   Plaintiff Xie was born on August 20, 1997.

433.   Plaintiff Xie's mother is a Falun Gong practitioner. His father is not.

434.   Plaintiff Xie auditioned for Shen Yun by sending in a video of him performing. He was invited to Dragon Springs to audition but was told that it was a "formality" and that he should pack his bags and be prepared to move there.

435.   Plaintiff Xie began working at Shen Yun as a musician on September 26, 2012, when he was 15 years old.

436.   Plaintiff Xie was told he was being accepted as a student of Fei Tian Academy of the Arts, and that he would receive a full scholarship. Every other student Plaintiff Xie met at the Fei Tian Schools also received a full scholarship.

437.   The Shen Yun Defendants took Plaintiff Xie's passport. He did not have access to his passport while he was on the compound. He was only given his passport to use when he traveled to go on tour, and whenever he arrived back to Dragon Springs, he was required to turn his passport over to the office. The Shen Yun Defendants kept possession of his passport even after he turned 18 years old.

438.   As soon as Plaintiff Xie was accepted, Siu Qing (the administrator working for the Lis) told him the rules. Plaintiff Xie learned that Performers were not allowed to leave Dragon Springs without special permission from the Shen Yun Defendants, and often from Rui Li directly. The rules regarding leaving the campus did not change for Performers once they turned eighteen years old. When Plaintiff Xie became an adult, he still could not leave Dragon Springs without the

Shen Yun Defendants' explicit permission. Plaintiff Xie knew he could not walk off the compound because he saw the gates, German Shepherds, and armed guards who refused to let individuals in and out without Hongzhi Li and Rui Li's permission.

439.    Siu Qing also told Plaintiff Xie that Performers were not allowed to have a platonic or romantic relationship with anyone from the opposite sex, that Performers were not allowed to have smart phones or social media, and that Performers were not allowed to play board games or computer games.

440.    Siu Qing demanded that Plaintiff Xie delete all his social media and disconnect from any of the people from his pre-Shen Yun life. Plaintiff Xie did so and accordingly could not readily contact any of his friends from his prior school. The Shen Yun Defendants would routinely check social media profiles to ensure that Performers did not have unauthorized social media accounts.

441.    Plaintiff Xie attended academic classes at Fei Tian Academy of the Arts approximately three hours a day. The rest of the day was spent rehearsing and training for the upcoming tour.

442.    Plaintiff Xie spent the first year at Dragon Springs rehearsing and practicing the cello. Generally, Plaintiff Xie and other Performers rehearsed and trained for the upcoming Shen Yun show from June to November at Dragon Springs. From December to May, Plaintiff Xie and other Performers toured with Shen Yun.

443.    Plaintiff Xie began touring in 2013. During each tour, Plaintiff Xie worked as a musician for approximately one hundred shows (or more) all over the United States and internationally.

444.    Plaintiff Xie's schooling at the Fei Tian Schools was grossly deficient. While at Dragon Springs, Plaintiff Xie's schedule at the Fei Tian Academy included three hours of academic classes. In comparison, Plaintiff Xie was required to rehearse or train for the Shen Yun shows until approximately 10 or 11 p.m. each day while at Dragon Springs. Plaintiff Xie's three hours of academic instruction per day was the same regardless of whether he was at Fei Tian Academy or Fei Tian College.

445.    Plaintiff Xie was assigned very little to no homework the entire time he was a student at the Fei Tian Schools. While on tour, Plaintiff Xie received no academic instruction and did not receive any significant schoolwork. Rather, he was instructed to complete a small packet of work that took a few hours to complete over the several months of the tour. He did not receive any grades on tour.

446.    Plaintiff Xie observed that the purpose of the Fei Tian Schools was not to provide him a quality education, but rather only to prepare him to perform in the Shen Yun shows. He was repeatedly told this by teachers—that performing in Shen Yun, not academics, were the purpose of his time there.

447.    Plaintiff Xie observed that Shen Yun sometimes employed "professional" musicians. The "professional" musicians did the same job as Plaintiff Xie and other musicians.

448.    Plaintiff Xie and other Performers were automatically moved from Fei Tian Academy of the Arts to Fei Tian College by the Shen Yun Defendants. One day during class, a Fei Tian Academy teacher gave Plaintiff Xie and his classmates a short form that he was instructed to fill out in class; that form was the "application" to Fei Tian College. After graduating from Fei Tian Academy of the Arts, the Shen Yun Defendants generally did not give Performers the opportunity to apply to other colleges but required them to attend Fei Tian College.

449.    Plaintiff Xie was restricted from communicating with the outside world. He was completely isolated from his friends and his life before Shen Yun, he was not allowed to have a smart phone, and he had restricted access to the internet. He was permitted an iPod but told that he could not listen to any music unless it was made before 1900.

450.    The Shen Yun Defendants encouraged Plaintiff Xie and other Performers to tell their family members only good things about life at Dragon Springs and on tour, and they discouraged him and the others from mentioning anything bad that was happening.

451.    The internet was extremely restricted for Plaintiff Xie and other Performers. He was allowed to use the internet in the computer room, but Performers' internet searches and usage were not private. The only websites Plaintiff Xie could access were his email, *The Epoch Times*, and other prior-approved sources.

452.    Hongzhi Li, Rui Li, and their agents told Performers that someone was constantly monitoring their internet usage and email traffic.

453.    On his first tour, Plaintiff Xie received no income, despite working 12 to 16 hours per day. In his second year on tour, Plaintiff Xie earned $300 a month. His income went up incrementally each year until he was earning $1,000 a month.

454.    While Plaintiff Xie was on tour, for six (6) months of the year, he did not attend any school, but rather, worked for the Shen Yun Defendants for meager pay.

455.    Plaintiff Xie performed in approximately 100 shows while on tour each year, often performing in two shows a day.

456.    On show days, Plaintiff Xie worked for approximately 13 to 16 hours a day, which included setting up, practicing, rehearsing, and performing in the show.

457.    While at Dragon Springs, Plaintiff Xie was never taken to a doctor for preventative care or an annual checkup. On one occasion, Plaintiff Xie witnessed one student suffer a mental breakdown, but no one from the Shen Yun Defendants provided him with any health care—instead, they expelled the student.

458.    The Shen Yun Defendants controlled Plaintiff Xie financially. Plaintiff Xie's wages were so small, for example, that he did not have the financial ability to leave.

459.    Plaintiff Xie observed how the Shen Yun Defendants controlled Performers' romantic relationships. Plaintiff Xie observed Rui Li often act as a matchmaker and set up U.S. citizens with non-citizens for the purpose of acquiring a green card for the non-citizen so they could easily stay in the U.S. and continue laboring for the Shen Yun Defendants.

460.    Plaintiff Xie witnessed mass criticism sessions, and those sessions further instilled a fear in him that breaking any of the rules imposed by Hongzhi Li, Rui Li, and the Shen Yun Defendants would subject him to humiliation, public attack, and ridicule.

461.    Hongzhi Li and Rui Li and their employees made Performers fear leaving Shen Yun by telling them, including Plaintiff Xie, that individuals who left Shen Yun committed suicide, suffered death and disease, and failed at life. Plaintiff Xie feared meeting a similar fate if he were to leave.

462.    Plaintiff Xie felt that he had no option but to labor for Shen Yun because the Shen Yun Defendants had isolated him and the other Performers from the outside world, including access to other schools, previous friends, and non-practitioners, effectively limiting information and closing doors on any other opportunities that Plaintiff Xie would have pursued. Plaintiff Xie wanted to leave but he had difficulty ascertaining what options were open to him after he left Shen

Yun. The Shen Yun Defendants repeatedly instructed that they expected Performers to work for Shen Yun for forever.

463.    Plaintiff Xie was also aware that the Shen Yun Defendants had retaliated against students who had left Shen Yun. The Shen Yun Defendants sought to undermine the outside opportunities for those who had left by marking them as expelled mid-year, delaying sending their transcripts for months, or by threatening students with tuition reimbursement if they leave. These retaliatory acts obstructed the Performers' ability to transition to educational institutions outside of Fei Tian.

464.    When Plaintiff Xie was 23 years old, however, he decided to leave Dragon Springs. He feared that he would face significant harm if he left, but he felt that staying in Shen Yun was too detrimental to his personal life and his professional prospects, and he saw too much mistreatment of Performers by the Shen Yun Defendants. He also understood he would be forced to marry another Shen Yun performer so as to provide her with a green card (Plaintiff Xie is a U.S. citizen). Plaintiff Xie felt it was impossible for him to continue working at Shen Yun.

465.    Plaintiff Xie realized that in order to be able to find a job outside of Shen Yun, he would need to complete additional schooling because the Fei Tian Schools did not provide him an education. He applied to graduate school.

466.    When Plaintiff Xie resolved to leave, he packed his things secretly at night so that no one would see what he was doing. Plaintiff Xie called his father, who was not a practitioner, to pick him up. Plaintiff Xie's father was not allowed inside Dragon Springs. On the day he left, Plaintiff Xie approached Rui Li and told her that he planned to leave. She told him that he "had no reason to leave." Rui Li called Plaintiff Xie's mother and sister, who were both practitioners, and they all implored him to stay.

467.     Rui Li threatened Plaintiff Xie with having to repay his tuition for the entirety of his time at Shen Yun. For approximately six (6) hours, Rui Li and some of her direct reports held Plaintiff Xie in the office and refused to let him leave, even though Plaintiff Xie's father was waiting outside for him. During this time, Plaintiff Xie was extremely emotional and repeatedly asked Rui Li to let him leave. Finally, Rui Li called Hongzhi Li, who ultimately gave Plaintiff Xie permission to leave.

468.     After Plaintiff Xie left Dragon Springs, Rui Li called a meeting of all the Performers. For approximately 45 minutes, she ranted about Plaintiff Xie leaving, calling him an "ungrateful bastard" in front of hundreds of Performers, teachers, administrators, and others at Dragon Springs. People from inside Shen Yun told Plaintiff Xie of this episode.

469.     In order to apply to college, Plaintiff Xie required his school transcript. Plaintiff Xie knew from other Performers that the Shen Yun Defendants withheld access to transcripts as a way of discouraging Performers from leaving. The Shen Yun Defendants similarly refused to give Plaintiff Xie his transcript when he left. He was able to procure it after nearly two months, and only after his friend at Dragon Springs visited the office every day for nearly two months to request it.

### 4.     Plaintiff Hofmann Zhu's Forced Labor as a Musician for Shen Yun

470.     Plaintiff Hofmann Zhu was a musician at Shen Yun for 11 years. He began when he was 15. He was with Shen Yun for nearly 10 years, living at Dragon Springs and enrolled at the Fei Tian Schools, until he left as an adult after 2020.

471.     Certain of Plaintiff Zhu's family members are Falun Gong practitioners.

472.     When Plaintiff Zhu came to Dragon Springs, he thought he was attending a legitimate school in the Fei Tian Academy. He came to realize that the education was a substandard

pretext for obtaining his labor for nearly nothing in service of the Shen Yun Defendants' lucrative commercial enterprise.

473.    Within a year of his joining Shen Yun, Plaintiff Zhu was performing in Shen Yun shows and touring.

474.    Plaintiff Zhu was told he was being accepted as a student of Fei Tian Academy of the Arts, and that he would receive a full scholarship. Every other student Plaintiff Zhu met at the Fei Tian Schools also received a full scholarship.

475.    The Shen Yun Defendants took Plaintiff Zhu's passport. Plaintiff Zhu was required to give the office his passport. Because the Shen Yun Defendants took away the passport, Plaintiff Zhu was never in possession of any identifying documents. He did not have access to his passport while he was on the compound. He was only given his passport to use when he traveled to go on tour, and whenever he arrived back to Dragon Springs, he was required to turn his passport over to the office. The Shen Yun Defendants kept possession of his passport even after he turned 18 years old.

476.    As soon as Plaintiff Zhu was accepted, Siu Qing (the administrator working for the Lis) told him the rules. Plaintiff Zhu learned that Performers were not allowed to leave Dragon Springs without special permission from the Shen Yun Defendants, and often from Rui Li directly. The rules regarding leaving the campus did not change for Performers once they turned eighteen years old. When Plaintiff Zhu became an adult, he still could not leave Dragon Springs without the Shen Yun Defendants' explicit permission. Plaintiff Zhu knew he could not walk off the compound because he saw the gates, German Shepherds, and armed guards who refused to let individuals in and out without Hongzhi Li and Rui Li's permission.

477.     Siu Qing also told Plaintiff Zhu that Performers were not allowed to have a platonic or romantic relationship with anyone from the opposite sex, that Performers were not allowed to have smart phones or social media, and that Performers were not allowed to play board games or computer games.

478.     Siu Qing demanded that Plaintiff Zhu delete all his social media and disconnect from any of the people from his pre-Shen Yun life. Plaintiff Zhu did so and accordingly could not readily contact any of his friends from his prior school. The Shen Yun Defendants would routinely check social media profiles to ensure that Performers did not have unauthorized social media accounts.

479.     The Shen Yun Defendants' control over Plaintiff Zhu and his fellow Performers was total. During the COVID-19 pandemic, for example, the Shen Yun Defendants implemented a complete and total lockdown at Dragon Springs. No one could leave the compound at all for any reason for six months.

480.     As part of this lockdown, Plaintiff Zhu's phone—along with the phones of the other Performers—was confiscated. Plaintiff Zhu understood that the reason for this was because the Shen Yun Defendants did not want any government officials to know that so many people were congregated together at Dragon Springs; they feared that someone would be able to determine the number of people congregating at Dragon Springs using cell signals.

481.     Plaintiff Zhu spent the first year at Dragon Springs rehearsing and practicing his instrument. Generally, Plaintiff Zhu and other Performers rehearsed and trained for the upcoming Shen Yun show from June to November at Dragon Springs. From December to May, Plaintiff Zhu and other Performers toured with Shen Yun.

482.    Plaintiff Zhu began touring approximately one year after he arrived at Dragon Springs. During each tour, Plaintiff Zhu worked as a musician for approximately one hundred shows (or more) all over the United States and internationally.

483.    Plaintiff Zhu's schooling at the Fei Tian Schools was grossly deficient. While at Dragon Springs, Plaintiff Zhu's schedule at the Fei Tian Academy included three hours of academic classes. In comparison, Plaintiff Zhu was required to rehearse or train for the Shen Yun shows until approximately 10 or 11 p.m. each day while at Dragon Springs. Plaintiff Zhu's three hours of academic instruction per day was the same regardless of whether he was at Fei Tian Academy or Fei Tian College.

484.    Plaintiff Zhu was assigned very little to no homework the entire time he was a student at the Fei Tian Schools. While on tour, Plaintiff Zhu did not receive any academic instruction and was not assigned any significant schoolwork. Rather, he was instructed to complete a small packet of work that took a few hours to complete over the several months of the tour. He did not receive any grades on tour.

485.    Plaintiff Zhu observed that the purpose of the Fei Tian Schools was not to provide him a quality education, but rather only to prepare him to perform in the Shen Yun shows. He was repeatedly told this by teachers—that performing in Shen Yun, not academics, were the purpose of his time there.

486.    Plaintiff Zhu observed that Shen Yun sometimes employed "professional" musicians. The "professional" musicians did the same job as Plaintiff Zhu and other musicians.

487.    Plaintiff Zhu and other Performers were automatically moved from Fei Tian Academy of the Arts to Fei Tian College by the Shen Yun Defendants, without filling out any applications. After graduating from Fei Tian Academy of the Arts, the Shen Yun Defendants

generally did not give Performers the opportunity to apply to other colleges but required them to attend Fei Tian College.

488.    Plaintiff Zhu was restricted from communicating with the outside world. He was completely isolated from his friends and his life before Shen Yun, he was not allowed to have a smart phone, and he had restricted access to the internet.

489.    The Shen Yun Defendants encouraged Plaintiff Zhu and other Performers to tell their family members only good things about life at Dragon Springs and on tour, and they discouraged him and the others from mentioning anything bad that was happening.

490.    The internet was extremely restricted for Plaintiff Zhu and other Performers. He was allowed to use the internet in the computer room, but Performers' internet searches and usage were not private. The only websites Plaintiff Zhu could access were his email, *The Epoch Times*, and other prior-approved sources.

491.    Hongzhi Li, Rui Li, and their agents told Performers that someone was constantly monitoring their internet usage and email traffic.

492.    On his first tour, Plaintiff Zhu received no income, despite working 12 to 16 hours per day. In his second year on tour, Plaintiff Zhu earned $300 a month. Two years later, his pay was raised to $500 per month. Two years after that, his pay was raised to $1,000 per month. He never made more than $1,000 per month ($12,000 per year), even as an adult performing at Shen Yun.

493.    While Plaintiff Zhu was on tour, for six (6) months of the year, he did not attend any school, but rather, worked for the Shen Yun Defendants for meager pay.

494.    Plaintiff Zhu performed in approximately 100 shows while on tour each year, often performing in two shows a day.

495.     On show days, Plaintiff Zhu worked for approximately 13 to 16 hours a day, which included setting up, practicing, rehearsing, and performing in the show.

496.     While at Dragon Springs, Plaintiff Zhu was never taken to a doctor for preventative care or an annual checkup.

497.     The Shen Yun Defendants controlled Plaintiff Zhu financially. Plaintiff Zhu's wages were so small, for example, that he did not have the financial ability to leave. The Shen Yun Defendants directed Plaintiff Zhu to open a bank account as a minor with the International Bank of Chicago. Like the other Performers, Siu Qing (a/k/a Judy Siu) was the custodian on his account. He was not able to access his account electronically. The only way he could obtain money from his account was at an ATM, and he did not have easy access to an ATM given the restrictions on his movement.

498.     Plaintiff Zhu observed how the Shen Yun Defendants controlled Performers' romantic relationships. Plaintiff Zhu observed Rui Li often act as a matchmaker and set up U.S. citizens with non-citizens for the purpose of acquiring a green card for the non-citizen so they could easily stay in the U.S. and continue laboring for the Shen Yun Defendants.

499.     Plaintiff Zhu witnessed mass criticism sessions, and those sessions further instilled a fear in him that breaking any of the rules imposed by Hongzhi Li, Rui Li, and the Shen Yun Defendants would subject him to humiliation, public attack, and ridicule. In particular, Plaintiff Zhu observed that leaving Shen Yun resulted in ostracization and threats—when Plaintiff Xie left, Rui Li organized a mass criticism session that involved her ranting and raving about Plaintiff Xie for 45 minutes and calling him an "ungrateful bastard," in front everyone at Dragon Springs.

500.     Hongzhi Li and Rui Li and their employees made Performers fear leaving Shen Yun by telling them, including Plaintiff Zhu, that individuals that left Shen Yun committed suicide,

suffered death and disease, and failed at life. Plaintiff Zhu feared meeting a similar fate if he were to leave.

501.    Plaintiff Zhu felt that he had no option but to labor for Shen Yun because the Shen Yun Defendants had isolated him and the other Performers from the outside world, including access to other schools, previous friends, and non-practitioners, effectively limiting information and closing doors on any other opportunities that Plaintiff Zhu would have pursued. Plaintiff Zhu wanted to leave but he had difficulty ascertaining what options were open to him after he left Shen Yun. The Shen Yun Defendants repeatedly instructed that they expected Performers to work for Shen Yun for forever.

502.    Plaintiff Zhu was also aware that the Shen Yun Defendants had retaliated against students who had left Shen Yun. The Shen Yun Defendants sought to undermine the outside opportunities for those who had left by marking them as expelled mid-year, by delaying sending their transcripts for months, or by threatening students with tuition reimbursement if they leave, which prompted at least one student to stay. These retaliatory acts obstructed the Performers' ability to transition to educational institutions outside of Fei Tian.

503.    When Plaintiff Zhu was in his early 20s, however, he decided to leave Dragon Springs. He feared that he would face significant harm if he left, but he felt that staying in Shen Yun was too detrimental to his personal life and his professional prospects, and he saw too much mistreatment of Performers by the Shen Yun Defendants. He felt it was impossible for him to continue working at Shen Yun.

504.    The Shen Yun Defendants made leaving difficult. Over the course of several days, they sent various Shen Yun employees—teachers, workers, and others—to pressure Plaintiff Zhu

against leaving. They tried to cause him to fail his graduate recital, so as to set him back educationally and thereby prevent him from leaving.

505.    Exercising extraordinary persistence, when Plaintiff Zhu finally obtained permission to leave Shen Yun, Rui Li threatened him by warning that he better not "dare go out and speak poorly against us."

## TVPRA CLASS ALLEGATIONS

506.    Plaintiffs assert their Trafficking Victims Protection Reauthorization Act claims on behalf of a class of Performers defined as follows:

> All current and former Performers for the Shen Yun Defendants who lived at the Dragon Springs compound.

507.    Excluded from the class is any Defendant or any immediate family member of any Defendant.

508.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

509.    <u>Numerosity</u>: The Performers Class is so numerous that joinder of all class members is impracticable. Defendants report that 640 individuals perform in their shows each season. These class members can be identified based on Defendants' records.

510.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Performers Class and predominate over any questions solely affecting individual members, including but not limited to:

a.    Whether the Shen Yun Defendants obtain labor by using serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

b.      Whether the Shen Yun Defendants' practice of ostracization, control, and threats of physical and psychological harm constitute serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

c.      Whether the Shen Yun Defendants obtain labor by using a scheme, plan, or pattern intended to cause a person to believe that, if they did not perform such labor or services, that person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

d.      Whether the Shen Yun Defendants' practice of forcing Performers to labor in the Shen Yun performances by threatening physical and psychological harm constitutes a scheme, plan, or pattern intended to cause Performers to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

e.      Whether the Shen Yun Defendants knowingly recruit Performers for forced labor;

f.      Whether Defendants knowingly benefit from participation in a venture which obtains labor in violation of the TVPRA while "knowing or in reckless disregard of the fact" that the venture has obtained labor by that means;

g.      Whether Defendants knowingly benefit from their violations of the TVPRA;

h.      Whether Defendants conspired to violate 18 U.S.C. § 1589;

i.      Whether Defendants conspired to violate 18 U.S.C. § 1590;

j.      Whether Defendant attempted to violate 18 U.S.C. § 1589;

k.      Whether Defendants attempted to violate 18 U.S.C. § 1590;

l.      The proper measure of damages;

m. The proper preliminary and permanent injunctive relief that must issue against each and both defendants; and

n. The proper measure of punitive damages.

511. <u>Typicality</u>: Plaintiffs' claims are typical of the members of the Performers Class. For example, Plaintiffs, like other putative class members, labored for Shen Yun facilities and was subject to common policies and procedures. Further, the Shen Yun Defendants treated Plaintiffs like they treated other class members, in accordance with their standard policies and practices.

512. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Performers Class. Plaintiffs are committed to the prosecution of this action and has retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiffs and the Performers Class they seeks to represent.

513. Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Performers Class predominate over any questions affecting only individual members of the Performers Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing Defendants' forced labor program are uniform across the Performers Class. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Common questions of law and fact also predominate as to Plaintiffs' claim that Defendants attempted to obtain, recruit, and benefit from forced labor in violation of the TVPRA. Defendants employed uniform structures, policies, and procedures in their attempt to obtain, recruit, and benefit from forced labor performed by Plaintiff and the Performers Class. Moreover, management of this action as a class action will

not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

514.   Plaintiffs intend to send notice to all members of the Performers Class to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendants' records and other available sources.

## NEW YORK LABOR LAW CLASS ALLEGATIONS

515.   Plaintiffs assert their New York Labor Law claims on behalf of a class of Performers defined as follows:

> All individuals who worked for Shen Yun as non-exempt Performers in New York in the previous six years.

516.   Excluded from the class is any Defendant.

517.   Plaintiffs bring this claim as a class action pursuant to Rule 23.

518.   <u>Numerosity</u>: The NYLL Performers Class is so numerous that joinder of all class members is impracticable. Defendants report that 640 individuals perform in their shows each season. These class members can be identified based on Defendants' records.

519.   <u>Commonality</u>: Common questions of law and fact exist as to all members of the NYLL Performers Class and predominate over any questions solely affecting individual members, including but not limited to:

a.     Whether the Shen Yun Defendants failed to pay Plaintiffs and the members of the NYLL Performers Class minimum wages;

b.     Whether the Shen Yun Defendants failed to pay Plaintiffs and the NYLL Performers Class minimum overtime wages for hours that they worked in excess of 40 hours per work week;

c.      Whether the Shen Yun Defendants failed to furnish Plaintiffs and the Performers Class with an accurate statement of wages that included the hourly rate or rates of pay and overtime rate of rates of pay, as required by the Wage Theft Prevention Act;

d.      Whether the Shen Yun Defendants failed to furnish Plaintiffs and the NYLL Performers Class with an accurate notice at the time of hire, which included overtime rates, as required by the Wage Theft Prevention Act; and

e.      Whether the Shen Yun Defendants failed to furnish Plaintiffs and the NYLL Performers Class with an accurate annual notice, as required by the Wage Theft Prevention Act.

520.    Typicality: Plaintiffs' claims are typical of the members of the NYLL Performers Class. For example, Plaintiffs, like other putative class members, labored for Shen Yun and was subject to common policies and procedures. Further, the Shen Yun Defendants treated Plaintiffs consistent with other class members, in accordance with their standard policies and practices.

521.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the NYLL Performers Class. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiffs and the NYLL Performers Class they seek to represent.

522.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the NYLL Performers Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing the Shen Yun Defendants' forced labor program emanate from their policy and are uniform across the NYLL Performers Class. Class certification will also obviate the

need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Common questions of law and fact also predominate as to Plaintiffs' claim that the Shen Yun Defendants violated the New York Labor Law. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

523.    Plaintiffs intend to send notice to all members of the NYLL Performers Class to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendants' records and other available sources.

<u>**COUNT ONE**</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1589(a) and 1595(a) – Obtaining Trafficked Labor**

**(Against the Shen Yun Defendants)**

524.    All previous paragraphs are incorporated as though fully set forth herein.

525.    It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

526.    The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

527.    Defendants obtained the labor of Plaintiffs and members of the Class through threats of serious harm, through a scheme to make Plaintiffs and the Classes believe they would suffer serious harm.

528.    Defendants kept Plaintiffs and members of the Class laboring without pay under inhumane conditions by preying on their vulnerabilities.

529.    Defendants obtained unpaid labor from Plaintiffs and members of the Class through serious harm and threats of serious harm both physical and nonphysical.

530.    Defendants refused to pay proper wages to Plaintiffs and members of the Class for their hours worked and threatened them with psychological harm if they refused to labor without pay.

531.    Defendants kept Plaintiffs and members of the Class working under inhumane conditions by preying on their vulnerability as children and reliance on Defendants for food, housing, and by withholding wages for hours worked.

532.    Defendants' use of such means to obtain the labor of Plaintiffs and members of the Class was knowing and intentional.

533.    Plaintiffs and members of the Class suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and members of the Class provided to Defendants, as well as emotional distress and other damages.

534.    Plaintiffs and members of the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## **COUNT TWO**

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1589(b) and 1595(a) – Benefitting from Trafficked Labor**

**(Against all Defendants)**

535.    All previous paragraphs are incorporated as though fully set forth herein.

536.    It is a criminal violation of the TVPRA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

537.    An individual may bring a civil action against a "perpetrator [] or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. 18 U.S.C. § 1595(a).

538.    Defendants participated in a venture that obtained labor in violation of the TVPRA because they financially benefited from the forced labor, by which Defendants obtained labor in violation of the TVPRA.

539.    Defendants knowingly benefited from participation in the forced labor venture described herein by obtaining labor in its commercial operations without paying market wages and willfully benefiting from forced labor.

540.    Defendants Shen Yun, Fei Tian College, Fei Tian Academy, Dragon Springs, Hongzhi Li, and Rui Li have knowingly benefited from its participation in the forced labor venture described herein by obtaining labor without incurring payroll and tax obligations, allowing Defendants to repurpose funds that would otherwise be used to pay paid staff to perform these tasks.

541.    Defendants Shen Yun, Fei Tian College, Fei Tian Academy, Dragon Springs, Hongzhi Li, and Rui Li knowingly benefited from their participation in the ventures described

herein because obtaining labor in violation of the TVPRA reduced the number of paid staff Defendants must recruit from other sources.

542.    Defendant Gong knowingly benefitted from his participation in the ventures described herein because obtaining the flow of "students" to the Fei Tian Schools provided him with employment as a teacher at those schools and his wife employment as an emcee for Shen Yun. Plaintiff Gong further benefitted because he has ingratiated himself with the Lis and enjoys the benefits of their favor. His wife, for example, often goes shopping with Rui Li, who (as described above) particularly enjoys high-end, luxury shopping.

543.    Defendant International Bank of Chicago knowingly benefited from its participation in the ventures described herein. The Bank facilitated and benefited from the Shen Yun Defendants' commercial performing arts venture. The Bank knew or should have known, including from the red flags of forced labor, that the Shen Yun Defendants' venture was involved in forced labor and trafficking.

544.    Defendants knew or recklessly disregarded the fact that the ventures described herein engaged in obtaining forced labor.

545.    Plaintiffs and the Class suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

546.    Plaintiff and the Dancers Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## **COUNT THREE**

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**

**18 U.S.C. §§ 1590(a) and 1595(a) – Recruiting, Harboring, and Transporting Trafficked Labor**

**(Against the Shen Yun Defendants)**

547.    All previous paragraphs are incorporated as though fully set forth herein.

548.    It is a violation of the TVPRA to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1590(a).

549.    Defendants knowingly recruited, harbored, and transported Plaintiffs and the Class members in violation of the TVPRA through the means described herein.

550.    Plaintiffs and the Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and the Class members provided to Defendants, as well as emotional distress and other damages.

551.    Plaintiffs and the Class members are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT FOUR

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1594(b) and 1595(a) – Conspiracy to Recruit, Harbor, Transport, Obtain, and Benefit from Trafficked Labor**

**(Against all Defendants)**

552.    All previous paragraphs are incorporated as though fully set forth herein.

553.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1594(b).

554.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. §§ 1589(b), 1594(b).

555.    Defendants Shen Yun, Fei Tian College, Fei Tian Academy, Dragon Springs, Hongzhi Li, Rui Li, and Zhang conspired to recruit Plaintiffs and the Class members to the Fei Tian Schools and ultimately obtained their forced labor by coercing them to work for Shen Yun. Defendant International Bank of Chicago's financial interconnectedness with the performing arts venture's use of forced child labor, as described above, constitutes its participation in that conspiracy.

556.    All Defendants conspired to benefit from Plaintiffs' and the Class members' forced labor by ensuring they were not paid their proper wages and were unable to have access to their money.

557.    Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

558.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## <u>COUNT FIVE</u>

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. §§ 1594(a) and 1595(a) – Attempted Trafficking**

**(Against the Shen Yun Defendants)**

559.    All previous paragraphs are incorporated as though fully set forth herein.

560.    Attempts to violate the TVPRA are themselves violations of the TVPRA. 18 U.S.C. § 1594(a).

561.    Defendants attempt to violate 18 U.S.C. §§ 1589 and 1590 by knowingly using the structure, policies, and procedures of Shen Yun, the Fei Tian Schools, and Dragon Springs in an attempt to obtain the labor of Plaintiffs and members of the Classes. Defendants also knowingly participate in a venture in an attempt to recruit, obtain, and benefit from forced labor by jointly creating and establishing the policies described herein.

562.    Plaintiffs and the Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

563.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT SIX

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. § 1590 and 1592(a) – Seizure of Documents**

**(Against the Shen Yun Defendants)**

564.    All previous paragraphs are incorporated as though fully set forth herein.

565.    It is a violation of the TVPRA to "knowingly…confiscate[], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person— (1) in the course of a violation of section 1581, 1583, 1584, 1589, 1590, 1591, or 1594(a); . . . (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or

services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims Protection Act of 2000."

566.    Defendants took possession of Plaintiffs' and Class members' passports and immigration paperwork so that they could not leave the country and would be forced to labor for Defendants.

567.    Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

568.    Plaintiffs and the Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT SEVEN

### New York State Minimum Wage Act, New York Labor Law § 650 et seq.; N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.3, 146-2.9

### (Against the Shen Yun Defendants)

569.    All previous paragraphs are incorporated as though fully set forth herein.

570.    Defendants knowingly failed to pay Plaintiffs and the Class members the full New York State minimum wage for all hours worked.

571.    Defendants' failure to pay Plaintiffs and the Class members the minimum wage was willful within the meaning of N.Y. Lab. Law § 663.

572.    As a result of Defendants' willful and unlawful conduct, Plaintiffs and the Class are entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

## COUNT EIGHT

**New York State Overtime Violations, N.Y. Lab. L. §§ 650 et seq. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.3, 146-1.4, 146-2.9**

**(Against the Shen Yun Defendants)**

573.    All previous paragraphs are incorporated as though fully set forth herein.

574.    During all relevant times, Plaintiffs and the Class did not qualify as exempt from the overtime requirements of the NYLL under 12 NYCRR § 142-3.12.

575.    Defendants knowingly failed to compensate Plaintiffs and the Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of NYLL and its supporting regulations. 12 NYCRR § 142-3.2.

576.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class members are entitled to recover from Defendants their unpaid overtime wages, attorneys' fees, costs, prejudgment interest and liquidated damages. NYLL § 198 (1-a).

577.    Due to Defendants' violations of NYLL § 195(3), Plaintiffs and the Class are entitled to statutory penalties as provided for in NYLL § 198 (1-d).

## COUNT NINE

**New York Spread of Hours Provisions, N.Y. Comp. Codes R. & Regs. Tit. 12 §§ 142-2.4**

**(Against the Shen Yun Defendants)**

578.    All previous paragraphs are incorporated as though fully set forth herein.

579.    Plaintiffs and the Class members regularly had workdays that lasted more than ten (10) hours.

580.    Defendants willfully and intentionally failed to compensate Plaintiffs and the Class members one hour's pay at the basic New York minimum hourly wage rate when their workdays exceeded ten (10) hours, as required by New York law.

581.    As a result of Defendants' willful and unlawful conduct, Plaintiffs and the Class are entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by N.Y. Lab. Law § 663.

## COUNT TEN

### New York Notice Requirements, N.Y. Lab. L. §§ 195, 198

### (Against the Shen Yun Defendants)

582.    All previous paragraphs are incorporated as though fully set forth herein.

583.    Defendants did not provide Plaintiffs and members of the Class with the notices required by N.Y. Lab. Law §§ 195(1) and 195(3).

584.    As a result of Defendants' willful and unlawful conduct, Plaintiffs and members of the Class are entitled to an award of damages, including liquidated damages, in amount to be determined at trial, pre- and post-judgment interest, and costs and attorneys' fees.

## COUNT ELEVEN

### New York State Late Payment of Wages Violations
### New York Minimum Wage Act, N.Y. Stat. § 190 et seq.

### (Against the Shen Yun Defendants)

585.    All previous paragraphs are incorporated as though fully set forth herein.

586.    At all relevant times, Defendants have been, and continue to be, an "employer" within the meaning of the NYLL, § 190, et seq. At all relevant times, Defendants have employed "employee[s]," including Plaintiffs and the Class members. Defendants did not pay Plaintiffs and the Class members all of their earned wages on a weekly basis.

587.    By their aforesaid conduct, Defendants willfully violated the provisions of the NYLL regarding timely payment of wages, NYLL Art. 6 § 191, et seq.

588.    Plaintiffs and the Class members are thereby entitled to recover from Defendants, jointly and severally, liquidated damages in the amount of Plaintiffs' and the Class members' respective untimely paid wages, as well as compensatory damages for bank fees paid by Plaintiffs and the Class members, interest, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## COUNT TWELVE

### Retaliation, N.Y. Lab. L. § 215
### On Behalf of Chun-Ko Chang

### (Against the Shen Yun Defendants)

589.    All previous paragraphs are incorporated as though fully set forth herein.

590.    At all relevant times, the Shen Yun Defendants were "employers" and Plaintiffs were "employees" within the meaning of the New York Labor Law.

591.    Plaintiff Chang engaged in protected activity under New York Labor Law § 215. She filed the instant lawsuit alleging violations of the New York Labor Law, including but not limited to overtime violations and minimum wage violations.

592.    In violation of § 215, the Shen Yun Defendants retaliated against Plaintiff Chang for filing this lawsuit by using their agents to file frivolous lawsuits against Plaintiff Chang in Taiwan, where she resides.

593.    There is a casual connection between Plaintiff Chang's protected activities and the Shen Yun Defendants' actions. Defendants subjected Plaintiff Chang to such actions because of and in retaliation for Plaintiff Chang's protected activities.

594.    By reason of the continuous nature of the Shen Yun Defendants' retaliatory conduct, Plaintiff Change is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

595. As a result of the Shen Yun Defendants' unlawful conduct, Plaintiff Chang has suffered and will continue to suffer harm, including but not limited to humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

A. Determining that this action may proceed as a class action under Rule 23(b)(2)-(3) of the Federal Rules of Civil Procedure;

B. Designating Plaintiffs as representatives for the Classes and designating Plaintiffs' counsel as counsel for the Classes;

C. Issuing proper notice to the Classes at Defendants' expense;

D. Leave to add additional plaintiffs and/or state law claims by motion or any other method approved by the Court, as appropriate;

E. Declaring that all Defendants committed violations of the TVPRA;

F. Preliminary and permanent injunctive relief requiring Defendants to cease violations of the TVPRA and prohibiting violations in the future;

G. Awarding damages as provided by the TVPRA, including punitive damages;

H. Declaring that Defendants committed violations of the NYLL;

I. Awarding damages as provided by the NYLL;

J. Awarding reasonable attorneys' fees and costs as provided by law; and

K. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR A JURY TRIAL

Plaintiffs, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand a trial by jury.

Dated: April 30, 2025

Respectfully submitted,

Mariyam Hussain (NY Bar No. 5492475)
**BERGER MONTAGUE PC**
1820 West Division Street
Chicago, IL 60622
Tel.: (773) 666-4316
mhussain@bm.net

Michael Dell'Angelo
Michaela Wallin
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-3000
mdellangelo@bm.net
mwallin@bm.net

/ s / Adam Farra
Times Wang
Adam Farra
**FARRA & WANG PLLC**
1300 I Street, N.W. Suite 400E
Washington, D.C. 20005
Tel.: 202-505-6227
twang@farrawang.com
afarra@farrawang.com

*Attorneys for Plaintiffs and the Proposed Class*