UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHUN-KO CHANG, YI RAN WANG, GUANEE
XIE, and HOFMANN ZHU, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

SHEN YUN PERFORMING ARTS, INC., FEI
TIAN COLLEGE, FEI TIAN ACADEMY OF
THE ARTS, DRAGON SPRINGS BUDDHIST
INC., INTERNATIONAL BANK OF
CHICAGO, SHUJIA GONG a/k/a TIANLIANG
ZHANG, HONGZHI LI, and RUI LI a/k/a
SANDY REBECCA LEE,

Defendants.

Case No. 24-8980 (PMH) (JCM)

Class Action

Jury Trial Demanded

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT**

TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................1

II.   LEGAL STANDARD ................................................................................3

III.  FACTUAL BACKGROUND ....................................................................3

IV.  ARGUMENT .............................................................................................7

    A.   Plaintiffs Plausibly Allege TVPRA Violations............................................7

        1.  Plaintiffs plead that they were forced to labor under threat of serious harm.....8

        2.  The SY Defendants' challenges to the TVPRA claims depend on factual disputes that *may not* be considered on a motion to dismiss. ...........................13

        3.  Plaintiffs plausibly allege claims for keeping documents, beneficiary liability, and conspiracy/attempt under the TVPRA. .......................................14

    B.   Plaintiffs Plausibly Allege New York Labor Claims. ................................15

        1.  The bulk of the NYLL claims are not time barred.......................................16

        2.  Extraterritoriality does not support dismissal of Plaintiffs' NYLL claims. .......17

        3.  The complaint adequately states a retaliation claim.......................................17

    C.   Plaintiffs' Complaint Gives Fair Notice of Their Claims.............................18

    D.   The SY Defendants' Affirmative Defenses Regarding Religious Protection Fail....19

        1.  The ministerial exception defense does not apply to trafficking or minimum wage and overtime violations. ........................................20

        2.  The ministerial exception is a fact-bound affirmative defense that the SY Defendants cannot meet their burden to demonstrate....................................22

            a.  Fact disputes about the SY Defendants' sincerity preclude dismissal. ......23

            b.  Fact disputes about Shen Yun's status as a religious organization preclude dismissal. ...............................................24

            c.  Fact disputes about whether performers were designated "ministers" precludes dismissal. ...............................................25

        3.  The SY Defendants have waived RFRA and Free Exercise arguments...........27

        4.  The Performers are not subject to NYLL exemptions on the basis of religion.......................................................28

    E.   Plaintiffs Plead Plausible Claims Against the International Bank of Chicago. ........29

1.  The IBC participated in the Shen Yun commercial venture. ..........................29

2.  The IBC knowingly benefitted from its participation in the Shen Yun commercial performing arts venture.....................................................................31

3.  The IBC knew or should have known that the Shen Yun commercial performing arts venture was engaged in an act of forced labor. ......................32

4.  The IBC conspired with the SY Defendants to knowingly benefit from its participation in the venture. ..................................................................33

F.  Plaintiffs adequately allege TVPRA claims against Zhang........................................34

G.  Plaintiffs Have Standing to Seek Prospective Relief. .................................................35

V.  CONCLUSION .....................................................................................................................35

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Adia v. Grandeur Mgmt., Inc.,*
   933 F.3d 89 (2d Cir. 2019) ...................................................................................................3, 31

*Am. Protein Corp. v. AB Volvo,*
   844 F.2d 56 (2d Cir. 1988) .........................................................................................................19

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................................................................3

*Atuahene v. City of Hartford,*
   10 Fed. App'x 33 (2d Cir. 2001) ...........................................................................................18, 19

*Baldia v. RN Express Staffing Registry LLC,*
   633 F. Supp. 3d 693 (S.D.N.Y. 2022) .................................................................................8, 10, 11

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ....................................................................................................................33

*Bensky v. Indyke,*
   743 F. Supp. 3d 586 (S.D.N.Y. 2024) ..................................................................................31, 34

*Brandenburg v. Greek Orthodox Archdiocese of N. Am., No.,*
   20-cv-3809 (JMF), 2021 WL 2206486 (S.D.N.Y. 2021) ............................................................28

*Burlington N. & Santa Fe Ry. Co. v. White,*
   548 U.S. 53 (2006) .......................................................................................................................17

*Califano v. Roman Cath. Diocese of Rockville Ctr., New York,*
   751 F. Supp. 3d 42 (E.D.N.Y 2024) .........................................................................................23

*Chen v. Cai,*
   No. 19-cv-05387 (PMH), 2022 WL 917575 (S.D.N.Y. Mar. 28, 2022) .....................................31

*Chen v. Oceanica Chinese Rest., Inc.,*
   No. 13-cv-4623 (NG)(GPK), 2023 WL 2583856 (E.D.N.Y. Mar. 21, 2023) ............................16

*Chevron Corp. v. Donziger,*
   990 F.3d 191 (2d Cir. 2021) .......................................................................................................27

*Cho v. Chu,*
   No. 21-cv-2297 (PGG)(SDA), 2022 WL 4463823 (S.D.N.Y. Sept. 26, 2022) ..........................32

*Collins v. Suffolk Cnty. Police Dep't,*
   349 F. Supp. 2d 559 (E.D.N.Y. 2004) ......................................................................................35

*Commack Self-Serv. Kosher Meats, Inc. v. Hooker*,
   680 F.3d 194 (2d Cir. 2012) ................................................................................28

*County of Riverside v. McLaughlin*,
   500 U.S. 44 (1991) ...............................................................................................35

*Cruz v. Maypa*,
   773 F.3d 138 (4th Cir. 2014) ..............................................................................14

*Culbreth v. Manuel*,
   No. 24-CV-00497 (PMH), 2025 WL 35059 (S.D.N.Y. Jan. 6, 2025) ...................22, 24

*Doe 1 v. Apple Inc.*,
   96 F.4th 403 (D.C. Cir. 2024) .............................................................................31

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
   671 F. Supp. 3d 387 (S.D.N.Y. 2023)................................................................30, 34

*E.E.O.C. v. Roman Cath. Diocese of Raleigh, N.C.*,
   213 F.3d 795 (4th Cir. 2000) ..............................................................................26

*Foukas v. Foukas*,
   No. 20-cv-05516 (NCM)(SJB), 2024 WL 3813253 (E.D.N.Y. July 26, 2024)
   *report & recommendation adopted*, 2024 WL 4315026 (E.D.N.Y. Sept. 27, 2024) ...................9

*Franco v. Diaz*,
   51 F. Supp. 3d 235 (E.D.N.Y. 2014) ................................................................10, 11

*Fratello  v. Archdiocese of N.Y.*,
   863 F.3d 190 (2d Cir. 2017) ................................................................................26

*Frazier v. FCBC Cmty. Dev. Corp.*,
   No. 22-cv-5270 (LJL), 2023 WL 2970873 (S.D.N.Y. Apr. 17, 2023) ........................28

*G.G. v. Salesforce.com, Inc.*,
   76 F.4th 544 (7th Cir. 2023) ............................................................................31, 32

*Gao v. Gonzales*,
   424 F.3d 122 (2d Cir. 2005) ................................................................................23

*Geiss v. Weinstein Co. Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019)..................................................................32

*Han v. InterExchange, Inc.*,
   No. 23-cv-07786 (JLR), 2024 WL 3990770 (S.D.N.Y. Aug. 28, 2024) ................18, 19

*Headley v. Church of Scientology Int'l*,
   687 F.3d 1173 (9th Cir. 2012) .............................................................................12

iv

*Headley v. Church of Scientology Int'l,*
   No. 09-cv-3986, 2010 WL 3157064 (C.D. Cal. Aug. 5, 2010) ........................................ 12, 13, 22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,*
   565 U.S. 171 (2012) ................................................................................................ 20, 21, 24

*In re Currency Conversion Fee Antitrust Litig.,*
   265 F. Supp. 2d 385 (S.D.N.Y. 2003) ........................................................................... 19

*In re Int. Rate Swaps Antitrust Litig.,*
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ........................................................................... 14

*Int'l Soc. For Krishna Consciousness, Inc. v. Barber,*
   650 F.2d 430 (2d Cir. 1981) ...................................................................................... 24

*Jackson v. Mann,*
   196 F.3d 316 (2d Cir. 1999) ...................................................................................... 23

*Javier v. Beck,*
   No. 13-cv-2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014) .......................................... 8

*Khazai v. Grover,*
   No. 2:22-cv-00100, 2023 WL 8939324 (C.D. Cal. Nov. 22, 2023) ................................ 14

*Kitler v. Church of Jesus Christ of Latter-Day Saints,*
   No. 24-cv-01071 (AMN)(PJE), 2025 WL 2209870 (N.D.N.Y. Aug. 4, 2025) .................. 33

*Kravitz v. Purcell,*
   87 F.4th 111 (2d Cir. 2023) ...................................................................................... 23

*LaFaro v. New York Cardiothoracic Grp., PLLC,*
   570 F.3d 471 (2d Cir. 2009) ...................................................................................... 3

*Levin v. Sarah Lawrence Coll.,*
   747 F. Supp. 3d 645 (S.D.N.Y. 2024) .......................................................................... 32

*Lyu v Alfa Chemistry Inc.,*
   No. 23-cv-7951 (EK)(ST), 2025 WL 1093134 (E.D.N.Y. Apr. 13, 2025) ....................... 9

*Macolor v. Libiran,*
   No. 14-cv-4555, 2016 WL 1488121 (S.D.N.Y. Mar. 25, 2016)
   *report & recommendation adopted,* 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016) .................... 8

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC,*
   268 F.3d 58 (2d Cir. 2001) ...................................................................................... 19

*Magtoles v. United Staffing Registry, Inc.,*
   No. 21-cv-1850, 2021 WL 6197063 (E.D.N.Y. Dec. 30, 2021) .................................... 15

*Martin v. SS Columba-Brigid Cath. Church,*
   No. 21-cv-491, 2022 WL 3348382 (W.D.N.Y. August 12, 2022) ................................................26

*Matter of Ocasio,*
   237 A.D.3d 1412 (N.Y. App. Div. 2025) ..................................................................................28

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC,*
   No. 24-cv-598, 2025 WL 2232879 – F.4th --, at *3 (2d Cir. Aug. 6, 2025) ................................33

*Muchira v. Al-Rawaf,*
   850 F.3d 605 (4th Cir. 2017) ..................................................................................................14

*Newdow v. Peterson,*
   753 F.3d 105 (2d Cir. 2014) ....................................................................................................27

*Noble v. Weinstein,*
   335 F. Supp. 3d 504 (S.D.N.Y. 2018) ....................................................................................31

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   591 U.S. 732 (2020) ........................................................................................ 21, 22, 25, 26

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
   286 F. Supp. 3d 430 (E.D.N.Y. 2017) ....................................................................................11

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
   No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019) ................................................12

*Patrick v. LeFevre,*
   745 F.2d 153 (2d Cir. 1984) ................................................................................................23, 24

*Prince v. Mass.,*
   321 U.S. 158 (1944) ................................................................................................................21

*Reynolds v. Lifewatch, Inc.,*
   136 F. Supp. 3d 503 (S.D.N.Y. 2015) ................................................................................19, 21

*Romero v. Bestcare, Inc.,*
   No. 15-cv-7397, 2018 WL 1702001 (E.D.N.Y. Feb. 28, 2018) ................................................17

*Ross v. Jenkins,*
   325 F. Supp. 3d 1141 (D. Kan. 2018) .......................................................................... 10, 11, 13

*Roth v. Jennings,*
   489 F.3d 499 (2d Cir. 2007) ....................................................................................................13

*Rweyemamu v. Cote,*
   520 F.3d 198 (2d Cir. 2008), *abrogated on other grounds*
   *Jusino v. Fed'n of Catholic Teachers,* 54 F.4th 95, 104 (2d Cir. 2022) ........................................27

*Schneider v. OSG, LLC*,
  No. 22-cv-7686 (AMD)(VMS), 2024 WL 1308690 (E.D.N.Y. Mar. 27, 2024) ...............9, 11, 12

*Sulaiman v. Laram*,
  No. 16-cv-8182, 2017 WL 11659746 (S.D.N.Y. Apr. 4, 2017) .....................................................12

*Susu Wei v. Holder*,
  314 F. App'x 404 (2d Cir. 2009) ...............................................................................................23

*TianJie Chen v. Holder*,
  365 F. App'x 252 (2d Cir. 2010) ...............................................................................................23

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985) ....................................................................................................................21

*Torres v. Gristede's Operating Corp.*,
  628 F. Supp. 2d 447 (S.D.N.Y. 2008) ........................................................................................17

*United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*,
  567 F. Supp. 3d 429 (S.D.N.Y. 2021) ........................................................................................16

*United States v. Bradley*,
  390 F.3d 145 (1st Cir. 2004) ......................................................................................................10

*United States v. Fell*,
  531 F.3d 197 (2d Cir. 2008) .......................................................................................................27

*United States v. Manneh*,
  645 F. Supp. 2d 98 (E.D.N.Y. 2008) ..........................................................................................23

*United States v. Rivera*,
  799 F.3d 180 (2d Cir. 2015) ...................................................................................................8, 11

*United States v. Thompson*,
  896 F.3d 155 (2d Cir. 2018) ..................................................................................................20, 22

*Vantone Grp. LLC v. Yangpu NGT Indus. Co.*,
  No. 13-cv-7639, 2015 WL 4040882 (S.D.N.Y. July 2, 2015) ....................................................18

*Wynder v. McMahon*,
  360 F.3d 73 (2d. Cir 2004) .........................................................................................................18

*Zhang Jingrong v. Chinese Anti-Cult World All.*,
  311 F. Supp. 3d 514 (E.D.N.Y. 2018) .............................................................................. 24, 25, 26

Statutes

18 U.S.C. § 1589(a) ...............................................................................................................................7
18 U.S.C. § 1589(b) ........................................................................................................................14, 29

18 U.S.C. § 1589(c)(2) ................................................................................ 8, 9, 10, 11

18 U.S.C. § 1592(a) ................................................................................................14

18 U.S.C. §§ 1594 and 1595(a) .............................................................................15

18 U.S.C. § 1595 ....................................................................................................31

18 U.S.C. § 1595(a) .........................................................................................29, 31

31 U.S.C. § 5318(g) ...............................................................................................30

42 U.S.C. § 2000bb-1(a) ........................................................................................27

42 U.S.C. § 2000bb-1(b) ........................................................................................27

Abolish Trafficking Reauthorization Act of 2022,
    Pub. L. No. 117-347, 136 Stat. 6199 (2023) ..................................................15

<u>Rules</u>

Fed. R. Civ. P. 15(c)(1)(B) ...................................................................................16

<u>Regulations</u>

31 C.F.R. § 1020.320 ..............................................................................................30

N.Y. Comp. Codes R. & Regs., tit. 12, §142-3.12(c)(8) .......................................28

<u>Other Authorities</u>

U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN AdvisoryFIN-
2014-A008, Appendix B: Human Trafficking Red Flags, (Sept. 11, 2014),
    https://www.fincen.gov/sites/default/files/advisory/FIN-2014-A008.pdf..........................30

U.S. Department of theTreasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-
2020-A008, "Supplemental Advisory on Identifying and Reporting Human Trafficking and
Related Activity"(Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-
15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf...............................................30

## I.    INTRODUCTION

Hongzhi Li, his wife, and the organizations they tightly control (the "SY Defendants"[1]) made hundreds of millions of dollars off the forced labor of children. They induced parents to enroll their children in Fei Tian Academy of the Arts (and, later, Fei Tian College) (together, "Fei Tian Schools") with the promise of an education. In reality, the SY Defendants forced the children to work long hours with little pay as performers in their commercial performing arts juggernaut, "Shen Yun."

To keep the children working, the SY Defendants threatened them with harms including financial ruin, ostracization, humiliation, and destruction of their reputations if they left Shen Yun. These threats were made day after day to children trapped in a system of total control. The children were separated from their families and isolated in a remote compound—Dragon Springs—guarded by German Shepherds and armed men. They couldn't freely access unapproved newspapers, books, or music, speak with their families or others outside the community, obtain medical care, access their meager wages, eat, or have romantic relationships—even after they became adults.

The SY Defendants collaborated closely with the Defendant International Bank of Chicago ("IBC") to control Plaintiffs' finances and give their enterprise the veneer of legitimacy. The SY Defendants made the Performers engage in criminal conduct—like smuggling stacks of cash into the United States or entering into sham marriages to secure immigration status so they could continue to labor for Shen Yun. And all the while, the SY Defendants lived large: Hongzhi Li and his wife are chauffeured in a Mercedes Maybach while shopping at luxury stores. These facts and those in the Second Amended Complaint (Dkt. No. 91 ("SAC" or "complaint")) have given rise to civil and criminal investigations by the U.S. Attorney's Office for the Southern District of New York, the U.S. State Department, the U.S. Department of Homeland Security, and the New York Department of

---

[1] The SY Defendants are Hongzhi Li, Rui Li, Shen Yun Performing Arts, Inc. ("Shen Yun"), Fei Tian College, Fei Tian Academy of the Arts, and Dragon Springs Buddhist Inc. ("Dragon Springs").

Labor, and they far exceed Rule 12(b)(6)'s standard of pleading "plausible" violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") and New York's labor laws.

Defendants' motions to dismiss intone the standard of review—and then promptly forget it. The motions say nothing about most of the facts alleged in the complaint, like the children smuggling cash, green card marriages, public mass criticism sessions of children, the threats of repayment of hundreds of thousands of dollars in "scholarships," or the civil and criminal investigations. Instead, they present an alternative reality, claiming that this was an innocent religious boarding school and a bank doing ordinary work supporting it. This narrative cannot be squared with the complaint's allegations, many of which simply quote the SY Defendants themselves. Nor is it appropriate for consideration at this stage. Defendants ask this Court to consider documents that they claim support their story. But Rule 12(b)(6) asks whether the plaintiffs have stated a plausible claim based on the facts alleged *in the complaint*, taken as true and construed in the light most favorable to the plaintiffs. Defendants' improper attempt to rely on a one-sided presentation of "facts" outside the complaint only highlights that they cannot seriously dispute that the complaint itself states a claim.

Ultimately, the Defendants cannot seriously dispute that the Plaintiffs have plausibly alleged that the SY Defendants—aided by the IBC—forced the children in their care to work grueling hours for almost no pay. Nor that they benefited from the hundreds of millions of dollars that this forced labor generated. Those are violations of the TVPRA and the New York Labor Law ("NYLL"). In response, the SY Defendants prematurely raise the affirmative defense that they are permitted to force children to labor and refuse to pay workers minimum wage because, they say, Shen Yun is a religious organization. But the Constitution does not shield organizations from forced labor or wage-and-hour claims. And, in any event, the complaint plausibly alleges that Shen Yun is not a sincerely religious organization. The SY Defendants' factual disagreement with Plaintiffs' allegations cannot be resolved on a motion to dismiss. This Court should deny the motions.

## II.    LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).[2] All inferences are drawn in favor of the plaintiff. *LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). "Specific facts are not necessary; [a complaint] need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 92 (2d Cir. 2019) (reversing dismissal of a TVPRA claim).

## III.    FACTUAL BACKGROUND

**1.** Shen Yun touts itself as a nonprofit dance company that highlights traditional Chinese culture and critiques the Chinese Communist Party ("CCP"). SAC ¶ 1. But in reality, Shen Yun is a huge commercial performing arts enterprise that has generated hundreds of millions of dollars via the forced labor of children. *Id.* ¶¶ 1, 12, 47, 90, 104. Shen Yun is a massively successful performing arts company that stages hundreds of dance and musical performances across the world each year. *Id.* ¶ 47. The SY Defendants profit handsomely off this enterprise; Shen Yun reportedly holds, among other assets, over $249 million in cash. *Id.* ¶¶ 12, 43, 47, 87.

The SY Defendants work together to further their core motive—profit—and each entity plays a defined role in that goal. *Id.* ¶¶ 41-43, 90. Hongzhi Li is the founder and ultimate authority on every decision pertaining to Shen Yun, the Fei Tian Schools, and the Dragon Springs compound. *Id.* ¶¶ 3, 6, 38, 67, 69, 75, 105. He shares that authority with his right-hand lieutenant—his wife, Rui Li. *Id.* ¶¶ 3, 39, 70, 75, 105. Hongzhi Li and Rui Li work with and through Shen Yun, the Fei Tian Schools, and Dragon Springs to target children as young as eleven years old. *Id.* ¶¶ 69, 73, 75, 105, 107. They induce parents to send their children to live at the Dragon Springs compound and then

---

[2] Unless otherwise specified, all internal quotation marks, citations, and alterations are omitted from quotations throughout the brief.

force those children to work for Shen Yun (the "Performers"[3]). *Id.* ¶¶ 2, 4, 107, 110, 116-18. The Fei Tian Schools provide an academic cover for the forced labor scheme, and Dragon Springs provides an isolated stronghold at which to conduct it. *Id.* ¶¶ 41-43, 110, 113, 119.

The families who send their children to live at Dragon Springs are led to believe that Hongzhi Li will protect their children and provide them with an education. *Id.* ¶¶ 4, 109-110. Many Performers are recruited from abroad, and all Performers are children of adherents of a movement called Falun Gong, which is led by Hongzhi Li and combines teachings for self-improvement and meditation. *Id.* ¶¶ 2-3, 100. Because of their young age, Performers cannot have consented to work for Shen Yun. *Id.* ¶¶ 2, 107, 114. Shen Yun itself acknowledges that it recruits children. *Id.* ¶ 108. But its focus on children has a dark purpose: children are more easily coerced. *Id.* ¶ 108, 153.

Having uprooted Performers from their families, the SY Defendants subject Performers to a system of coercion and control that extends to nearly every aspect of their lives, cuts them off from the outside world, threatens them with serious harm if they fail to follow commands, and forces them to labor long, brutal hours for little to no pay. *Id.* ¶¶ 4, 111, 142, 145-48, 155. The SY Defendants dictate Performers' schedules down to the minute, requiring them to regularly work 10-16-hour days. *Id.* ¶¶ 1, 120, 137-38. The SY Defendants enroll Performers in the Fei Tian Schools where their education is grossly deficient, and their actual focus is spending long hours practicing for Shen Yun performances. *Id.* ¶¶ 8, 113, 121-22, 130, 143. Within mere months of their arrival at the Fei Tian schools, Performers are sent out on tours where they work over 16-hour days, with no days off for weeks, and receive no education. *Id.* ¶¶ 7-10, 122, 137-38, 293.

Performers are not properly compensated for these long hours by their employers, the SY Defendants. *Id.* ¶¶ 11, 111, 285, 298-304. The SY Defendants typically do not pay Performers at all

---

[3] The complaint defines the proposed class as: All current and former Performers for the Shen Yun Defendants who lived at the Dragon Springs compound. *Id.* ¶ 508.

in their first year on tour, and later Performers receive only $300-500 per month, or $1-2 per hour. *Id.* ¶¶ 11, 286-88. Even after they "graduate" from Fei Tian College and are "professional" performers, the SY Defendants only pay Performers $1,000 a month. *Id.* ¶¶ 11, 288, 324-326.

Performers labor for little to no compensation because the SY Defendants control every aspect of their lives, and having established this control, the SY Defendants threaten that disobeying Hongzhi Li's directives will result in grave harm to themselves and their families. *Id.* ¶¶ 14, 147, 155.

The SY Defendants restrict Performers' physical movements, including by prohibiting them from leaving the compound without permission and confiscating their passports and immigration paperwork. *Id.* ¶¶ 15, 155, 161-173. They isolate Performers from the outside world, including generally prohibiting contact with those outside Dragon Springs, even their own families, and restricting Performers' access to unapproved information. *Id.* ¶¶ 155, 171, 174-189, 222. They control what Performers eat, how much they weigh, who they date, whether they receive medical care, and whether, as adults, they marry or have children. *Id.* ¶¶ 15-16, 155, 190-208, 216-222. They control Performers' finances, including how much they are paid, and they tightly restrict Performers' control and access to their bank accounts. *Id.* ¶¶ 223-230, 285-300. They require that those who step out of line with the SY Defendants' directives be subject to social ostracism and criticism, including large-scale public humiliation sessions. *Id.* ¶¶ 147, 155, 209-215.

The SY Defendants' treatment of those who leave Shen Yun is even more severe: they publicly shame such individuals, require that they be ostracized by the broader community, and actively destroy their reputations. *Id.* ¶¶ 20, 209-15, 235-36. The SY Defendants, for example, had their agents file frivolous lawsuits against Plaintiff Chang in retaliation for this lawsuit, to make an example of her to other Performers. *Id.* ¶¶ 376-381. If Performers do not continue to labor for Shen Yun, they are subjected to mass criticism sessions where they are berated in front of their peers and where the SY Defendants spread misinformation about them. *Id.* ¶¶ 19, 209-13, 232, 236.

The SY Defendants' control over Performers is so complete that the SY Defendants have even forced Performers to engage in criminal activity. *Id.* ¶¶ 17-18. For example, the SY Defendants' company managers gave Performers—most of whom are, again, children—stacks of cash equaling $10,000 and instructed them to hide the bills on their bodies and in their hand luggage while traveling across borders. *Id.* ¶¶ 17, 169-70. The SY Defendants told Performers not to declare the money, and that if U.S. customs personnel asked them about the cash, they should lie and say that their parents had given it to them. *Id.* This happened multiple times. *Id.* In another example, Rui Li forced Performers into fraudulently arranged marriages between non-U.S. citizen Performers to U.S. citizen Performers for green card purposes—so that they could stay in the U.S. and continue laboring for Shen Yun. *Id.* ¶¶ 18, 218, 420, 459, 464, 500. By entangling Performers in criminal conduct, the SY Defendants build more leverage and control over them. *Id.* ¶¶ 17-18.

The SY Defendants also use financial coercion to control the Performers and stop them from leaving. *Id.* ¶¶ 21, 223-30. For example, the SY Defendants purport to provide "scholarships" for all Performers that cover tuition and room and board at the Fei Tian Schools. *Id.* But the SY Defendants tell Performers that quitting Shen Yun would contractually require them to repay the scholarships if they leave—scholarships the SY Defendants then claim are worth $50,000 a year. *Id.* ¶¶ 21, 129, 238-39. And if a Performer tries to leave, the SY Defendants threaten that the performer will have to pay back every year of their "scholarship"—which can amount to as much as $500,000. *Id.* This threat is particularly powerful because Performers typically come from modest means and the SY Defendants pay them little to nothing for their work. *Id.* ¶¶ 129, 239.

**2.** To maintain their draconian financial control over the Performers, the SY Defendants needed a bank. It found a willing partner in the IBC, whose founders have close personal and professional ties to Hongzhi Li and Rui Li. *Id.* ¶¶ 23, 256, 276-84. As discussed in more detail below, the IBC and the SY Defendants set up the Performers' accounts so that they would be directly

controlled by the SY Defendants—the assistant to Hongzhi Li and Rui Li was the adult custodian across hundreds of accounts opened for these (often foreign) minors. *Id.* ¶¶ 224-29, 255, 261–65. They then structured the Performers' bank accounts with very low limits, preventing them from buying tickets to leave the Dragon Springs compound. *Id.* ¶ 264. The IBC concealed all this from federal regulators. *Id.* ¶¶ 267, 270–72, 274. In exchange, the IBC received not only a pipeline of accounts from hundreds of minor Performers, but also the banking business—worth hundreds of millions of dollars—of the SY Defendants and affiliated companies. *Id.* ¶¶ 246-47, 266.

**3.** Tianliang Zhang (also known as Shujia Gong) acts as an enforcer for the SY Defendants by making frequent media appearances to smear critics. *Id.* ¶¶ 44, 373. After Plaintiff Chang brought this case, Zhang repeatedly used his platform to falsely accuse her of being a CCP agent. *Id.* ¶¶ 370-74. The SY Defendants reward him by sharing their profits with him. *Id.* ¶ 44.

## IV.    ARGUMENT

Plaintiffs are two former dancers and two former musicians who collectively spent nearly forty years inside Shen Yun, starting from when they were children until their early adulthood. They allege violations of the TVPRA and the New York Labor Laws.  These claims are plausibly alleged.

### A.    Plaintiffs Plausibly Allege TVPRA Violations.

The TVPRA prohibits trafficking in forced labor. The statute imposes liability on anyone who knowingly provides or obtains a person's labor "by means of serious harm or threats of serious harm," or "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a). The Act also imposes liability on those who benefit from a venture that uses forced labor, and those who conspire or attempt to provide or obtain forced labor. *See id.* §§ 1589(b), 1594(a)-(b).

The TVPRA is not limited to prohibiting the use of violence to obtain labor; it also prohibits forced labor "achieved through nonviolent coercion." *Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 704 (S.D.N.Y. 2022). Thus, the statute defines threats of "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2); *see also Baldia*, 633 F. Supp. 3d at 705; *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015).

### 1. Plaintiffs plead that they were forced to labor under threat of serious harm.

The SY Defendants challenge Plaintiffs' core TVPRA claims only on the basis that they fail to state that Defendants obtained Plaintiffs' labor through threat of serious harm. Mem. Of Law in Support of the SY Defendants' Mot. to Dismiss the Second Amended Complaint at 5-10 ("SY Br."). But Plaintiffs properly allege that the SY Defendants made exactly the kinds of threats of harm that courts in this Circuit have already held are sufficient for TVPRA liability. Each of these kinds of threats are independently sufficient and viewed in conjunction they are far more than enough.

Courts consistently find that the threat of financial penalties, including payment of sums less than those threatened here, "constitutes serious harm within the meaning of" the TVPRA. *E.g.*, *Baldia*, 633 F. Supp. 3d at 705 ($33,320 in liquidated damages); *Macolor v. Libiran*, No. 14-cv-4555, 2016 WL 1488121 (S.D.N.Y. Mar. 25, 2016), *report & recommendation adopted*, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016) ($20,000 damages provision). Financial penalties need not be such that they "would have left [plaintiff] without money to leave or live" to order to establish serious harm. *Javier v. Beck*, No. 13-cv-2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014). Whatever form the penalties take, it is sufficient if a reasonable person in plaintiff's position would find the "threatened financial penalties serious enough to compel him or her into remaining on the job."

*Foukas v. Foukas,* No. 20-cv-05516, 2024 WL 3813253 (E.D.N.Y. July 26, 2024), *report & recommendation adopted,* 2024 WL 4315026 (E.D.N.Y. Sept. 27, 2024) (sustaining TVPRA claim based on threats of loss of tens of thousands of dollars in investments because "losing large sums of money as a young immigrant constitutes a threat of serious financial harm"). Indeed, financial penalties take on increased coercive effect when they constitute a significant "ratio between [plaintiff's] earnings and the contemplated damages amounts." *Lyu v Alfa Chemistry Inc.,* No. 23-cv-7951, 2025 WL 1093134 (E.D.N.Y. Apr. 13, 2025).

Here, the Plaintiffs allege that they were only paid $12,000 per year *at most.* SAC ¶ 494. In contrast, they were threatened that if they left, they would have to repay purported "scholarships" of $50,000 per year—which could amount to half a million dollars or more over time. *Id.* ¶ 238. Not only that, but "the coercive means of the scholarship repayment threat is compounded by the fact that most Performers come from modest backgrounds," "the [SY] Defendants do not pay Performers a proper wage" from which they could draw, and the SY Defendants limited Performers' education and their opportunities for outside employment—all of which obstruct Performers' ability to withstand the threat of financial penalty. *Id.* ¶ 239.

Threats of social ostracism and "reputational harm" also constitute serious harm. 18 U.S.C. § 1589(c)(2). One court denied a motion to dismiss TVPRA claims where students at "an 'esoteric school' that promoted the teachings of a 'philosopher'" were "required to perform free labor for [the school's] benefit." *Schneider v. OSG, LLC,* No. 22-cv-7686, 2024 WL 1308690, at *1-2 (E.D.N.Y. Mar. 27, 2024). The "defendants expected students to follow a rigid set of rules, including mandated secrecy, complete obedience to [the philosopher's] and other teachers' instructions—which covered every aspect of the student's personal lives—and ostracizing anyone who left the organization." *Id.* If "a student broke a rule," the student would be "publicly chastised" and "humiliat[ed]" and defendants would share "damaging personal and sensitive information about that student." *Id.* at 2-

3. The court held these allegations sufficient, as whether the fear of shame and ostracization "were serious enough to compel a reasonable person in the plaintiff's circumstances to perform labor cannot be resolved on a motion to dismiss." *Id.* at 6.

Similar threats were made to the Plaintiffs here. Plaintiffs allege that "any individual who rejects the authority of Hongzhi Li, or is perceived to do so, is subject to group criticism and faces grave reputational harm." SAC ¶ 209. Individuals who left Shen Yun are the subject of the "most virulent mass criticisms" and the SY Defendants often "actively work to destroy the reputation of individuals that leave Shen Yun by spreading misinformation about them." *Id.* ¶ 213-15, 235-36. Similarly, the SY Defendants threaten Performers who wish to leave with ostracism. *Id.* ¶ 158. They systematically isolate Performers from the world outside Dragon Springs from the time they are children, undermine external support systems, and limit their ability to function independently outside Shen Yun. *Id.* ¶¶ 177-80, 237. That Plaintiffs were children isolated from the rest of society enhances the likelihood that threats of social ostracism and reputational damage amount to serious harm. *Baldia*, 633 F. Supp. 3d at 705; *see also Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1164 (D. Kan. 2018) (sustaining TVPRA claim where "[d]efendants exploited plaintiff's vulnerability, knowing that she was unfamiliar with the world outside the cult, had received no standard education, was constantly moved from place to place, and had no money.").

The multifaceted systems of coercion, control, and discipline that the SY Defendants imposed are also sufficient to state a claim for forced labor under threat of serious harm. The TVPRA prohibits "non-physical . . . psychological," 18 U.S.C. § 1589(c)(2), coercion because it "was enacted as a rejection of case law that limited the definition of involuntary servitude to 'physical' or 'legal' coercion, and was intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion." *Franco v. Diaz*, 51 F. Supp. 3d 235, 247 (E.D.N.Y. 2014); *see also United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) (holding that serious harm encompasses

"subtle psychological methods of coercion."). Courts have recognized TVPRA violations based on psychological coercion where defendants established themselves as infallible authorities, whose control extended into intimate and fundamental aspects of the plaintiffs' lives, and threatened discipline for disobedience. *See OSG*, 2024 WL 1308690, at *2-3 (defendants imposed a "rigid set of rules . . . cover[ing] every aspect of the students' personal lives" and extreme discipline for infractions); *Ross*, 325 F. Supp. 3d at 1164 (defendants restricted outside communication, food, medical care, education, and romantic relationships, and told plaintiff "that serious harm would come to her if she left the 'safety' of" the community).

Here too, the SY Defendants ensnared Performers in a highly controlled and coercive system in which Performers reasonably feared harm if they disobeyed the SY Defendants. This wasn't a strict boarding school. Instead, Plaintiffs allege the existence of a commercial operation in which the SY Defendants established hierarchies and interlocking methods of control and isolation designed to restrain Performers' freedom and keep them working to line the SY Defendants' pockets. *See, e.g.*, SAC ¶¶ 147-245. The SY Defendants attempt to counter this narrative by examining, and discounting, individual elements of the scheme in isolation—by asking whether, for example, restrictions on interaction between the sexes or on media use are by themselves coercive. SY Br. at 7-10. But this is inconsistent with the statute's requirement that a court consider "all the surrounding circumstances" in assessing the threatened harm. 18 U.S.C. § 1589(c)(2); *Baldia*, 633 F. Supp. 3d at 705; *Rivera*, 799 F.3d at 186.

The SY Defendants argue that the Performers' entrance into and work in the Shen Yun program was voluntary, and those who chose to leave could do so. SR Br. at 7, 10. But the TVPA "does not require that plaintiffs be kept under literal lock and key.'" *Franco*, 51 F. Supp. 3d at 247; *see also Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (whether a "plaintiff was physically able to leave her employment and eventually did so is not

determinative"). And this ignores the SY Defendants' many additional tactics to obstruct leaving, *See, e.g.,* SAC ¶ 126. Further even on the SY Defendants' framing, this does not negate the threats to coerce the Performers to continue laboring described above. Courts regularly find TVPRA claims established where victims voluntarily entered a situation in which they were then forced to work under fear of serious harm. *See, e.g., Sulaiman v. Laram*, No. 16-cv-8182, 2017 WL 11659746, at *2-3 (S.D.N.Y. Apr. 4, 2017); *OSG*, 2024 WL 1308690, at *2. This is true even if a plaintiff was previously aware of the nature of the work, for "prior awareness of the harm does not make a defendant's actions, if indeed in violation of the TVPA, any less exploitative." *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 24, 2019). And that's not even true here, as Plaintiffs allege that they were minors, fed misinformation, and neither joined nor continued to work at Shen Yun voluntarily. SAC ¶¶ 2, 4, 365, 423, 461, 500. At most, whether the Performers' work was voluntary as Plaintiffs allege, as opposed to coerced, is a fact question that should not be resolved at this stage.

The SY Defendants primarily cite a single case to support their argument, and the limitations of that decision itself demonstrates the flaws in the SY Defendants' logic. This case—*Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012)—is an out-of-circuit decision concerning a motion for summary judgment. The *Headley* court considered a full record regarding whether plaintiffs' participation in alleged forced labor was indeed coerced through reasonable fear of serious harm, and the Ninth Circuit found that "the record does not allow th[is] conclusion." *Id.* at 1181. In *Headley*, plaintiffs were adults who failed to present evidence that they were compelled to labor *because of*—"by means of"—threats of serious harm. *See, e.g., Headley v. Church of Scientology Int'l*, No. 09-cv-3986, 2010 WL 3157064, at *2 (C.D. Cal. Aug. 5, 2010). Here, Plaintiffs' complaint alleges that threats of serious harm—grave financial harms, destruction of reputations, social ostracism, and psychological coercion—compelled Performers to work. SAC ¶¶ 151-154, 209-25,

245, 31-39, 243-44. Further, because Performers start their work as children and the SY Defendants isolate them from the outside world, they are particularly vulnerable to threats of ostracization, discipline, and reputational harm. *See Ross*, 325 F. Supp. 3d at 1164. Taken as true, as required, this plausibly alleges a TVPRA violation. Nothing in *Headley* is to the contrary.

### 2. The SY Defendants' challenges to the TVPRA claims depend on factual disputes that *may not* be considered on a motion to dismiss.

The SY Defendants' central argument is that Plaintiffs and Performers voluntarily enrolled in a boarding school with a rigorous dance program and strict religious rules and that they voluntarily practiced and performed for Shen Yun to further their education, family, and faith. SY Br. at. 4, 7, 10. That factual narrative has little to do with what is actually alleged in the complaint. Nowhere does the complaint allege that Plaintiffs or Performers entered Shen Yun "because of their dedication to their families and to participate in Shen Yun's mission to save souls." *Id.* at 4 (citing SAC ¶¶ 307, 312-13, 383-84). And the SY Defendants ignore the allegations that Performers work for Shen Yun because they fear "grave harm will befall them or their families if they cease performing for Shen Yun without Hongzhi Li's permission." SAC ¶¶ 151-154, 224, 245. The SY Defendants also say nothing about the allegations that Performers feared the threats of having to pay hundreds of thousands of dollars in "scholarships" back to the Fei Tian Schools; feared being targeted for a "mass criticism" session and the destruction of their reputations; and feared that they would be socially ostracized by the only community they had. *Id.* ¶¶ 147-49, 158-59; 209-25, 231-39, 243-44.

The SY Defendants focus on whether Plaintiffs' claims are "credible," *see* SY Br. at 1, and rely extensively on cherry-picked documents outside the complaint that they say supports their version of events. *See, e.g.*, SY Br. at 2-3 and ns. 1-4. None of this is proper on a motion to dismiss. A court may not consider documents outside the pleadings for "the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Nor may "defendants . . . use plaintiffs'

sources as an archive from which to build what amounts to a factual rebuttal" on a motion to dismiss. *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 481 (S.D.N.Y. 2017). A motion to dismiss must be based on the facts actually alleged in the complaint.

### 3. Plaintiffs plausibly allege claims for keeping documents, beneficiary liability, and conspiracy/attempt under the TVPRA.

First, the complaint alleges that by keeping the Performers' passports, the SY Defendants violated 18 U.S.C. § 1592(a), which imposes liability for anyone who "knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport" in the course of violating or with intent to violate the TVPRA. The SY Defendants' argument to the contrary ignores the plain language of the statute, which prohibits the act of *possessing* passports in the course of a TVPRA violation. *Id.* There is no requirement that such possession be forcible. *See, e.g., Khazai v. Grover*, No. 2:22-cv-00100, 2023 WL 8939324, at *3 (C.D. Cal. Nov. 22, 2023). The cases the SY Defendants cite, SY Br. at 18-19, do not hold otherwise; they merely involve different facts. *Cruz v. Maypa*, 773 F.3d 138, 142 (4th Cir. 2014) (forcible removal of a passport); *Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir. 2017) (no facts establishing underlying TVPRA violation).

Second, the SY Defendants contend that Plaintiffs have not adequately pleaded that each Defendant knowingly benefitted from their participation in the venture. 18 U.S.C. § 1589(b). But the complaint alleges that the SY Defendants have generated hundreds of millions of dollars from operating the venture, an outcome only possible because of the decades of forced labor. SAC ¶¶ 12, 90, 247. And Plaintiffs pleaded facts that support beneficiary liability as to each SY Defendant. Plaintiffs allege that all the SY Defendants work toward the same goal—"revenue from Shen Yun Performances"—and that each entity "plays a clear role in that goal." *Id.* ¶¶ 41-43. Plaintiffs allege further that Shen Yun's profits directly benefit the SY Defendants. The funds not only amass wealth

that the Lis effectively control and enjoy, *id.* ¶ 88, but they power and support the operations of Shen Yun, Dragon Springs, and the Fei Tian Schools, *id.* ¶¶ 12-13, 106, 113.

Third, the SY Defendants argue that Plaintiffs' claims under 18 U.S.C. §§ 1594 and 1595(a)—of conspiracy to procure forced labor, conspiracy to benefit from forced labor, and attempts to violate the TVPRA—must all fail because, according to the SY Defendants, they were only established by a statutory amendment that occurred after Plaintiffs left Dragon Springs. SY Br. at 20. But the amendment merely clarified that the statute prohibited this conduct all along. Congress expressly stated that the amendment was a "technical and clarifying update," not a substantive change that increased a party's liability. *See* Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-347, 136 Stat. 6199 (2023). Finally, the SY Defendants' argument that Plaintiffs have not alleged agreement amongst the SY Defendants to obtain forced labor ignores the many allegations that the SY Defendants consciously worked together for the joint aim of obtaining labor through threat of serious harm, for profit. *See, e.g.*, SAC ¶¶ 78-88, 41-43; *Magtoles v. United Staffing Registry, Inc.*, No. 21-cv-1850, 2021 WL 6197063, at *10 (E.D.N.Y. Dec. 30, 2021) (court can infer existence of an agreement between executive and staffing agency company he controlled because he used the agency in the TVPRA violations).

**B.    Plaintiffs Plausibly Allege New York Labor Claims.**

The SY Defendants do not dispute Plaintiffs' plausible allegations that they were not paid properly under the New York Labor Law. Nor can they. Plaintiffs allege that: Performers are never paid based on the hours they worked, SAC ¶ 289; Performers are not paid overtime payments for working over forty hours in a week, *id.* ¶ 290; they are not compensated for working over ten hours in a day., *id.* ¶ 291; and they do not receive wage statements or notices, *id.* ¶ 298. The SY Defendants can only argue that, despite these facial violations, Plaintiffs are barred from bringing their NYLL for other reasons. All of these arguments fail.

### 1. The bulk of the NYLL claims are not time barred.

Plaintiff Chang filed the original complaint on November 25, 2025 and alleged NYLL violations on behalf of herself and a proposed class that included dancers, musicians, emcees, and set designers who worked for Shen Yun. *See* Dkt. No. 1 ¶ 291. Pursuant to the NYLL's six-year statute of limitations, all claims that accrued on or after November 25, 2018 are actionable. Plaintiff Chang pleaded facts giving rise to NYLL violations that occurred within that time period. *Id.* ¶¶ 8-9, 223, 226-28, 230. Plaintiffs then filed the second amended complaint on April 30, 2025, which newly named Plaintiffs Xie, Zhu, and Wang. Plaintiffs Xie and Zhu similarly pleaded facts giving rise NYLL violations that occurred on or after November 25, 2018. SAC ¶¶ 444, 453, 456, 483, 492.

The SY Defendants misapply the statute of limitations to argue that, for those Plaintiffs added to the second amended complaint, any NYLL claims predating April 30, 2019 are time-barred. But the second amended complaint relates back to the original complaint because the amendment asserted the same NYLL violations, arising out of the same conduct, as those Plaintiffs Chang originally pleaded. Fed. R. Civ. P. 15(c)(1)(B)); *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 567 F. Supp. 3d 429, 444 (S.D.N.Y. 2021). The SY Defendants thus had "adequate notice of the mattes raised in the amended pleading . . . within the statute of limitations by the general fact situation alleged in the original pleading." *Id.* Indeed, the SY Defendants knew Plaintiffs asserted claims on behalf of individuals other than themselves: This was a class action complaint. *See Chen v. Oceanica Chinese Rest., Inc.*, No. 13-cv-4623, 2023 WL 2583856, at *8 (E.D.N.Y. Mar. 21, 2023). Given the relation back, the claims of any class members, including those newly named in the second amended complaint, that arose from conduct occurring on or after November 25, 2018 are timely.

### 2. Extraterritoriality does not support dismissal of Plaintiffs' NYLL claims.

The SY Defendants do not dispute that Plaintiffs properly pleaded NYLL claims arising from events that occurred within New York. The SY Defendants instead argue, without specificity, that certain claims that arose outside New York should be dismissed because the NYLL is not extraterritorial. But neither the Court nor the parties have sufficient information to determine what claims arose inside and outside New York. More discovery is needed to determine, for example, where and when Performers performed. This is not grounds to dismiss any of the NYLL claims.

### 3. The complaint adequately states a retaliation claim.

Plaintiff Chang adequately pled that the SY Defendants retaliated against her for filing this lawsuit. The NYLL makes it unlawful for "[any] employer or his or her agent ... or any other person ... [to] retaliate against any employee ... because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter." NYLL § 215(1)(a); *see also Romero v. Bestcare, Inc.*, No. 15-cv-7397, 2018 WL 1702001, at *3 (E.D.N.Y. Feb. 28, 2018). A plaintiff alleging retaliation must show that the challenged action might well have dissuaded a reasonable worker from claiming a violation of the NYLL. *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Courts in this district have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context. *Romero*, 2018 WL 1702001 at *5.

Here, Ms. Chang alleges that the SY Defendants launched a retaliatory campaign against her, which included defaming her on the news, on social media, during mass criticism sessions at Dragon Springs, and by directing the filing of two meritless lawsuits against her in Taiwan. SAC ¶¶ 370-76. Plaintiff Chang details that one of the individuals who filed the lawsuits against her is under Hongzhi Li's direct supervision. *Id.* ¶ 377. The second lawsuit was filed by the ex-boyfriend of the Lis'

17

daughter. *Id.* ¶ 378. The complaint details why the lawsuits were meritless, including that: they are based on criticisms Plaintiff Chang made about the SY Defendants (not the claimants), both suits were filed shortly after Plaintiff Chang filed this lawsuit, only Plaintiff Chang and her husband were targeted (despite others making/facilitating similar statements), and both claimants are represented by the same high-priced law firm. *Id.* ¶ 380. Drawing all reasonable inferences in Plaintiff Chang's favor, this is sufficient to allege objective baselessness.

## C. Plaintiffs' Complaint Gives Fair Notice of Their Claims.

The fact that Plaintiffs sometimes refer to the SY Defendants collectively does not require dismissal under Rule 8. Dismissal instead is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Wynder v. McMahon*, 360 F.3d 73, 80 (2d. Cir 2004). "[N]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." *Vantone Grp. LLC v. Yangpu NGT Indus. Co.*, No. 13-cv-7639, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015).

Here, Plaintiffs specify the SY Defendants against which they bring each of their claims. *See, e.g.*, SAC ¶ 1 (defining "Shen Yun Defendants"), *id.* ¶ 111 ("Count One . . . Against the Shen Yun Defendants"). This is sufficient to put SY Defendants on notice of the claims asserted against them. *See, e.g., Han v. InterExchange, Inc.*, No. 23-cv-07786 (JLR), 2024 WL 3990770, at *11 (S.D.N.Y. Aug. 28, 2024). No more specificity is required at this stage, because "prior to discovery, plaintiff need not"—and often cannot—"explain the details of each defendant's role in the . . . joint scheme." *Vantone Grp.*, 2015 WL 4040882, at *3 (cleaned up). The authority SY Defendants cite does not compel a contrary result. In *Atuahene v. City of Hartford*, 10 Fed. App'x 33 (2d Cir. 2001), an 11-paragraph pro se complaint not only referred to defendants collectively, but also "failed to identify

any factual basis for the legal claims made." *Id.* at 34. The complaint here is "far more precise and provides sufficient notice." *Han*, 2024 WL 3990770, at *12 (distinguishing *Attahene*).

Nor have the **SY** Defendants substantiated their claim that Plaintiffs have not plausibly pleaded alter ego liability. While "purely conclusory allegations cannot suffice to state a claim based on veil-piercing," the complaint affirmatively sets out "how [and] why the holding companies have dominion and control over the subsidiaries." *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003). Here, Plaintiffs alleged highly specific facts. *See, e.g.*, SAC ¶¶ 67, 69-73, 147 (centralized, hierarchical decision-making structure directed by Hongzhi Li, who is viewed as having ultimate authority), ¶ 82 (funds intermingled as **SY** Defendants subsidize the Lis' personal lives), ¶ 84 (**SY** Defendants have no business discretion), ¶ 86 (**SY** Defendants share all property). This is sufficient to withstand a motion to dismiss, especially where further details about organizational relationships are within the SY Defendant's control.

The **SY** Defendants' contrary position is entirely unsupported by caselaw. All but one of their cited cases consider veil-piercing in other contexts, involving more rigid standards of review; and they all underscore the need for fact-finding. *See, e.g., MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63-64 (2d Cir. 2001) (denying motion to compel arbitration and remanding for evidentiary hearing); *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 59-60 (2d Cir. 1988) (appeal of jury verdict). The only case that arose in the context of a 12(b)(6) motion is *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503 (S.D.N.Y. 2015). But there, unlike here, the pleading simply made no relevant allegations of domination or control. *Id.* at 527.

### D.    The SY Defendants' Affirmative Defenses Regarding Religious Protection Fail.

The **SY** Defendants assert several affirmative defenses based on purported religious protections. They argue that their activities are protected by the ministerial exception, that extending the TVPRA to prohibit their activities would violate the Religious Freedom Restoration Act

("RFPRA") and the Free Exercise Clause. SY Br. at 10-13. But the SY Defendants have made no showing that these defenses can extend to encompass trafficking children and forcing them to labor for profit. Moreover, these affirmative defenses are highly fact bound and are ill-suited for resolution on a motion to dismiss. This is particularly true where, as here, there are factual disputes as to the SY Defendants' sincerity, whether their organizations are religious, and whether they otherwise satisfy the defenses' requirements. The SY Defendants' claim that Performers are not employees under the NYLL because they are members of a religious order, *id.* at 21-23, fails for similar reasons.

### 1. The ministerial exception defense does not apply to trafficking or minimum wage and overtime violations.

The ministerial exception is an affirmative defense that protects "a religious organization's freedom to select its own ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 189 (2012). As such, it applies to claims that seek to limit a religious organization's ability to ensure that those who serve as its ministers do so in accordance with its tenets. *Id.* (protecting "a church's determination of who can act as its ministers."). In other words, it ensures that the government cannot force religious organizations to employ people as ministers if the organization does not wish to do so. It does not allow a religious organization to force people to work for it who do not want to, to decline to pay its workers, or to traffic children.

The SY Defendants ask this Court to dramatically expand the defense to encompass trafficking children and forced labor. They argue that the ministerial exception bars *any* claims involving labor by "ministers" for a purportedly religious organization. On that view, Shen Yun could kidnap people who are not Falun Gong practitioners and force them to perform. Fortunately, that is not the law. The Second Circuit has already rejected the ministerial exception as a defense to trafficking claims under the TVPRA. *United States v. Thompson*, 896 F.3d 155, 166 (2d Cir. 2018). And the Supreme Court has repeatedly applied labor protections to religious organizations, where

this does not require them to employ ministers who they do not wish to employ. *See, e.g., Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 298-99, 305 (1985) (minimum-wage law for businesses that were supposedly "vehicles for preaching and spreading the gospel"); *Prince v. Mass.*, 321 U.S. 158, 441 (1944) (child-labor protections, including for children who "preach the gospel").

The Supreme Court has instead only applied the ministerial exception in the context of "a minister, challenging her church's decision to fire her." *Hosanna-Tabor*, 565 U.S. at 196. The SY Defendants try to pluck language out of context from another decision for the proposition that the defense applies to all "employment disputes." SY Br. at 10 (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020)). But in context, that case simply applied the Supreme Court's prior holding—"that the Religion Clauses foreclose *certain* employment *discrimination* claims brought against religious organizations," *id.* at 747 (emphasis added)—to "employment discrimination claims" brought by teachers whose contracts had not been renewed. *Id.* at 738, 741, 745. Again, it protected a religious organization's ability to decide not to hire people as ministers. It did not silently expand the doctrine beyond that.

Nothing in the ministerial exception's history or reasoning warrants expanding the defense to allow an organization to force people to work or to decline to pay them minimum wage or overtime. The reason the doctrine protects the selection of ministers is to "preserve[] a church's independent authority" over "faith and doctrine" by preventing "a wayward minister's preaching, teaching, and counseling" from "contradict[ing] the church's tenets and lead[ing] the congregation away from the faith." *Our Lady*, 591 U.S. at 747. But setting an employee's wages or prohibiting the trafficking of children does not bear on a religious organization's ability to remove a "wayward minister[]." *See id.* The TVPRA and state wage and hour laws leave an organization free "to select its ministers" to guide the group in its faith. *Hosanna-Tabor*, 565 U.S. at 188. Plaintiffs do not challenge the SY Defendants' hiring and firing decisions. They instead challenge the SY Defendants'

21

choice to coerce and threaten minors to engage in backbreaking, long hours of work for little to no pay. SAC ¶¶ 147–49, 158–59; 161–73; 190–239, 243–44.

For these reasons, the Second Circuit had "little difficulty" rejecting a defendant's attempt to expand the ministerial exception to the TVPRA's prohibition on trafficking minors. *Thompson*, 896 F.3d at 166. Tellingly, although Plaintiffs cited *Thompson* in their pre-motion letter, Dkt. No. 85 at 3–4, the SY Defendants never address it in their briefing. Their TVPRA exception argument relies entirely on a single unpublished, out-of-circuit district court opinion that the Ninth Circuit expressly declined to adopt on appeal. (SY Br. at 10 (citing *Headley v. Church of Scientology Int'l*, 2010 WL 3157064 (C.D. Cal. 2010), *aff'd on other grounds*, 687 F.3d 1173, 1181 (9th Cir. 2012)). And the SY Defendants cite no Second Circuit authority that the ministerial exception allows them to violate minimum-wage laws. SY Br. at 11.[4]

The SY Defendants' attempt to dramatically expand the ministerial exception thus fail.

### 2.    The ministerial exception is a fact-bound affirmative defense that the SY Defendants cannot meet their burden to demonstrate.

Even if the ministerial exception *could* apply to claims like those here, there are several factual disputes as to sincerity, whether the SY Defendants are religious organizations, and whether the Performers are ministers. Each of these disputes is independently sufficient to deny dismissal. Generally, "an affirmative defense [must] be pled and proven" by the defendants, and when there are "issues of fact, the Court cannot definitively rule on [the defense]." *Culbreth v. Manuel*, No. 24-CV-00497 (PMH), 2025 WL 35059, at *5–6 (S.D.N.Y. Jan. 6, 2025) (Halpern, J.). That is especially applicable here, given the fact-bound nature of the ministerial exception: Courts must "take all relevant circumstances into account." *Our Lady*, 591 U.S. at 751, 758. "[R]eview of the case law in

---

[4] The SY Defendants' brief cites *Our Lady* for the proposition that the ministerial exception bars claims related to the "compensation" of ministers. SY Br. at 10-11. But *Our Lady* never mentions such claims, nor did it have reason to do so.

this area demonstrably shows that the question of application of the ministerial exception is fact specific" such that "resolution on a motion to dismiss [is] inappropriate." *Califano v. Roman Cath. Diocese of Rockville Ctr., New York*, 751 F. Supp. 3d 42, 48, 53 (E.D.N.Y 2024).

### a.    Fact disputes about the SY Defendants' sincerity preclude dismissal.

It is axiomatic that "beliefs must be sincerely held and religious in nature to be accorded First Amendment protection," *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984), instead of merely "self-serving," *Kravitz v. Purcell*, 87 F.4th 111, 127 (2d Cir. 2023). Courts "have a duty to determine whether what is professed to be religion is being asserted in good faith." *United States v. Manneh*, 645 F. Supp. 2d 98, 112, 114 (E.D.N.Y. 2008). The "inquiry [into sincerity] is largely a matter of individual credibility," rather than an examination of "applicable religious tenets." *Kravitz*, 87 F.4th at 127. The Second Circuit "has consistently held" that "where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, [even] summary judgment would appear to be inappropriate," *Patrick*, 745 F.2d at 157, 159, let alone dismissal. Here, Plaintiffs make detailed allegations that the SY Defendants are insincere.

Plaintiffs allege that the SY Defendants have made "numerous conflicting statements," which undercut sincerity. *Jackson v. Mann*, 196 F.3d 316, 322 (2d Cir. 1999). As to Falun Gong, the complaint alleges that "Hongzhi Li has repeatedly asserted—both publicly and to adherents—that Falun Gong is not a religion." SAC ¶ 3; *see also id.* ¶¶ 93–94, 103. And Shen Yun has "issued public statements that Shen Yun is nothing more than 'a fine art group that restores traditional Chinese culture'"; that Falun Gong is "not a specific faith or religion'"; and that "[w]e do not get involved in faiths." *Id.* ¶¶ 93–94; *see also infra* at 28. The Second Circuit has repeatedly noted that Falun Gong adherents "vehemently deny" that it is a religion. *Susu Wei v. Holder*, 314 F. App'x 404, 405 (2d Cir. 2009); *Gao v. Gonzales*, 424 F.3d 122, 125 (2d Cir. 2005); *TianJie Chen v. Holder*, 365 F. App'x 252, 253–54 (2d Cir. 2010). The SY Defendants ask this Court to ignore the inconsistent

statements alleged in the complaint in favor of "[e]xpert testimony" about "concepts of religion in China" provided in another district court case, which has since been reversed. *Zhang Jingrong v. Chinese Anti-Cult World All.*, 311 F. Supp. 3d 514, 559–60 (E.D.N.Y. 2018), *rev'd*, 16 F.4th 47 (2d Cir. 2021). But expert testimony in another case that Plaintiffs have had no opportunity to challenge is not a proper basis for granting a motion to dismiss.

Even putting aside Falun Gong itself, additional inconsistent statements create factual disputes about whether the SY Defendants are sincere in asserting that *Shen Yun* is religious. As the complaint alleges, "the Shen Yun Defendants or those affiliated with them have taken the position that Shen Yun is not affiliated with Falun Gong." SAC ¶ 94. That includes taking "the position in court that 'Shen Yun's performances have nothing to do with Falun Gong.'" *Id.* ¶¶ 94–103. Shen Yun's advertising also does not hold out its "performances as religious in nature." *Id.* ¶¶ 97, 99. This raises serious doubts as to the sincerity of the SY Defendants' assertion for litigation purposes that Shen Yun's commercial dance operation is religious.

Additionally, using the cloak of religion for "personal gain" is evidence of insincerity. *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 442 (2d Cir. 1981); *see also Patrick*, 745 F.2d at 157. Plaintiffs allege that Shen Yun's "core motive is commercial" and that the SY Defendants use forced labor to "generate extraordinary profits," which allows them to "live a life of privilege." SAC ¶¶ 87-88, 90. Here, the SY Defendants "materially gain[]" by "hiding secular interests behind a veil of religious doctrine." *Krishna Consciousness*, 650 F.2d at 441.

Drawing all reasonable inferences in the Plaintiffs' favor, clear issues of fact exist as to sincerity that bar dismissal on ministerial-exception grounds. *Culbreth*, 2025 WL 35059, at *5–6.

> **b.** **Fact disputes about Shen Yun's status as a religious organization preclude dismissal.**

The ministerial exception only applies to "religious organization[s]." *Hosanna-Tabor*, 565

U.S. at 188. Even if the Falun Gong movement were religious, there would still be serious factual questions about whether the entities that hired the Performers are religious organizations. As explained above, the SY Defendants have disclaimed Shen Yun's relationship to Falun Gong. *See supra* at 24. Further, the "messaging during the show is not religious and does not involve proselytizing or evangelizing," nor does the related advertising. *Id.* ¶¶ 97, 99. Even the documents from outside the complaint that the SY Defendants improperly rely on undercut their made-for-litigation claims. Shen Yun doesn't claim to be a "church"— the tax term for the kind of religious organization with ministers—on its tax form. *See* Decl. of Steven M. Schneebaum at 18.

Just because some Performers "practice Falun Dafa," and "it is a source of inspiration for [their] performances," SY Br.at 12, does not make the SY Defendants themselves religious organizations. Indeed, the Second Circuit recently rejected a similar attempt to stretch religious freedom protections beyond their limits by invoking Falun Gong. The court held that "no reasonable jury" could find that spreading the message about Falun Gong and the Chinese Communist Party rendered tables used for distributing literature into "place[s] of religious worship." *Jingrong*, 16 F.4th at 60. Instead, even if "political and social action" was "motivated by teachings of the Falun Gong leader," that did not transform the activity into "proselytizing, a protected religious practice." *Id.*

### c.    Fact disputes about whether performers were designated "ministers" precludes dismissal.

Similarly, Shen Yun performers don't occupy the kinds of "key roles" to which the ministerial exception applies: certain faith leaders, teachers, guides, and similar positions. *Our Lady*, 591 U.S. at 746. There is no "rigid formula" for determining if an employee qualifies as a "minister." *Id.* A variety of "circumstances" are "relevant": (1) whether the individual has a formal religious "title" that connotes "a role distinct from that of most of its members"; (2) whether the role "reflect[s] a significant degree of religious training followed by a formal process of commissioning"; (3) whether

an employee "held herself out as a minister"; and (4) whether the "job duties reflected a role in conveying the Church's message and carrying out its mission," such as by "leading others toward [religious] maturity" or "teaching faithfully the Word of God." *Id.* at 750–51.

These fact-intensive factors cannot be resolved on a motion to dismiss. Plaintiffs' pleadings disclaim all of these factors. First, the Plaintiffs had no special titles that would differentiate them—the word "disciple" is used more generally for followers of Falun Gong. SAC ¶ 79 n.11. Second, significant religious training was not necessary; the SY Defendants "frequently" employed musicians who were not practitioners and were not trained in Falun Gong. *Id.* ¶¶ 64–66. Third, there is nothing in the complaint showing that the Plaintiffs understood "that [they] would be perceived as ... religious leader[s]." *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 208 (2d Cir. 2017). Fourth, Performers were "tasked solely with communicating the evils of the CCP and portraying classical Chinese dance and music." SAC ¶ 101. The mere fact that these "political and social" messages may have been *inspired* by Falun Gong doesn't make the performances religious. *Jingrong*, 16 F.4th at 60. Nor are Performers *messengers* of the faith; even if they internally thought something about the performance was saving others, the "messaging during the show is not religious and does not involve proselytizing or evangelizing." SAC ¶¶ 97, 99. This is consistent with the SY Defendants' own representations that Shen Yun is not religious. *Supra* at 24.

Unlike the cases on which the SY Defendants rely—most of which are out-of-circuit—Performers aren't "teachers" or "directors." They don't exercise "discretionary religious judgment" by "selecting the music to be played at . . . masses." *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006; *see also E.E.O.C. v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 802 (4th Cir. 2000) (emphasizing how "a music *minister or teacher* can thus influence the spiritual and pastoral mission of the church" (emphasis added)); *Martin v. SS Columba-Brigid Cath. Church*, No. 21-cv-491, 2022 WL 3348382, at *7 (W.D.N.Y. August 12, 2022) (same focus on "music teachers

and directors"). Instead, the Performers "are at the bottom of the hierarchy, subject to discipline, control, and forced to labor." SAC ¶ 74; *see also id.* ¶¶ 63–66, 75, 97–103, 304–507. They dance and play non-religious music for a general audience that is paying to see what Shen Yun advertises is a non-religious dance performance. Drawing all reasonable inferences in Plaintiffs' favor, this is insufficient to qualify as a minister.

### 3.    The SY Defendants have waived RFRA and Free Exercise arguments.

In passing, the SY Defendants assert that applying the TVPRA and the NYLL to them would violate the RFRA and/or the Free Exercise Clause. SY Br. at 9. 23. By raising these arguments only in "conclusory" assertions, the SY Defendants have waived them. *Chevron Corp. v. Donziger*, 990 F.3d 191, 204 n.8 (2d Cir. 2021); *see also United States v. Fell*, 531 F.3d 197, 233 n.25 (2d Cir. 2008). Even if not waived, neither defense applies.

The Second Circuit is skeptical that a RFRA defense even applies in suits like this one between private parties, given the plain text of the statute. *See Rweyemamu v. Cote*, 520 F.3d 198, 203 & n.2 (2d Cir. 2008), *abrogated on other grounds Jusino v. Fed'n of Catholic Teachers*, 54 F.4th 95, 104 (2d Cir. 2022). This RFRA argument is also premature—it is an affirmative defense, and the SY Defendants have not met their burden to show sincerity, religiosity, or that prohibiting them from threatening minors to work for paltry wages substantially burdens their religious exercise. 42 U.S.C. § 2000bb-1(a); *Newdow v. Peterson*, 753 F.3d 105, 108 (2d Cir. 2014).[5] The SY Defendants' Free Exercise arguments also require a showing of sincerity, which is disputed. *See supra* at 23-25. Further, both the TVPRA and the NYLL are neutral and generally applicable laws that would easily

---

[5] Even if the SY Defendants had met their burden, the TVPRA also would satisfy RFRA's test, since prohibiting human trafficking is the least restrictive means of furthering the compelling interest of prohibiting human trafficking. 42 U.S.C. § 2000bb-1(b).

survive rational basis review. *See, e.g., Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 212 (2d Cir. 2012). Preventing forced labor and wage theft is a rational basis.

### 4. The Performers are not subject to NYLL exemptions on the basis of religion.

The SY Defendants also assert religious exemptions from the NYLL. They are wrong.

First, the SY Defendants contend that Shen Yun performers are exempt "members[s] of a religious order." SY Br. at 22. But the Plaintiffs allegations raise factual questions about sincerity and religiosity, *supra* at 23-25, which prevent adjudication of the motion to dismiss the NYLL claims. *See, e.g., Matter of Ocasio*, 237 A.D.3d 1412, 1414 (N.Y. App. Div. 2025). Moreover, the administrative code that the SY Defendants cite defines "religious order" as "a group of persons who are joined together under the authority of a religious leader and are dedicated to the performance of religious works." N.Y. Comp. Codes R. & Regs., tit. 12, §142-3.12(c)(8). But here, rather than being "dedicated to the performance of religious works," *id.*, the Plaintiffs have alleged that Shen Yun is dedicated to making profits for their leadership. SAC ¶¶ 87–90.

Further, far from being "a group of co-religionists who engage in daily religious study and practice," SY Br. at 22, Shen Yun performers include professional musicians who are "not Falun Gong practitioners" and do "not follow Hongzhi Li's teachings." SAC ¶¶ 64–66. That makes Shen Yun performers very different from a group of "nuns" who "identif[ied] themselves as clergy" *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20-cv-3809 (JMF), 2021 WL 2206486, at *1 (S.D.N.Y. 2021), or a "pastor" in a church, *Frazier v. FCBC Cmty. Dev. Corp.*, No. 22-cv-5270 (LJL), 2023 WL 2970873, at *3 (S.D.N.Y. Apr. 17, 2023). Finally, raising even further questions about sincerity and religiosity, the SY Defendants' newspaper has also claimed that Hongzhi Li is the "'artistic director' of Shen Yun Performing Arts," SAC ¶ 68—not its "religious leader," N.Y. Comp. Codes R. & Regs., Tit. 12, § 142-3.12(c)(8). The SY Defendants cannot have it both ways. Drawing all reasonable inferences in the Plaintiffs' favor, the exemptions do not apply.

Second, the Performers are not subject to other NYLL exemptions for organizations that are truly "organized and operated *exclusively* for religious, charitable or educational purposes." NYLL § 651(5)(e) (emphasis added). Rather, as the complaint alleges, Shen Yun is a commercial enterprise that uses the Performers' labor to make millions of dollars for the Lis. SAC ¶¶ 87-88; NYLL § 651(5)(e) (to be an "exclusively" religious, charitable, or educational foundation, there must be "no part of the net earnings of which inures to the benefit of any private shareholder or individual.").

### E.    Plaintiffs Plead Plausible Claims Against the International Bank of Chicago.

The TVPRA authorizes victims to "bring a civil action against . . . whoever [1] knowingly benefits[] or attempts or conspires to benefit . . . from [2] participation in a venture which [3] that person knew or should have known has engaged in an act" of forced labor. 18 U.S.C. § 1595(a); *id.* § 1589(b). The claims against the IBC for benefiting and conspiring to benefit are plausible.

#### 1.    The IBC participated in the Shen Yun commercial venture.

The complaint sets out detailed allegations of close, unusual, years-long collaboration between the IBC and the SY Defendants. In 2012, the IBC opened its only branch outside of Illinois fifteen minutes away from Dragon Springs—a bespoke branch created to service the SY Defendants. SAC ¶¶ 253–54 (quoting the IBC's CEO). The SY Defendants require that minor Performers set up accounts at the IBC, *id.* ¶ 224, and the IBC sends employees into the secretive and guarded compound to do so, *id.* ¶¶ 256–58. IBC employees observe and work with the Performers and even assist with production of the shows. *Id.* To assert financial control over the Performers, the IBC and the SY Defendants placed Performers' accounts under the direct control of the SY Defendants—the adult custodian across hundreds of accounts was the assistant to Hongzhi Li and Rui Li. *Id.* ¶¶ 263–65. The IBC also structured the Performers' bank accounts with very low limits, preventing them from pulling funds needed to leave. *Id.* ¶ 264.

Under the Bank Secrecy Act, banks are required to report "any suspicious transaction relevant to a *possible* violation of law or regulation," and federal law identifies red flags for potential forced labor. 31 C.F.R. § 1020.320 (emphasis added); 31 U.S.C. § 5318(g); SAC ¶¶ 270–72.[6] But the IBC never filed any reports, instead continuing to open and profit from these accounts despite witnessing a litany of red flags. SAC ¶ 270(a)-(j) (common custodians, abnormal or no payroll expenditures, lack of legitimate purpose of repeat payments, limiting payments below reporting requirements, foreign account holders with employer as a joint holder, employer was aware of transactions, employer held critical documents, and performers showed physical signs of trafficking). The IBC also knew that New York has special legal requirements for management of "child performer accounts," requiring that a percentage of a child's gross earnings be maintained in a trust account—but the IBC did not establish trust accounts. *Id.* ¶¶ 271–72.

Taken together, the allegations show the IBC's participation in the performing arts venture, and are sufficient to state a TVPRA claim, as Judge Rakoff held in a similar case. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 406 (S.D.N.Y. 2023) (sustaining TVPRA claims where banks "fail[ed] to file suspicious activity reports," structured cash payments to avoid alerting authorities, and provided payments that "raised numerous 'red flags'").

The IBC repeatedly argues that Plaintiffs have not alleged that the IBC participated in "a *forced labor* venture," and thus have not stated a claim. *See* Defendant IBC's Mem. Of Law in Support of its Mot. to Dismiss at 5-6 ("IBC Br.") (emphasis added). But this is not required. The TVPRA only requires that the IBC participate in *a* venture that it should have known engaged in "an

---

[6] *See* U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2014-A008, Appendix B: Human Trafficking Red Flags, (Sept. 11, 2014), https://www.fincen.gov/sites/default/files/advisory/FIN-2014-A008.pdf; U.S. Department of the Treasury, Financial Crimes Enforcement Network, FinCEN Advisory FIN-2020-A008, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity" (Oct. 15, 2020), https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf.

act" of forced labor. 18 U.S.C. § 1595(a). The venture could be one with a commercial purpose, like a farm or a massage parlor, in which some but not all employees are subject to forced labor. The IBC cites *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523 (S.D.N.Y. 2018), but *Noble* interpreted a different provision of the TVPRA: the criminal provision governing sex trafficking. Nearly every court that has since considered the issue has rejected applying *Noble*'s logic to the more relaxed civil remedy in § 1595. *See, e.g.*, *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554, n.8 (7th Cir. 2023).

In any event, the complaint alleges the link between the IBC and forced labor: The IBC secured the SY Defendants' financial control over the Performers, and it helped the SY Defendants conceal the forced labor by not filing required suspicious activity reports. *See* SAC ¶¶ 270, 275; *Doe*, 671 F. Supp. 3d at 406 (failure to file suspicious activity reports despite red flags helped conceal trafficking). The allegations show far more than "an ordinary buyer-seller transaction" in an "arms-length" relationship, *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024), or a single employment relationship between the trafficker and his employer. *Chen v. Cai*, No. 19-cv-05387 (PMH), 2022 WL 917575, at *3 (S.D.N.Y. Mar. 28, 2022). The IBC demands that Plaintiffs, without discovery, present more facts—like the specific "payroll, operating or other business accounts" the SY Defendants held, IBC Br. at 6—but this is not required at this stage. *Adia*, 933 F.3d at 92.

### 2. The IBC knowingly benefitted from its participation in the Shen Yun commercial performing arts venture.

The IBC received a pipeline of accounts from hundreds of minor Performers as well as banking business with the well-financed SY Defendants and associated entities like *The Epoch Times* and New Tang Dynasty TV. *Id.* ¶¶ 246-47, 266(a)-(c). This meets the broad statutory requirement that the IBC benefit either "financially or by receiving anything of value." 18 U.S.C. § 1595(a); *Bensky v. Indyke*, 743 F. Supp. 3d 586, 591 (S.D.N.Y. 2024) (sustaining TVPRA

beneficiary claims against Jeffrey Epstein's "moneymen" because "they were, of course, being paid every step of the way" for enabling him financially).

The IBC argues there must be a "causal relationship between [the IBC's] alleged 'facilitation' *of forced labor* and the benefits that [the IBC] allegedly received." IBC Br. at 8 (emphasis added). But that argument has been repeatedly rejected by courts. *See G.G.*, 76 F.4th at 548 ("[W]e reject defendant's arguments . . . that to knowingly benefit requires that the sex trafficker provide the participant with a benefit because of the participant's facilitation of a sex-trafficking venture[.]"); *Doe*, 671 F. Supp. 3d at 408 ("[T]he Court is not convinced that the benefit element should be read in this way[.]"); *Cho v. Chu*, No. 21-cv-2297 (PGG)(SDA), 2022 WL 4463823, at *3 (S.D.N.Y. Sept. 26, 2022) ("[A]ctual participati[on] in the forced labor is not required for civil liability under [the TVPRA][.]"). In any event, the allegations establish a causal relationship: But for the IBC opening hundreds of accounts for Performers without reporting the suspicious activity it witnessed, the IBC would not have obtained or kept those new accounts or the banking business from the SY Defendants or their affiliates. SAC ¶¶ 266-67. This is far different than a benefit that bears no relationship at all to the venture, *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 679 (S.D.N.Y. 2024), or a benefit that would have been received regardless of participation in the venture, *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169-70 (S.D.N.Y. 2019).

### 3. The IBC knew or should have known that the Shen Yun commercial performing arts venture was engaged in an act of forced labor.

The IBC knew or was on notice of the forced labor violations. The IBC maintains the Performers' accounts, has a federal regulatory obligation to monitor transactions for suspicious activity, and does banking business with the SY Defendants. The IBC thus knows how little the Performers are paid, the regularity of those payments, whether taxes are withheld, the purported purpose of those payments, and the details of the SY Defendants' substantial business relative to

those small payments. SAC ¶¶ 268–69. These factors should all have raised red flags for the IBC. And the IBC certainly was on notice of forced labor claims following *The New York Times* reporting on Shen Yun's practices in August 2024. *Id.* ¶ 273. The IBC's checkered recent history with banking regulators about suspicious activity reporting, as well as the personal and professional entanglements the IBC's founders and executives have with the SY Defendants, make plausible the allegations that the IBC looked the other way to suit its self-interest. *Id.* ¶¶ 180, 275, 280-81, 283.

The IBC contends Plaintiffs failed to plead required information about what the IBC knew, how exactly it knew it, and what was in the mind of its employees. IBC Br. at 8-10. But Rule 9(b) says that intent, knowledge, and other conditions of a person's mind may be alleged generally. "Allegations plausibly suggesting that the [defendant] 'should have known,' or had constructive knowledge of, the alleged trafficking are enough." *Kitler v. Church of Jesus Christ of Latter-Day Saints*, No. 24-cv-01071, 2025 WL 2209870, at *11 (N.D.N.Y. Aug. 4, 2025); *see also Doe*, 671 F. Supp. 3d at 407 (knowledge of Epstein's reputation and ignorance of "numerous red flags associated with Epstein's accounts" were "sufficient").

#### 4. The IBC conspired with the SY Defendants to knowingly benefit from its participation in the venture.

The facts described above about the IBC's conduct—its role as the near-exclusive provider of banking services to the Performers, SAC ¶ 224, its stationing of IBC representatives inside Dragon Springs, *id.* ¶¶ 256-57, its refusal to report potentially suspicious activity, *id.* ¶¶ 270-71, and its personal and professional relationships with the SY Defendants (SAC ¶¶ 278, 280-84)—are "enough factual matter (taken as true) to suggest that an agreement was made" between the IBC and the SY Defendants. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, No. 24-cv-598, 2025 WL 2232879, -- F.4th --, at *3 (2d Cir. Aug. 6, 2025) (vacating dismissal of antitrust conspiracy claim because district court misapplied "the low pleading

threshold for surviving a motion to dismiss"). The IBC acknowledges that it "agreed to provide banking services to" Performers, but it reiterates that it must have agreed "to actually engage in a forced labor venture" with the SY Defendants. IBC Br. at 11. On the law, that argument fails for the reasons stated above. *Supra* at 31. On the facts, the allegations show that the IBC agreed to provide banking services integral to maintaining financial control over the Performers in a manner that kept the forced labor undetected. *Supra* at 31-32.

### F.    Plaintiffs adequately allege TVPRA claims against Zhang.

Defendant Zhang seeks dismissal of claims that he violated the NYLL or the TVPRA. SY Br. at 25. But Plaintiffs did not assert NYLL claims against Zhang. And Plaintiffs pleaded more than enough facts to allege Zhang's beneficiary and conspiracy liability under the TVPRA.

Drawing all reasonable inferences in Plaintiffs' favor, the complaint alleges that Zhang effectively acted as an enforcer by using his large media platform to attack and intimidate critics of Shen Yun and to justify Shen Yun's forced labor practices, all on the SY Defendants' behalf. ¶¶ 44, 370-74. It further alleges that Zhang was rewarded for doing so via payments to the Tianliang Alliance, Inc., a nonprofit that Zhang founded and controls, is located right next to Dragon Springs, and has no employees, but had more than $1 million in revenues in fiscal years 2021 and 2022. ¶ 44. As such, the complaint plausibly alleges that Zhang had "some level of active engagement" in the Shen Yun venture, *Deutsche Bank*, 671 F. Supp. 3d at 405, satisfying the participation element. And substantial cash payments satisfy the benefiting element. *E.g., Bensky*, 743 F. Supp. 3d at 591 ("being paid" for enabling a violative venture is a benefit).

Further, as a deeply embedded insider of both Shen Yun and the Fei Tian Schools who acted as the SY Defendants' enforcer, it is plausible that Zhang entered into an agreement with the SY Defendants that he would help them obtain forced labor, and that he would benefit from it. Thus, the complaint also adequately alleges conspiracy claims against him.

34

### G.    Plaintiffs Have Standing to Seek Prospective Relief.

One of the ways the SY Defendants coerce Performers is by threatening them with various forms of retaliation and then making good on those threats. *E.g.*, SAC ¶¶ 209, 234, 235, 238, 381, 463, 502. The complaint further alleges that the SY Defendants are currently engaged in such retaliation against at least Plaintiff Chang and that she is being made into an example to instill fear in current Performers. *Id.* ¶¶ 370-81. Thus, Plaintiff Chang has standing to seek an injunction prohibiting the SY Defendants from engaging in retaliation as a means of obtaining Performers' labor and services. *E.g.*, *Collins v. Suffolk Cnty. Police Dep't*, 349 F. Supp. 2d 559, 563 (E.D.N.Y. 2004) (enjoining future acts of retaliation given evidence of ongoing retaliation). Similarly, Plaintiff Zhu has been threatened against speaking out about Shen Yun. *Id.* ¶ 505-507. Because this harm is "at [this] moment capable of being redressed through injunctive relief," Defendants' challenge to Plaintiffs' standing should be rejected. *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991).

## V.    CONCLUSION

Defendants' motions should be denied.

Respectfully submitted,

/s/ Mariyam Hussain
Mariyam Hussain (NY Bar No. 5492475)
**BERGER MONTAGUE PC**
1820 West Division Street
Chicago, IL 60622
Tel.: (773) 666-4316
mhussain@bm.net

Michael Dell'Angelo*
Michaela Wallin*
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-3000
mdellangelo@bm.net
mwallin@bm.net

Times Wang*
Adam Farra*
**FARRA & WANG PLLC**
1300 I Street, N.W. Suite 400E
Washington, D.C. 20005
Tel.: 202-505-6227
twang@farrawang.com
afarra@farrawang.com

Thomas Scott-Railton (NY Bar No. 5687330)
**GUPTA WESSLER LLP**
2001 K Street NW, Suite 850
Washington, DC 20006
Tel.: 202-888-1741
thomas@guptawessler.com

*Attorneys for Plaintiffs and the Proposed Class*

*  Admitted pro hac vice*